ORIGINAL

Gordon & Rees LLP
101 West Broadway
Suite 1600
San Diego, CA 92101

1  BRIAN M. LEDGER (SBN: 156942)
   KRISTIN REYNA (SBN: 211075)
2  GORDON & REES LLP
   101 West Broadway, Suite 2000
3  San Diego, CA. 92101
   Telephone: (619) 696-6700
4  Fax: (619) 696-7124

5  JAN GOLDSMITH (SBN: 70988)
   FREDERICK M. ORTLIEB (SBN: 131751)
6  DAVID J. KARLIN (SBN: 156178)
   OFFICE OF THE CITY ATTORNEY
7  1200 Third Avenue, Suite 1100
   San Diego, CA. 92101
8  Telephone: (619) 533-5800
   Fax: (619) 533-5856

9
   Attorneys for CITY OF SAN DIEGO
10

**FILED**

OCT 1 4 2009

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

11            UNITED STATES DISTRICT COURT

12        FOR THE SOUTHERN DISTRICT OF CALIFORNIA

13  CITY OF SAN DIEGO                          )  Case No. 09 CV 2275 W CAB
                                               )
14                                             )  **COMPLAINT FOR ENVIRONMENTAL**
                                               )  **COST RECOVERY AND**
15                     Plaintiff,              )  **CONTRIBUTION, INJUNCTIVE**
        vs.                                    )  **RELIEF, DECLARATORY RELIEF,**
16                                             )  **AND DAMAGES**
                                               )
17  NATIONAL STEEL & SHIPBUILDING             )
    COMPANY; NATIONAL STEEL &                 )  **Demand For Jury Trial**
18  SHIPBUILDING CORPORATION;                 )
    NATIONAL IRON WORKS; MARTINOLICH          )
19  SHIP BUILDING COMPANY; SOUTHWEST          )  FAXED
    MARINE, INC.; BAE SYSTEMS SAN DIEGO       )
20  SHIP REPAIR, INC.; SAN DIEGO MARINE       )
    CONSTRUCTION COMPANY; STAR AND            )
21  CRESCENT BOAT COMPANY, a division of      )
    SAN DIEGO MARINE CONSTRUCTION             )
22  COMPANY; STAR AND CRESCENT BOAT           )
    COMPANY; STAR AND CRESCENT                )
23  INVESTMENT COMPANY; STAR AND              )
    CRESCENT FERRY COMPANY; SAN               )
24  DIEGO MARINE CONSTRUCTION                 )
    CORPORATION; MCCSD; CAMPBELL              )
25  INDUSTRIES; SAN DIEGO GAS &               )
    ELECTRIC; UNITED STATES NAVY; SAN         )
26  DIEGO UNIFIED PORT DISTRICT; and          )
    DOES 1-100, inclusive,                    )
27                                             )
                                               )
28                     Defendants.             )

- 1 -
COMPLAINT

Plaintiff City of San Diego ("Plaintiff") complains and alleges as follows:

**PARTIES**

1.     Plaintiff is, and at all times material to this complaint has been, a municipal corporation in the County of San Diego, State of California.

2.     Plaintiff is informed and believes, and on that basis alleges, that defendant NATIONAL STEEL & SHIPBUILDING COMPANY ("NAASCO") is a corporation organized and existing under the laws of the State of Nevada and is authorized to do business and is doing business in the State of California.  Upon information and belief, NAASCO is a successor in interest to defendants National Steel and Shipbuilding Corporation and National Iron Works.

3.     Plaintiff is informed and believes that defendant NATIONAL STEEL & SHIPBUILDING CORPORATION is a former corporation that was organized and existed under the laws of the State of California and was authorized to do business and did business in the State of California.

4.     Plaintiff is informed and believes that defendant NATIONAL IRON WORKS is a former corporation that was organized and existed under the laws of the State of California and was authorized to do business and did business in the State of California.

5.     Plaintiff is informed and believes that defendant MARTINOLICH SHIP BUILDING COMPANY is  former corporation that was organized and existed under the laws of the State of California and was authorized to do business and did business in the State of California.

6.     Plaintiff is informed and believes, and on that basis alleges, that defendant SOUTHWEST MARINE, INC. is a corporation organized and existing under the laws of the State of California and was authorized to do business and did business in the State of California.

7.     Plaintiff is informed and believes, and on that basis alleges, that defendant BAE SYSTEMS SAN DIEGO SHIP REPAIR, INC. is the successor to SOUTHWEST MARINE, INC. ("BAE SYSTEMS")[1], and is a corporation organized and existing under the laws of the

---

[1]     The term "BAE SYSTEMS" will be used to refer to BAE SYSTEMS SAN DIEGO SHIP REPAIR, INC. and/or SOUTHWEST MARINE, INC.

Gordon & Rees LLP
101 West Broadway
Suite 1600
San Diego, CA 92101

1    State of California, doing business in California.

2         8.      Plaintiff is informed and believes, and on that basis alleges, that defendant SAN

3    DIEGO MARINE CONSTRUCTION COMPANY is a former corporation that was organized

4    and existed under the laws of the State of California and was authorized to do business and did

5    business in the State of California.

6         9.      Plaintiff is informed and believes, and on that basis alleges, that defendant STAR

7    AND CRESCENT BOAT COMPANY, A DIVISION OF SAN DIEGO MARINE

8    CONSTRUCTION COMPANY[2] is a former corporation that was organized and existed under

9    the laws of the State of California and was authorized to do business and did business in the State

10   of California.

11        10.     Plaintiff is informed and believes, and on that basis alleges, that defendant STAR

12   AND CRESCENT BOAT COMPANY is a former corporation that was organized and existed

13   under the laws of the State of California and was authorized to do business and did business in

14   the State of California.

15        11.     Plaintiff is informed and believes, and on that basis alleges, that defendant STAR

16   AND CRESCENT INVESTMENT COMPANY is a former corporation that was organized and

17   existed under the laws of the State of California and was authorized to do business and did

18   business in the State of California.

19        12.     Plaintiff is informed and believes, and on that basis alleges, that defendant STAR

20   AND CRESCENT FERRY COMPANY is a former corporation that was organized and existed

21   under the laws of the State of California and was authorized to do business and did business in

22   the State of California.

23        13.     Plaintiff is informed and believes, and on that basis alleges, that defendant

24   CAMPBELL INDUSTRIES is a corporation organized and existing under the laws of the State

25   of California, authorized to do business in the State of California and did business in the State of

Gordon & Rees LLP
101 West Broadway
Suite 1600
San Diego, CA 92101

---

26   [2]      The term "SDMCC DEFENDANTS" will be used to refer to SAN DIEGO MARINE CONSTRUCTION
27   COMPANY; STAR AND CRESCENT BOAT COMPANY, a division of SAN DIEGO MARINE
     CONSTRUCTION COMPANY; STAR AND CRESCENT BOAT COMPANY; STAR AND CRESCENT
28   INVESTMENT COMPANY; and STAR AND CRESCENT FERRY COMPANY.

1  California.

2      14.    Plaintiff is informed and believes, and on that basis alleges, that defendant

3  MCCSD is a former corporation that organized and existed under the laws of the State of

4  California and was authorized to do business and did business in the State of California.  On

5  information and belief, MCCSD was a wholly owned subsidiary of CAMPBELL INDUSTRIES

6  and changed its name to defendant SAN DIEGO MARINE CONSTRUCTION

7  CORPORATION.

8      15.    Plaintiff is informed and believes, and on that basis alleges, that defendant SAN

9  DIEGO MARINE CONSTRUCTION CORPORATION is a former corporation that was

10  organized and existed under the laws of the State of California and formerly did business in the

11  State of California.[3]

12      16.    Plaintiff is informed and believes, and on that basis alleges, that defendant SAN

13  DIEGO GAS & ELECTRIC is a corporation organized and existing under the laws of the State

14  of California and is authorized to do business and does business in the State of California.

15      17.    Plaintiff is informed and believes, and on that basis alleges, that defendant

16  UNITED STATES NAVY ("NAVY") is a branch of the United States military organized and

17  existing under federal law, and authorized to do business and does business in the State of

18  California.  Plaintiff has submitted or is in the process of submitting a claim against NAVY

19  under the Federal Tort Claims Act for the tort claims Plaintiff has against NAVY related to the

20  Shipyard Sediment Site.  Should NAVY deny Plaintiff's administrative claim as to the tort

21  claims, Plaintiff will seek leave of court to amend this complaint to name NAVY as a defendant

22  to each of the tort claims herein.

23      18.    Plaintiff is informed and believes, and on that basis alleges, that defendant SAN

24  DIEGO UNIFIED PORT DISTRICT ("PORT DISTRICT") is a special governmental entity,

25  created in 1962 by the San Diego Unified Port District Act and California Harbors and

26  Navigation Code in order to manage San Diego Harbor, and administer certain public lands

27  

28  

Gordon & Rees LLP
101 West Broadway
Suite 1600
San Diego, CA 92101

[3]    The term "CAMPBELL DEFENDANTS" will be used to refer to CAMPBELL INDUSTRIES, MCCSD, and/or SAN DIEGO MARINE CONSTRUCTION CORPORATION.

- 4 -

COMPLAINT

1   along the San Diego Bay and is authorized to do business and does business in the State of

2   California. Government Code section 905(i) authorizes Plaintiff, a local public entity, to bring

3   these claims against Defendant PORT DISTRICT, another local public entity, without any prior

4   administrative claims procedure.

5        19.    Plaintiff is ignorant of the true names or capacities of the defendants sued herein

6   under the fictitious names DOES 1 through 100, inclusive, and therefore sues these defendants

7   by such fictitious names. Plaintiff will amend this complaint to allege their true names and

8   capacities when ascertained. Plaintiff is informed and believes and thereon alleges that each of

9   said fictitiously named defendants are, through their negligence, intentional torts, and/or conduct

10  giving rise to said liability, responsible or liable in some manner for the occurrences herein

11  alleged, and that the damages alleged herein were the direct and legal result of said actions or

12  omissions.

13                          **NATURE OF ACTION**

14       20.    Plaintiff and Defendants NASSCO, BAE SYSTEMS, CAMPBELL

15  INDUSTRIES, SDG&E, and NAVY have all been named as "Dischargers" or "Persons

16  Responsible" for alleged environmental contamination at the property known as the "Shipyard

17  Sediment Site" by the California Regional Water Quality Control Board, San Diego Region ("the

18  Regional Board"), in Tentative Clean Up & Abatement Order No. R9-2005-0126 (the "Tentative

19  Order"). A copy of the Tentative Order is attached to this Complaint as Exhibit "A" and is

20  incorporated by reference herein.

21       21.    The Shipyard Sediment Site is a portion of San Diego Bay along the eastern shore

22  of the Bay in an area extending from approximately the Sampson Street Extension to the north

23  and Chollas Creek to the south, and from the NASSCO shipyard facility and BAE SYSTEMS

24  shipyard facility shoreline out to the San Diego main shipping channel to the west.

25       22.    The Regional Board contends that Plaintiff and defendants are jointly and

26  severally responsible for alleged property damage, including, but not limited to alleged damage

27  to aquatic life, at and beyond leaseholds at the Shipyard Sediment Site once and/or currently

28  occupied by Defendants and other entities. The Regional Board contends that such property

Gordon & Rees LLP
101 West Broadway
Suite 1600
San Diego, CA 92101

- 5 -
COMPLAINT

1  damage and injury was proximately caused by historical contamination of the Bay by the alleged

2  Dischargers and various other entities.  Upon information and belief, based on the Tentative

3  Order and historical records, the alleged property damage and injury at issue began in the early

4  twentieth century and has continued to the present.

5       23.     The Regional Board contends that environmental investigations conducted at a

6  Shipyard Sediment Site revealed the presence of elevated levels of pollutants in the San Diego

7  Bay bottom marine sediment.  The Regional Board has concluded that the contaminated marine

8  sediment has caused conditions of contamination in the San Diego Bay that adversely affects

9  aquatic life, aquatic-dependent wildlife, human health, and San Diego Bay beneficial uses.  The

10  following hazardous substances have been detected in the sediment at the Shipyards Sediment

11  Site: Arsenic, Cadmium, Copper, Lead, Mercury, Zinc, Tributyltin ("TBT"), High Molecular

12  Weight Polynuclear Aromatic Hydrocarbons ("HPAHs"), and Polychlorinated Biphenyls

13  ("PCBs")[4].

### JURISDICTION

15       24.     This Court has jurisdiction over the subject matter of this action pursuant to the

16  Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), 42

17  U.S.C. §§ 9613(b) and (f), and 42 U.S.C. § 9607; pursuant to the Oil Pollution Act, 33 U.S.C.

18  § 2709; pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201; and pursuant to 28 U.S.C.

19  § 1331.

20       25.     This Court also has subject matter jurisdiction over Plaintiff's claims brought

21  under state law by virtue of the supplemental jurisdiction provided in 28 U.S.C. § 1367, and

22  under the doctrine of pendent jurisdiction set forth in *United Mine Workers v. Gibbs*, 383 U.S.

23  715 (1966).  Plaintiff's claims under state law arise from the same nucleus of operative facts as

24  the claims under federal law.

### VENUE

26       26.     Pursuant to 42 U.S.C. § 9613(b), venue is proper in any district in which the

---

[4]     The hazardous substances identified in this sentence will be referred to as the constituents of concern ("COCs").

Gordon & Rees LLP
101 West Broadway
Suite 1600
San Diego, CA 92101

1   release or damages occurred.  The releases of hazardous substances and damages occurred in San

2   Diego, California, which is in the Southern District of California.

### GENERAL ALLEGATIONS/ BACKGROUND

**A.     PLAINTIFF**

5        27.    Plaintiff City of San Diego owns and operates a municipal storm water system

6   (MS4) through which it discharges urban runoff to San Diego Bay subject to the terms and

7   conditions of its National Pollution Discharge Elimination System ("NPDES") permit under

8   section 402 of the Clean Water Act.

9        28.    From approximately 1914-1962, Plaintiff served as the designated public trustee,

10   via an Act of the Legislature of the State of California approved May 1, 1911, for the tidelands

11   property on which Defendants NASSCO and BAE SYSTEMS presently operate (the NAASCO

12   and BAE SYSTEMS leaseholds, respectively).  From 1914-1962, Plaintiff did not conduct any

13   operations on the property at any time; Plaintiff did not discharge any hazardous substances from

14   these properties; nor did Plaintiff cause or permit any hazardous substances to be discharged

15   from these properties.  The Regional Board did not find Plaintiff's past role of public trustee of

16   this property to be a basis for naming Plaintiff a "Discharger" or "Responsible Party" under its

17   Tentative Order.

**B.     NASSCO**

19        29.    Upon information and belief, from approximately 1945 to present, NASSCO

20   and/or its predecessors in interest have owned and operated a full service ship construction,

21   modification, repair, and maintenance facility located at 2798 Harbor Drive (28th Street and

22   Harbor Drive) in San Diego, California.  Upon information and belief, NASSCO leases the land

23   on which its facility operates from the PORT DISTRICT, the designated public trustee of the

24   property since assuming that function from Plaintiff in 1962 ("the NAASCO Leasehold").

25        30.    NASSCO's primary business has historically been ship repair, construction, and

26   maintenance for the NAVY and commercial customers.  Current site features include offices,

27   shops, warehouses, concrete platens for steel fabrication, a floating dry dock, a graving dock,

28   two shipbuilding ways, and five piers, which provide 12 berthing spaces.

Gordon & Rees LLP
101 West Broadway
Suite 1600
San Diego, CA 92101

- 7 -

COMPLAINT

31.     Upon information and belief, the primary industrial processes which NASSCO has historically conducted include: surface preparation and paint removal; paint application; tank cleaning; mechanical repair/maintenance/installation; structural repair/alteration/assembly; integrity/hydrostatic testing; paint equipment cleaning; engine repair/maintenance/installation; steel fabrication and machining; electrical repair/maintenance/installation; hydraulic repair/maintenance/installation; tank emptying; fueling; shipfitting; carpentry; and refurbishing/modernization/cleaning.

32.     Upon information and belief, the primary materials used by NASSCO in its operations have historically included 1) abrasive grit (sometimes consisting of slag from coal-fired boilers and often containing iron, aluminum, silicon, calcium oxides, copper, zinc and titanium; also sand, cast iron or steel shot is used; enormous amounts are needed to remove paint and it is needed in both wet and dry blasting); 2) paint (containing copper, zinc, chromium, lead, and hydrocarbons; anticorrosive paint often containing lead and zinc; antifouling paint often containing copper and tributyltin); 3) miscellaneous, including oils, grease, fuels, weld, detergents, cleaners, rust inhibitors, paint thinners, hydrocarbon and chlorinated solvents, degreasers, acids, caustics, resins, adhesives/cement/sealants and chlorine.

33.     Upon information and belief, the wastes commonly generated by NASSCO historically in its operations have been abrasive blast waste (with the largest concern being spent paint containing, among other substances, copper, tributyltin, lead, chromium and zinc); fresh paint; bilge waste/oily wastewater; blast wastewater; oils; waste paints; construction repair wastes and trash; and miscellaneous wastes consisting of lubricants, grease, fuels, sewage, boiler blowdown, condensate, discard, acid wastes, caustic wastes, and aqueous wastes.

34.     In 1972, the Regional Board initiated an investigation to determine the amount of and kinds of pollutants that entered San Diego Bay from shipbuilding and repair facilities, and the possible effects that pollution could have on beneficial uses of the Bay.  All shipbuilding and repair facilities were inspected.  The report noted, *inter alia,* the following:

a.     It was estimated by workers and managers at all San Diego Bay shipyards that 5-10 percent of the sand blasted waste and other waste was either intentionally or

Gordon & Rees LLP
101 West Broadway
Suite 1600
San Diego, CA 92101

1    accidentally discharged into the Bay. The Regional Board estimated that this resulted in 335

2    tons of sand, 27 tons of copper oxide, 3 tons of lead oxide and 1 ton of zinc chromate being

3    discharged to the Bay from shipyard operations for 1971 alone;

4           b.      The Regional Board collected bay sediment core samples from 11 sites in

5    the Bay in March 1972. The results of the sampling indicated that heavy metal concentrations

6    were higher near shipbuilding and repair facilities than other locations.

7    35.    Based on the data available for the years 1987-1991, NASSCO generates an

8    average of 198 tons of abrasive blast waste alone per month.

9    36.    Prior to the early 1990s, when a storm water first-flush capture system was

10   installed for portions of the facility, all surface water runoff from NASSCO's operations was

11   intentionally or accidentally discharged directly into San Diego Bay.

12   37.    During numerous inspections starting in the late 1980s, the Regional Board would

13   observe abrasive blast wastes at NASSCO's facility deposited in areas where it would probably

14   be discharged to the Bay via stormwater runoff. Samples of abrasive blast waste and other

15   wastes were collected in the vicinity of storm drains or other areas susceptible to being

16   transported to the Bay. For example:

17          a.      During inspections by the Regional Board in August 1989, the inspector

18   reported that "...the sandblast pit is a major problem. Sandblast waste is everywhere w/o runoff

19   controls.";

20          b.      During an inspection on October 16, 1991, the Regional Board inspector

21   reported "a threatened discharge to the storm drains from blasting, painting and dust collection

22   activities in the yard."

23          c.      During an inspection on February 27, 1992, the Regional Board inspector

24   noted spent abrasive blast waste on storm drain surfaces.

25   38.    The Regional Board has previously issued Administrative Civil Liability Orders

26   against NASSCO for discharges to the Bay, including:

27          a.      On May 22, 1989, the Regional Board issued Complaint No. 89-42 to

28   NASSCO for discharge of spent abrasive waste from a floating dry dock to San Diego Bay and

Gordon & Rees LLP
101 West Broadway
Suite 1600
San Diego, CA 92101

- 9 -

1    for operating its graving dock in a manner in violation of a past order.  NASSCO waived a

2    hearing and accepted liability for discharge of contaminated cooling water from the hull and

3    freeboard abrasive blast operations to the Bay, failing to prevent water flows from coming in

4    contact with sand blast residue in the graving dock, and discharge of slurry blast to the Bay.

5         b.     On January 30, 2001, the Regional Board issued Complaint No. 2001-24

6    to NASSCO for violations of storm water runoff requirements of its NPDES permit.  NASSCO

7    sampled 21 discharge points and all failed the discharge requirements.

8         39.    The Regional Board has alleged in Tentative Order R9-2005-0126 that NASSCO

9    has caused or permitted waste from its shipyard operations to be discharged into the Bay in

10   violation of waste discharge requirements, and discharged or deposited waste where it was

11   discharged into the Bay creating, or threatening to create, a condition of pollution or nuisance.

12   The Regional Board has alleged that NASSCO violated Water Code section 13304 and violated

13   its NPDES permit requirements under the Clean Water Act section 402.

14        40.    Upon information and belief, NAASCO has discharged the COCs from its

15   leasehold and these discharges have resulted in the contamination of the sediment at the

16   Shipyards Sediment Site.

17   C.   **NATIONAL STEEL & SHIPBUILDING CORPORATION**

18        41.    Upon information and belief, from approximately 1950 to 1960, defendant

19   NATIONAL STEEL & SHIPBUILDING CORPORATION and/or its predecessors in interest

20   owned and operated a full service ship construction, modification, repair, and maintenance

21   facility located at 2798 Harbor Drive (28th Street and Harbor Drive) in San Diego, California.

22   NATIONAL STEEL & SHIPBUILDING CORPORATION leased the land on which its facility

23   operated from Plaintiff.

24        42.    Upon information and belief, NATIONAL STEEL & SHIPBUILDING

25   CORPORATION's primary business was ship repair, construction, and maintenance for the

26   NAVY and commercial customers.  Site features are believed to have included offices, shops,

27   warehouses, concrete platens for steel fabrication, a floating dry dock, a graving dock, two

28   shipbuilding ways, and piers providing numerous berthing spaces.

Gordon & Rees LLP
101 West Broadway
Suite 1600
San Diego, CA 92101

Gordon & Rees LLP
101 West Broadway
Suite 1600
San Diego, CA 92101

43.    Upon information and belief, the primary industrial processes which NATIONAL STEEL & SHIPBUILDING CORPORATION conducted included: surface preparation and paint removal; paint application; tank cleaning; mechanical repair/maintenance/installation; structural repair/alteration/assembly; integrity/hydrostatic testing; paint equipment cleaning; engine repair/maintenance/installation; steel fabrication and machining; electrical repair/maintenance/installation; hydraulic repair/maintenance/installation; tank emptying; fueling; shipfitting; carpentry; and refurbishing/modernization/cleaning.

44.    Upon information and belief, the primary materials used by NATIONAL STEEL & SHIPBUILDING CORPORATION in its operations included 1) abrasive grit (sometimes consisting of slag from coal-fired boilers and often containing iron, aluminum, silicon, calcium oxides, copper, zinc and titanium; also sand, cast iron or steel shot is used; enormous amounts are needed to remove paint and it is needed in both wet and dry blasting); 2) paint (containing copper, zinc, chromium, lead, and hydrocarbons; anticorrosive paint often containing lead and zinc; antifouling paint often containing copper and tributyltin); 3) miscellaneous, including oils, grease, fuels, weld, detergents, cleaners, rust inhibitors, paint thinners, hydrocarbon and chlorinated solvents, degreasers, acids, caustics, resins, adhesives/cement/sealants and chlorine.

45.    Upon information and belief, the wastes commonly generated by NATIONAL STEEL & SHIPBUILDING CORPORATION in its operations were abrasive blast waste (with the largest concern being spent paint containing, among other substances, copper, tributyltin, lead, chromium and zinc); fresh paint; bilge waste/oily wastewater; blast wastewater; oils; waste paints; construction repair wastes and trash; and miscellaneous wastes consisting of lubricants, grease, fuels, sewage, boiler blowdown, condensate, discard, acid wastes, caustic wastes, and aqueous wastes.

46.    Upon information and belief, NATIONAL STEEL & SHIPBUILDING CORPORATION discharged the COCs from its leasehold and these discharges have resulted in the contamination of the sediment at the Shipyards Sediment Site.

C.    **NATIONAL IRON WORKS**

47.    Upon information and belief, from approximately 1945 to 1960, defendant

1  NATIONAL IRON WORKS owned and operated a full service ship construction, modification,

2  repair, and maintenance facility located at 2798 Harbor Drive (28th Street and Harbor Drive) in

3  San Diego, California.  NATIONAL IRON WORKS leased the land on which its facility

4  operated from Plaintiff.

5       48.    Upon information and belief, NATIONAL IRON WORKS's primary business

6  was ship repair, construction, and maintenance for the NAVY and commercial customers.  Site

7  features are believed to have included offices, shops, warehouses, concrete platens for steel

8  fabrication, a floating dry dock, a graving dock, two shipbuilding ways, and piers providing

9  numerous berthing spaces.

10       49.    Upon information and belief, the primary industrial processes which NATIONAL

11  IRON WORKS conducted included: surface preparation and paint removal; paint application;

12  tank cleaning; mechanical repair/maintenance/installation; structural repair/alteration/assembly;

13  integrity/hydrostatic testing; paint equipment cleaning; engine repair/maintenance/installation;

14  steel fabrication and machining; electrical repair/maintenance/installation; hydraulic

15  repair/maintenance/installation; tank emptying; fueling; shipfitting; carpentry; and

16  refurbishing/modernization/cleaning.

17       50.    Upon information and belief, the primary materials used by NATIONAL IRON

18  WORKS in its operations included 1) abrasive grit (sometimes consisting of slag from coal-fired

19  boilers and often containing iron, aluminum, silicon, calcium oxides, copper, zinc and titanium;

20  also sand, cast iron or steel shot is used; enormous amounts are needed to remove paint and it is

21  needed in both wet and dry blasting); 2) paint (containing copper, zinc, chromium, lead, and

22  hydrocarbons; anticorrosive paint often containing lead and zinc; antifouling paint often

23  containing copper and tributyltin); 3) miscellaneous, including oils, grease, fuels, weld,

24  detergents, cleaners, rust inhibitors, paint thinners, hydrocarbon and chlorinated solvents,

25  degreasers, acids, caustics, resins, adhesives/cement/sealants and chlorine.

26       51.    Upon information and belief, the wastes commonly generated by NATIONAL

27  IRON WORKS in its operations were abrasive blast waste (with the largest concern being spent

28  paint containing, among other substances, copper, tributyltin, lead, chromium and zinc); fresh

Gordon & Rees LLP
101 West Broadway
Suite 1600
San Diego, CA 92101

- 12 -
COMPLAINT

1 paint; bilge waste/oily wastewater; blast wastewater; oils; waste paints; construction repair

2 wastes and trash; and miscellaneous wastes consisting of lubricants, grease, fuels, sewage, boiler

3 blowdown, condensate, discard, acid wastes, caustic wastes, and aqueous wastes.

4     52.    Upon information and belief, NATIONAL IRON WORKS discharged the COCs

5 from its leasehold and these discharges have resulted in the contamination of the sediment at the

6 Shipyards Sediment Site.

7 **D.    MARTINOLICH SHIP BUILDING COMPANY**

8     53.    Upon information and belief, from approximately 1940 to 1960, defendant

9 MARTINOLICH SHIP BUILDING COMPANY ("MARTINOLICH") owned and operated a

10 full service ship construction, modification, repair, and maintenance facility located at 2798

11 Harbor Drive (28th Street and Harbor Drive) in San Diego, California.  MARTINOLICH leased

12 the land on which its facility operated from Plaintiff.

13     54.    Upon information and belief, MARTINOLICH's primary business was ship

14 repair, construction, and maintenance for the NAVY and commercial customers.  Site features

15 are believed to have included offices, shops, warehouses, concrete platens for steel fabrication, a

16 floating dry dock, a graving dock, two shipbuilding ways, and piers providing numerous berthing

17 spaces.

18     55.    Upon information and belief, the primary industrial processes which

19 MARTINOLICH conducted included: surface preparation and paint removal; paint application;

20 tank cleaning; mechanical repair/maintenance/installation; structural repair/alteration/assembly;

21 integrity/hydrostatic testing; paint equipment cleaning; engine repair/maintenance/installation;

22 steel fabrication and machining; electrical repair/maintenance/installation; hydraulic

23 repair/maintenance/installation; tank emptying; fueling; shipfitting; carpentry; and

24 refurbishing/modernization/cleaning.

25     56.    Upon information and belief, the primary materials used by MARTINOLICH in

26 its operations included 1) abrasive grit (sometimes consisting of slag from coal-fired boilers and

27 often containing iron, aluminum, silicon, calcium oxides, copper, zinc and titanium; also sand,

28 cast iron or steel shot is used; enormous amounts are needed to remove paint and it is needed in

both wet and dry blasting); 2) paint (containing copper, zinc, chromium, lead, and hydrocarbons; anticorrosive paint often containing lead and zinc; antifouling paint often containing copper and tributyltin); 3) miscellaneous, including oils, grease, fuels, weld, detergents, cleaners, rust inhibitors, paint thinners, hydrocarbon and chlorinated solvents, degreasers, acids, caustics, resins, adhesives/cement/sealants and chlorine.

57.     Upon information and belief, the wastes commonly generated by MARTINOLICH in its operations were abrasive blast waste (with the largest concern being spent paint containing, among other substances, copper, tributyltin, lead, chromium and zinc); fresh paint; bilge waste/oily wastewater; blast wastewater; oils; waste paints; construction repair wastes and trash; and miscellaneous wastes consisting of lubricants, grease, fuels, sewage, boiler blowdown, condensate, discard, acid wastes, caustic wastes, and aqueous wastes.

58.     Upon information and belief, MARTINOLICH discharged the COCs from its leasehold and these discharges have resulted in the contamination of the sediment at the Shipyards Sediment Site.

**E.     BAE SYSTEMS**

59.     Since 1979, BAE SYSTEMS has owned and operated a ship repair, alteration, and overhaul facility on approximately 40 acres of tidelands property located at 2205 East Belt Street, Foot of Sampson Street, in San Diego, California ("the BAE Leasehold").

60.     Since 1979, BAE SYSTEMS has leased the land on which its facility operates from the PORT DISTRICT.

61.     BAE SYSTEMS' business historically has been ship repair and maintenance for NAVY and commercial customers. The facilities at BAE SYSTEMS have historically included 5 piers, 2 floating dry docks and 2 marine railways, which, together with cranes, enable ships to be launched or repaired. On-shore facilities have included an abrasive blasting building and a paint spray booth. There is an area for steam cleaning/pressure washing vehicles and equipment, which includes a sump where effluent is collected and drained to a clarifier that is connected to the sewer system. There are also manufacturing and storage areas. BAE SYSTEMS also presently manages a solid waste reclamation and recycling area and a hazardous waste

Gordon & Rees LLP
101 West Broadway
Suite 1600
San Diego, CA 92101

reclamation facility on the property.

62.     Upon information and belief, the primary industrial processes which BAE SYSTEMS has historically conducted include: surface preparation and paint removal; paint application; tank cleaning; mechanical repair/maintenance/installation; structural repair/alteration/assembly; integrity/hydrostatic testing; paint equipment cleaning; engine repair/maintenance/installation; steel fabrication and machining; electrical repair/maintenance/installation; hydraulic repair/maintenance/installation; tank emptying; fueling; shipfitting; carpentry; and refurbishing/modernization/cleaning.

63.     Upon information and belief, the primary materials used by BAE SYSTEMS in its operations have historically been 1) abrasive grit (sometimes consisting of slag from coal-fired boilers and often containing iron, aluminum, silicon, calcium oxides, copper, zinc and titanium; also sand, cast iron or steel shot is used; enormous amounts are needed to remove paint and it is needed in both wet and dry blasting); 2) paint (containing copper, zinc, chromium, lead, and hydrocarbons; anticorrosive paint often containing lead and zinc; antifouling paint often containing copper and tributyltin); 3) miscellaneous, including oils, grease, fuels, weld, detergents, cleaners, rust inhibitors, paint thinners, hydrocarbon and chlorinated solvents, degreasers, acids, caustics, resins, adhesives/cement/sealants and chlorine.

64.     Upon information and belief, the wastes commonly generated by BAE SYSTEMS historically in its operations have been abrasive blast waste (with the largest concern being spent paint containing copper, tributyltin, lead, chromium and zinc); fresh paint; bilge waste/oily wastewater; blast wastewater; oils; waste paints; construction repair wastes and trash; and miscellaneous wastes consisting of lubricants, grease, fuels, sewage, boiler blowdown, condensate, discard, acid wastes, caustic wastes, and aqueous wastes.

65.     Based on the data available for the years 1987-1991, BAE SYSTEMS generated an average of 178 tons of abrasive blast waste alone per month.

66.     During numerous inspections starting in the late 1980s, the Regional Board observed abrasive blast wastes at BAE SYSTEMS' facility deposited in areas where it would probably be discharged to the Bay via stormwater runoff. Samples of abrasive blast waste and

Gordon & Rees LLP
101 West Broadway
Suite 1600
San Diego, CA 92101

Gordon & Rees LLP
101 West Broadway
Suite 1600
San Diego, CA 92101

1   other wastes were collected in the vicinity of storm drains or other areas susceptible to being

2   transported to the Bay.  For example:

3         a.     During an inspection on March 3, 1987, the Regional Board inspector

4   reported that "...this facility discharged water from the dry dock to the San Diego Bay";

5         b.     During an inspection on November 9, 1988, the Regional Board inspector

6   reported that "Sand blast waste and sewage are being discharged to San Diego Bay".

7       67.    The Regional Board has previously issued Administrative Civil Liability Orders

8   against BAE SYSTEMS for discharges to the Bay, including:

9         a.     The Regional Board issued Complaint 89-02 against BAE SYSTEMS for

10   discharge of abrasive grit waste and raw sewage to San Diego Bay.  The abrasive grit waste

11   contained elevated levels of arsenic, chromium, lead, and zinc and hazardous levels of copper.

12         b.     The Regional Board issued Complaint 2001-138 to BAE SYSTEMS for

13   violation of storm water runoff requirements of its NPDES permit.  Storm water samples

14   exceeded the permitted levels for copper and zinc.

15       68.    On April 30, 1996, the Natural Resources Defense Counsel, Inc., San Diego

16   Baykeeper, and Kenneth J. Moser brought Clean Water Act legal action in this Court against

17   BAE SYSTEMS for, *inter alia,* violating its NPDES permit requirements by discharging

18   unlawful amounts of pollutants into San Diego Bay.

19       69.    On September 7, 1999, this Court issued its findings of fact and conclusions of

20   law, finding that convincing evidence showed, *inter alia,* that BAE SYSTEMS' reports

21   demonstrated a pattern of poor housekeeping and showed that violations, when reported, were

22   not remedied timely; that BAE SYSTEMS' implementation of its plans had led to significant

23   contributions of pollutants to BAE SYSTEMS' leasehold; that substantial quantities of pollutants

24   from BAE SYSTEMS' paint-blasting operations had entered San Diego Bay in BAE SYSTEMS'

25   storm water discharges; and that BAE SYSTEMS' failure to implement its storm water plans

26   adequately was contributing to and perpetuating the contamination of its leasehold.  The findings

27   and ruling was appealed to the Ninth Circuit Court of Appeals, which did not overturn any of the

28   rulings of this Court.  The United States Supreme Court denied the appeal.

Gordon & Rees LLP
101 West Broadway
Suite 1600
San Diego, CA 92101

70.     The Regional Board has alleged in Tentative Order R9-2005-0126 that BAE SYSTEMS has caused or permitted waste from its shipyard operations to be discharged into the Bay in violation of waste discharge requirements, and discharged or deposited waste where it was discharged into the Bay creating, or threatening to create, a condition of pollution or nuisance.   The Regional Board has alleged that BAE SYSTEMS has violated Water Code section 13304 and violated its NPDES permit requirements under the Clean Water Act section 402.

71.     Upon information and belief, BAE SYSTEMS has intentionally or accidentally discharged the COCs from its leasehold and these discharges have resulted in the contamination of the sediment at the Shipyards Sediment Site.

**F.      SAN DIEGO MARINE CONSTRUCTION COMPANY & THE STAR AND CRESCENT COMPANIES**

72.     Plaintiff leased to the SDMCC DEFENDANTS certain property at the foot of Sampson street from 1914 to 1962.

73.     From 1962 to July 1972, the PORT DISTRICT leased this property to the SDMCC DEFENDANTS.

74.     Upon information and belief, the facility owned and operated by the SDMCC DEFENDANTS was historically a ship repair and construction facility for NAVY and commercial customers.  The facility included 2 floating dry docks and 3 marine railways, which, together with cranes, enabled ships to be launched or repaired.

75.     Upon information and belief, the primary industrial processes which the SDMCC DEFENDANTS likely conducted include: surface preparation and paint removal; paint application; tank cleaning; mechanical repair/maintenance/installation; structural repair/alteration/assembly; integrity/hydrostatic testing; paint equipment cleaning; engine repair/maintenance/installation; steel fabrication and machining; electrical repair/maintenance/installation; hydraulic repair/maintenance/installation; tank emptying; fueling; shipfitting; carpentry; and refurbishing/modernization/cleaning.

76.     Upon information and belief, the primary materials believed to have been used by

- 17 -

COMPLAINT

1  the SDMCC DEFENDANTS in their operations, based on typical materials used in the industry,

2  are 1) abrasive grit (sometimes consisting of slag from coal-fired boilers and often containing

3  iron, aluminum, silicon, calcium oxides, copper, zinc and titanium; also sand, cast iron or steel

4  shot is used; enormous amounts are needed to remove paint and it is needed in both wet and dry

5  blasting); 2) paint (containing copper, zinc, chromium, lead, and hydrocarbons; anticorrosive

6  paint often containing lead and zinc; antifouling paint often containing copper and tributyltin); 3)

7  miscellaneous, including oils, grease, fuels, weld, detergents, cleaners, rust inhibitors, paint

8  thinners, hydrocarbon and chlorinated solvents, degreasers, acids, caustics, resins,

9  adhesives/cement/sealants and chlorine.

10      77.    Upon information and belief, the wastes believed to have been generated by the

11  SDMCC DEFENDANTS in their operations, based on those generated by the above-listed

12  shipyard activities, are abrasive blast waste (with the largest concern being spent paint containing

13  copper, tributyltin, lead, chromium and zinc); fresh paint; bilge waste/oily wastewater; blast

14  wastewater; oils; waste paints; construction repair wastes and trash; and miscellaneous wastes

15  consisting of lubricants, grease, fuels, sewage, boiler blowdown, condensate, discard, acid

16  wastes, caustic wastes, and aqueous wastes.

17      78.    In March 1972, the Regional Board initiated an investigation to determine the

18  amount of and kinds of pollutants that entered San Diego Bay from shipbuilding and repair

19  facilities, and the possible effects that pollution could have on beneficial uses of the Bay.  All

20  shipbuilding and repair facilities were inspected, including SDMCC.  The report noted, *inter*

21  *alia,* the following conditions from the year 1971:

22      a.    SDMCC constructed 6 new ships and refinished 70 ships in 1971.

23  Approximately 20-50% of the ships were sandblasted.  Approximately 8,000 gallons of paint and

24  primer containing copper and tributyltin were used.  Air sand blasting with black sand was used

25  to strip vessels to bare metal in the dry docks and on the railways;

26      b.    The SDMCC DEFENDANTS' facility was located immediately adjacent

27  to the Bay, and wastes from the facility were conveyed to the Bay by water flows, by becoming

28  airborne, or by falling directly into the Bay;

Gordon & Rees LLP
101 West Broadway
Suite 1600
San Diego, CA 92101

- 18 -
COMPLAINT

79.     The Regional Board has alleged in Tentative Order R9-2005-0126 that SDMCC caused or permitted waste from its shipyard operations to be discharged into the Bay creating, or threatening to create, a condition of pollution or nuisance.   The Regional Board has alleged that SDMCC has violated Water Code section 13304.

80.     Upon information and belief, SDMCC has intentionally or accidentally discharged the COCs from its leasehold and these discharges have resulted in the contamination of the sediment at the Shipyards Sediment Site.

**G.     CAMPBELL INDUSTRIES, MCCSD, AND SAN DIEGO MARINE CORPORATION**

81.     Upon information and belief, from at least 1972 (if not earlier) to 1979, the CAMPBELL DEFENDANTS owned and operated a ship repair, alteration, and overhaul facility on approximately 40 acres of tidelands property on or about 2205 East Belt Street, Foot of Sampson Street, in San Diego, California, within or adjacent to the BAE Leasehold.  The CAMPBELL DEFENDANTS leased this property from the PORT DISTRICT.

82.     Upon information and belief, the CAMPBELL DEFENDANTS' facility included 2 floating dry docks and 3 marine railways, which, together with cranes, enable ships to be launched or repaired.

83.     Upon information and belief, the primary industrial processes which the CAMPBELL DEFENDANTS likely conducted, based upon typical ship construction and repair industry activities, include: surface preparation and paint removal; paint application; tank cleaning; mechanical repair/maintenance/installation; structural repair/alteration/assembly; integrity/hydrostatic testing; paint equipment cleaning; engine repair/maintenance/installation; steel fabrication and machining; electrical repair/maintenance/installation; hydraulic repair/maintenance/installation; tank emptying; fueling; shipfitting; carpentry; and refurbishing/modernization/cleaning.

84.     Upon information and belief, the primary materials believed to have been used by the CAMPBELL DEFENDANTS in its operations, based on typical materials used in the industry, are 1) abrasive grit (sometimes consisting of slag from coal-fired boilers and often

Gordon & Rees LLP
101 West Broadway
Suite 1600
San Diego, CA 92101

- 19 -

1   containing iron, aluminum, silicon, calcium oxides, copper, zinc and titanium; also sand, cast

2   iron or steel shot is used; enormous amounts are needed to remove paint and it is needed in both

3   wet and dry blasting); 2) paint (containing copper, zinc, chromium, lead, and hydrocarbons;

4   anticorrosive paint often contains lead and zinc; antifouling paint often contains copper and

5   tributyltin); 3) miscellaneous, including oils, grease, fuels, weld, detergents, cleaners, rust

6   inhibitors, paint thinners, hydrocarbon and chlorinated solvents, degreasers, acids, caustics,

7   resins, adhesives/cement/sealants and chlorine.

8       85.   Upon information and belief, the wastes believed to have been generated by the

9   CAMPBELL DEFENDANTS in its operations, based on those generated by the above-listed

10  shipyard activities, are abrasive blast waste (with the largest concern being spent paint containing

11  copper, tributyltin, lead, chromium and zinc); fresh paint; bilge waste/oily wastewater; blast

12  wastewater; oils; waste paints; construction repair wastes and trash; and miscellaneous wastes

13  consisting of lubricants, grease, fuels, sewage, boiler blowdown, condensate, discard, acid

14  wastes, caustic wastes, and aqueous wastes.

15      86.   Data from the PORT DISTRICT indicate that historical operations at the

16  CAMPBELL DEFENDANTS' facility included:

17          a.   Use of formaldehyde and arsenic in pretreated wood at the wood shop;

18          b.   Performance of blasting, welding and painting activities for Navy contract

19  work in the blasting area;

20          c.   Use of a dust suppression system for the blasting house, which consisted

21  of blowers directed to the Bay with a water spray to cause blast dust to settle in the water;

22          d.   Discharge of all wastes generated on the dry dock to the Bay, including

23  blast grit and paint.

24      87.   In 1973, an undetermined amount of fuel was released to the Bay from the

25  CAMPBELL DEFENDANTS' leasehold, resulting in temporary site closure.

26      88.   The Regional Board has alleged in Tentative Order R9-2005-0126 that the entities

27  operating at the CAMPBELL DEFENDANTS' facility caused or permitted waste from its

28  shipyard operations to be discharged into the Bay in violation of waste discharge requirements,

Gordon & Rees LLP
101 West Broadway
Suite 1600
San Diego, CA 92101

1  and discharged or deposited waste where it was discharged into the Bay creating, or threatening

2  to create, a condition of pollution or nuisance.   The Regional Board has alleged that

3  CAMPBELL violated Water Code section 13304 and violated its NPDES permit requirements

4  under the Clean Water Act section 402.

5          89.     Upon information and belief, the CAMPBELL DEFENDANTS have intentionally

6  or accidentally discharged the COCs from its leasehold and these discharges have resulted in the

7  contamination of the sediment at the Shipyards Sediment Site.

8  **H.**    **SDG&E**

9          90.     Defendant SDG&E, a subsidiary of Sempra Energy Company, owned and

10  operated the Silvergate Power Plant along the north side of the BAE Leasehold from

11  approximately 1943 to the 1990s.   The plant ceased active operations in approximately 1984 and

12  was decommissioned in 2004.

13          91.     Upon information and belief, the Silvergate Power Plant included 4 steam turbine

14  electrical generators.   The boilers initially burned fuel oil, and in later years were converted to

15  burn both natural gas and fuel oil.   There was also an electrical switchyard adjacent to the plant

16  itself.   The facility had transformers onsite.

17          92.     Upon information and belief, as part of the plant's operations, SDG&E

18  maintained an easement to San Diego Bay for cooling water discharge tunnels ("CW tunnels") to

19  deliver and remove water used for cooling the turbines.   The turbine sump pumps discharged to

20  the CW tunnels.   Bilge water was also piped to the CW tunnels.   The CW tunnels had flow rates

21  of 120-180 million gallons per day.   The discharge CW tunnel was located in close proximity to

22  the property line with the BAE Leasehold.

23          93.     Upon information and belief, there were also at least 2 wastewater

24  settling/evaporation ponds and 2 subgrade oil separators on the SDG&E easement, within close

25  proximity to the Bay.   Basement bilge water from the boiler side of the plant was pumped to a

26  pond(s) for settling and evaporation, and some of that water was discharged to the Bay.

27  Historical photographs indicate a surface spill at "Pond A" occurred on or about 1952 when a

28  plug in piping led to overflow of liquid onto the adjacent ground, which photographs indicate

Gordon & Rees LLP
101 West Broadway
Suite 1600
San Diego, CA 92101

- 21 -

COMPLAINT

Gordon & Rees LLP
101 West Broadway
Suite 1600
San Diego, CA 92101

1   flowed to the Bay. "Pond B" was used from at least 1966-1973 as an oil-water settling pond.

2   There was also an area referred to as "Nobel's Lake," which may have been "Pond B," which

3   received discharges from all sources in the north side of the plant, including the fuel oil pump

4   room sump pump, and possibly the turbine room sump pumps, control rooms, generator vaults in

5   the switchyard, electrical repair, maintenance and machining areas, and rinsewater from cleaning

6   out drums containing PCBs. As of 1974, "Nobel's Lake" was filled to the brim and contained an

7   11 foot deep mixture of oil and earth.

8        94.    Upon information and belief, the Silvergate Power Plant's switchyard and plant

9   itself were sources of PCBs:

10           a.    In the switchyard, the following equipment likely contained PCB fluids:

11   75 oil circuit breaker tanks, 4 transformers, and the main and auxillary transformers for

12   Generator Units 1-4. The presence of PCBs at the site was documented during the Underground

13   Tank Storage program on or about 2006.

14           b.    In the power plant itself, the following equipment in the turbine room and

15   on the cooling water deck likely contained PCB fluids: 4 Steam Turbine Generator Sets, 8

16   (2500-3000 gallon) Turbine Lubricating Oil tanks, 2 power and 2 lighting transformers near each

17   of Generator Units 1 and 2 on the cooling water deck. Shop areas conducting electrical repairs,

18   maintenance and machining also could have been PCB sources. Capacitors, switches, reclosers,

19   wiring insulation, lube oil coolers, condensate pumps, overhead cranes and hoists are also

20   potential sources.

21        95.    Upon information and belief, Studies indicate that steam turbine

22   hydraulic/lubricating oil loss from power plants on an annual basis ranges from 5-30%, with the

23   average annual loss in the United States 7-10%.

24        96.    Upon information and belief, Case studies indicate that PCBs are most commonly

25   found on and around the oil lubrication systems, former station transformer areas and power-

26   generation equipment at plants, and that PCBs were found in turbine generator lubrication oil

27   because of the use of the same as a lubricant throughout plants.

28        97.    Upon information and belief, there were multiple transport pathways for PCBs to

Gordon & Rees LLP
101 West Broadway
Suite 1600
San Diego, CA 92101

1   be discharged from the Silvergate Power Plant to San Diego Bay:

2           a.     CW Tunnel System:  The turbine sump pumps discharged to the CW

3   Tunnel, which discharged to the Bay immediately north of the current BAE SYSTEMS

4   leasehold.  The turbine sump pumps were likely recipients of discharges from turbine generator

5   lubrication/hydraulic systems, overhead crane hydraulic system, or electrical gear (capacitors,

6   transformers, reclosers, switchers), which contained PCBs.  Bilge water was also piped to the

7   CW tunnels.  The CW tunnel system was not a closed system.

8           b.     Ponds, including "Nobel's Lake":  "Pond A" had a documented overflow

9   in 1952 which reached the Bay near the property line with the current BAE SYSTEMS

10   leasehold.  This overflow likely contained PCBs, given that PCB containing oils were used at

11   power plants on a widespread basis in this time frame.  "Pond B" was used from at least 1966-

12   1973 as an oil-water settling pond, located a few hundred feet from the Bay, also near the

13   property line with the BAE Leasehold.  "Nobel's Lake," which may have been "Pond B,"

14   received discharges from all sources in the north side of the plant, including the fuel oil pump

15   room sump pump, and possibly the turbine room sump pumps, control rooms, generator vaults in

16   the switchyard, electrical repair, maintenance and machining areas, and rinsewater from cleaning

17   out drums containing PCBs.  Photographs indicate surface drainage around the Nobel's Lake

18   area in the 1950s and document removals of "sludge" and "muck" from it which was simply

19   placed in a hole nearby, all in very close proximity to the Bay.  As of 1974, "Nobel's Lake" was

20   filled to the brim and contained an 11 foot deep mixture of "oil and earth."  Photographs and

21   plant diagrams indicate that Nobel's Lake itself drained into the CW discharge tunnel or directly

22   into the Bay through an outlet pipe.  Soil samples taken in the vicinity of Pond B/Nobel's Lake

23   in 1995 indicate elevated levels of PCBs, chromium, copper, lead, nickel and zinc.

24           c.     Floor drains:  An undated SDG&E training manual states that "… floor

25   drains are in areas where large amounts of oil may be spilled."

26           d.     Surface runoff from switchyard:  There was the potential for runoff of

27   sediments containing PCBs during precipitation events, directly to the Bay or to the Bay through

28   one of Plaintiff's MS4 outfalls.  On information and belief, transformers in the switchyard were

1   not contained within concrete sumps and there were not secondary containment measures for oil

2   storage units until the 1970s.

3       98.     Upon information and belief, in 2006, during closure of SDG&E's underground

4   storage tanks, PCBs were detected in the soil in all 18 samples taken around at the facility.

5   Eleven of the samples had PCBs above 1000 ug/kg.  The 3 highest samples had concentrations of

6   125,000 ug/kg, 14,700 ug/kg and 34,700 ug/kg.  Copper, lead and zinc were also detected.  The

7   Regional Board found in its Tentative Order R9-205-0126 that the PCBs and metals deposited in

8   the soil by SDG&E were such that they were, or probably would be, discharged to the Bay via

9   storm water runoff.

10      99.     In 2005, Plaintiff observed an illegal discharge into its MS4 catch basin on the

11  north side of Sampson Street, immediately to the east of BAE SYSTEMS' parking lot and the

12  SDG&E Silvergate Power Plant.  Plaintiff took sampling of the inside and base of the six inch

13  lateral entering the basin from the former plant leasehold, the base of the 12 inch lateral entering

14  the basin from an area draining water from the facility, and from the 18 inch pipe exiting the

15  basin and conveying to the Bay at the Shipyard Sediment Site.  The results indicated the

16  presence of PCBs and PAHs entering the storm water system from the former plant leasehold,

17  and exiting the storm drain system to the Bay.  Plaintiff issued a Notice of Violation to SDG&E.

18      100.    The Regional Board has alleged in Tentative Order R9-2005-0126 that SDG&E

19  caused or permitted waste from its power plant operations to be discharged into the Bay in

20  violation of waste discharge requirements, and discharged or deposited waste where it was

21  discharged into the Bay creating, or threatening to create, a condition of pollution or nuisance.

22  The Regional Board has alleged that SDG&E has violated Water Code section 13304 and

23  violated its NPDES permit requirements under the Clean Water Act section 402.

24      101.    Upon information and belief, SDG&E has intentionally or accidentally discharged

25  the COCs from its leasehold and these discharges have resulted in the contamination of the

26  sediment at the Shipyards Sediment Site.

27  **I.     UNITED STATES NAVY**

28      102.    From 1921 to present, NAVY has provided shore support and pier-side berthing

- 24 -

COMPLAINT

Gordon & Rees LLP
101 West Broadway
Suite 1600
San Diego, CA 92101

1  services to U.S. Pacific fleet vessels at Naval Station San Diego ("NAVSTA"), which it owns

2  and operates, located at 3445 Surface Navy Boulevard.

3      103.    NAVSTA currently occupies 1,029 acres of land and 326 water acres adjacent to

4  San Diego Bay to the west, and Chollas Creek north near Pier 1. It is immediately south of and

5  adjacent to the Shipyard Sediment Site. NAVSTA's present leasehold includes a 24,653 square

6  foot parcel north of and immediately adjacent to Chollas Creek, at the south end of 28th Street.

7      104.    Between 1938 and 1956, NAVSTA's leasehold also included the 28th Street

8  Shore Boat Landing Station, located at the south end of the present day NASSCO leasehold at

9  the foot of 28th Street, including the 28th Street Pier. Upon information and belief, at this

10  location, NAVY conducted operations similar to a small boatyard, including solvent cleaning

11  and degreasing of vessel parts and surfaces, abrasive blasting and scraping for paint removal and

12  surface preparations, metal plating, and surface finishing and painting.

13      105.    Upon information and belief, NAVSTA historically has provided supply and

14  maintenance logistical support to numerous U.S. Navy vessels. NAVSTA was used extensively

15  in the 1920s and 1930s for repair and maintenance of U.S. Navy Destroyer vessels. The base was

16  rapidly expanded in the 1930s and 1940s. From 1943 to 1945, more than 5,000 ships were sent

17  to the base for conversion, overhaul, battle damage, repair, or maintenance. Almost half of these

18  ships were dry docked. In the mid-1940s, the base added another 823 acres, 200 buildings, a

19  1,700 marine railway, a cruiser graving dry dock, five large repair piers, a quay wall totally

20  28,000 feet of berthing space, and extensive industrial repair facilities. NAVSTA is currently

21  home port for approximately 60 naval vessels and 50 separate commands.

22      106.    Upon information and belief, a number of historical activities at NAVSTA

23  resulted in the discharge of hazardous substances to the San Diego Bay, including:

24      a.    Former ship repair basins: Many ship repair operations were conducted in

25  4 basins used as ship repair wet docks between 1943-1945, when over 5,000 ships were sent

26  there for conversion, overhaul and repair. Thereafter, until 1972, at least 2 basins were used as

27  informal disposal sites for hazardous and non-hazardous solid waste. Chemical constituents

28  identified in these basins in the 1990s included lubricants, oils, and PCBs. In 1998, 16 tons of

Gordon & Rees LLP
101 West Broadway
Suite 1600
San Diego, CA 92101

COMPLAINT

Gordon & Rees LLP
101 West Broadway
Suite 1600
San Diego, CA 92101

1   PCB and PAH impacted soil was removed as part of an initial cleanup action.

2         b.       Mole pier:  Constructed in 1942, materials such as creosote-coated pier

3   pilings, lumber, refuse concrete, waste paints, gasoline, oil and diesel fuel were burned at the site

4   between 1945 and 1972.  Trucks and heavy equipment were decontaminated here by spraying

5   them with diesel fuel and dunking them in Paleta Creek, which flows to the Bay.   It is estimated

6   that approximately 500,000 gallons of fuel was sprayed, burned or buried in this area

7   historically.

8         c.       Salvage Yard:  Materials handled by this yard between 1943 and

9   approximately 1975 include transformers containing PCBs, mercury, electrolytes from old

10  batteries, drummed petroleum wastes, solvents and thinners, and demolition debris.  It is

11  estimated that 100-200 drums of waste lubricating oils, lubricants and solvents were transported

12  here for handling.  Liquids were incinerated, poured onto the ground, or recycled.  Pollutants

13  could have migrated to the Bay via Paleta Creek or surface water runoff.

14        d.       Defense Property Disposal Office Storage Yard:  Used between 1943

15  through 1981, this site was routinely oiled as a dust control measure prior to 1975, with some

16  35,000 to 75,000 gallons of waste petroleum, oils and lubricants.  Chemical constituents

17  identified here in the 1990s include petroleum, PCBs and metals.  Hazardous substances

18  migrated to the Bay via Paleta Creek or surface water runoff.

19        e.       Firefighting training facility:  Between 1945 and 1995, NAVY operated

20  this facility near its Pier 8.  Training fires were lit regularly using petroleum hydrocarbons,

21  including approximately 3500 gallons per week of jet propellant grade 5 and gasoline.  Prior to

22  1972, there was no pollution control equipment and chemicals could have migrated to the Bay.

23  Contamination was identified at the site in the early 1990s and extraction systems have

24  reportedly removed some 15,000 gallons of free product.

25        f.       PCB Storage Facility Electrical Storage Yard:   From 1981 through 1994,

26  NAVY operated a PCB storage facility near Paleta Creek, approximately 1000 feet from the Bay.

27  The area was used primarily for maintenance of electrical equipment, including draining of

28  transformer fluids and storage of fluids containing PCBs.  PCBs were not segregated from other

- 26 -
COMPLAINT

1    fluids until the late 1980s. Waste oil likely containing PCBs was applied to the ground for dust

2    and weed suppression. PCB impacted soil was removed from the site and a nearby storm drain

3    in the mid-1990s.

4          g.      Material Storage Yard: The site was used between 1939 and 1995 as an

5    unpaved storage yard for metal finishing, preservation and packaging at Building 321. In the

6    1990s, metals, PAHs and PCBs were identified in soil at the site.

7          h.      Brinser Street parking area: NAVY constructed floating dry docks and

8    barges here near its Pier 7 between 1941 and 1945. Facilities included 2 shallow creosote dip

9    ponds used to treat lumber on the site. Soil investigations have revealed presence of petroleum

10    products, PAHs and metals, among others. Surface water run off could have transported

11    pollutants to the Bay.

12          i.      Drydock sandblast area: The drydock sandblast grit area is located

13    immediately east of Piers 5 and 6. The site has been used for overhaul and maintenance of ships,

14    repair of ship components and contractor equipment since 1942. Operations here, which

15    continue to present, include sandblasting and painting. Copper abrasive blast material was used

16    to remove anticorrosive and antifouling paint from ship hulls. A railcar and silo transported and

17    stored the sandblast grit. Open air sandblasting took place until 1993. In October 1992, visible

18    surface contamination was removed, and the elevated levels of arsenic, iron, lead, manganese,

19    copper, and nickel, among others, were detected.

20          j.      Historic operations at present NASSCO leasehold: Between 1938 and

21    1956, NAVY operated the 28th Street Shore Boat Landing Station, currently part of the NASSCO

22    leasehold, consisting of a finger pier and various machine and electrical shops and stores. On

23    information and belief, the activities conducted were most likely similar to those at a small boat

24    yard. Typically, such activities include scrubbing boat hulls, blasting, and painting. Paints used

25    typically include copper, arsenic, and mercury. Activities historically occur outside, close to

26    receiving waters. In its 1970s investigation of shipyards, the Regional Board concluded that in

27    San Diego Bay, heavy metal concentrations were higher in sediment near boatyards and

28    shipyards. Core sampling in the area of these former NAVY operations indicates that there are

Gordon & Rees LLP
101 West Broadway
Suite 1600
San Diego, CA 92101

COMPLAINT

metals, tributyltin and PCBs likely attributable to NAVY's operations.

107.    Upon information and belief, current NAVY operations on the wetside also likely discharge pollutants into San Diego Bay from in and around NAVSTA's 13 piers berth ships, barges and support vessels.  Berth-side repair and maintenance conducted is believed to include abrasive blasting, hydro-blasting, metal grinding, painting, tank cleaning, removal of bilge and ballast water, removal of anti-fouling paint, sheet metal work, electrical work, mechanical repair, engine repair, hull repair and sewage disposal.  More complex similar activities are typically conducted at the graving dock or floating dry dock.  Discharges include industrial process water or stormwater contaminated with abrasive blast material, paint, oils, lubricants, fuels and solvents.  NAVY ship movements and tidal flows work to distribute pollutants from NAVSTA to the Shipyard Sediment Site.

108.    On information and belief, additionally, NAVY currently and historically has many of its ships and other vessels serviced at the NASSCO leasehold operations and the BAE SYSTEMS leasehold operations.  On information and belief, NAVY would provide detailed specifications for all repair, overhaul, construction and maintenance work on its ships to NASSCO, NATIONAL STEEL & SHIPBUILDING CORPORATION, NATIONAL IRON WORKS, MARTINOLICH SHIP BUILDING COMPANY, BAE SYSTEMS, the SDMCC DEFENDANTS, and the CAMPBELL DEFENDANTS.  Upon information and belief, this included, but was not limited to, what type of antifouling and marine paints to use on NAVY ships, which were NAVY or U.S. Military formulations; other painting specifications for NAVY ships; how to conduct abrasive blasting and scraping on ships; and how to conduct hull cleaning on ships.  On information and belief, NAVY has and had its own offices and/or conference rooms and/or NAVY operated facilities at the current NASSCO and BAE SYSTEMS leaseholds, both presently and historically.  On information and belief, NAVY personnel on the ships and vessels also themselves conducted such repair, overhaul, construction and maintenance work on NAVY ships while those ships were docked at the facilities owned and operated by NASSCO, NATIONAL STEEL & SHIPBUILDING CORPORATION, NATIONAL IRON WORKS, MARTINOLICH SHIP BUILDING COMPANY, BAE SYSTEMS, the SDMCC

Gordon & Rees LLP
101 West Broadway
Suite 1600
San Diego, CA 92101

1   DEFENDANTS and the CAMPBELL DEFENDANTS.  Discharges from this work on NAVY

2   ships and vessels from this work, which NAVY was aware of and intended via its issuance of

3   detailed specifications for this work, and which NAVY itself caused from its own work on these

4   ships and vessels while docked at these shipyards, likely contributed to the discharge of

5   hazardous substances into the Shipyard Sediment Site, including metals (arsenic, cadmium,

6   copper, lead, mercury, zinc), tributyltins, PAHs, and PCBs.

7       109.   Upon information and belief, NAVSTA's dryside consists of facilities east of

8   Harbor Drive, and contains at least 8 of its own MS4 storm drains.  NAVY owns and operates its

9   own MS4 storm water conveyance system.  Some 266 acres of NAVSTA drain directly to

10   Chollas Creek.

11       110.   The Regional Board has alleged in Tentative Order R9-2005-0126 that NAVY

12   has caused or permitted the discharge of pollutants to the San Diego Bay in violation of its

13   NPDES permit, including excessive concentrations of copper, lead and zinc.

14       111.   The Regional Board has further alleged in Tentative Order R9-2005-0126 that

15   NAVY caused or permitted waste from its NAVSTA operations to be discharged into the Bay,

16   via storm water, tides and ship movement, and discharged directly into the Shipyard Sediment

17   Site through its prior operations at the 28th Street Shore Boat Landing Station, in violation of

18   waste discharge requirements, and discharged or deposited waste where it was discharged into

19   the Bay creating, or threatening to create, a condition of pollution or nuisance.  The Regional

20   Board has alleged that NAVY has violated Water Code section 13304 and violated its NPDES

21   permit requirements under the Clean Water Act section 402.

22       112.   NAVY's own studies suggest that a chronic substantial source of PAHs to San

23   Diego Bay is from creosote treated pilings, like those on NAVY's Mole pier.

24       113.   Upon information and belief, the NAVY has intentionally or accidentally

25   discharged the COCs from its operations and these discharges have resulted in the contamination

26   of the sediment at the Shipyards Sediment Site.

27   **J.**      **PORT DISTRICT**

28       114.   Since 1962, the PORT DISTRICT has had an ownership interest, as a public

- 29 -

COMPLAINT

1   trustee and landlord, in the NASSCO and BAE Leaseholds, and in the property formerly leased

2   to the SDMCC DEFENDANTS and the CAMPBELL DEFENDANTS, as well as in an easement

3   for the cooling water tunnels from SDG&E's Silvergate Powerplant.

4       115.   The State of California holds title to the navigable waterways and the land

5   beneath them as a trustee for the public.  The State's power to control, regulate and utilize the

6   navigable waterways within the terms of the trust is absolute except as limited by the supervisory

7   power of the federal government.  Under the San Diego Unified Port District Act ("the Act"), the

8   state of California delegated its authority to manage and control San Diego Bay to the PORT

9   DISTRICT. The Act authorizes the PORT DISTRICT to make and enforce all necessary rules

10   and regulations regarding the tidelands within its jurisdiction.  Accordingly, the PORT

11   DISTRICT had regulatory land use authority over the property it held in trust and leased to

12   NAASCO, BAE SYSTEMS, the SDMCC DEFENDANTS, the CAMPBELL DEFENDANTS,

13   and SDG&E.

14       116.   Upon information and belief, the PORT DISTRICT had, through its interactions

15   with the Regional Board over the years, known of the likelihood of intentional and/or accidental

16   discharges of hazardous substances from NASSCO, BAE SYSTEMS, the SDMCC

17   DEFENDANTS, the CAMPBELL DEFENDANTS, and SDG&E contributing to the

18   accumulations of hazardous substances in the Shipyards Sediment Site area.  Despite this

19   knowledge, the PORT DISTRICT did not exercise its regulatory land use authority to prevent the

20   discharges of hazardous substances.

21       117.   Upon information and belief, the PORT DISTRICT has had the legal authority

22   under its lease agreements with its lessees, including Defendants discussed above, to impose

23   controls that could prevent or reduce the Defendant lessees' discharges of hazardous substances:

24          a.   Lease agreements between PORT DISTRICT and its tenants typically

25   contained terms that obligated its tenants to "abide by and conform to . . . any applicable laws of

26   the State of California and Federal Government."

27          b.   Defendant PORT DISTRICT's leases also required that its tenants keep

28   the leased premises in a clean and sanitary condition, free and clear of waste.

Gordon & Rees LLP
101 West Broadway
Suite 1600
San Diego, CA 92101

- 30 -

c.      The leases also authorized PORT DISTRICT to enter and inspect the premises at any time during normal business hours.

d.      The leases authorized PORT DISTRICT to terminate the lease after 60 days written notice if the tenant defaulted in performance of the lease provisions.

118.    The Regional Board alleged, in Tentative Order R9-2005-0126, that the above cited lease terms would be sufficient to base a finding that the PORT DISTRICT had the requisite degree of control over its tenants' activities to show that PORT DISTRICT caused or permitted waste to be discharged into San Diego Bay, creating a condition of pollution at the Shipyard Sediment Site.

119.    Upon information and belief, the PORT DISTRICT's tenants at the NAASCO and BAE Leaseholds have intentionally and/or accidentally discharged the COCs from their operations and these discharges have resulted in the contamination of the sediment at the Shipyards Sediment Site.

## FIRST CAUSE OF ACTION

### (Cost Recovery Under CERCLA against all Defendants)

120.    Plaintiff realleges all prior paragraphs and incorporates them by reference.

121.    The Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), CERCLA Section 107(a), 42 U.S.C. § 9607(a), provides as follows:

(1) the owner or operator of a . . . facility,

(2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of, [or]

(3) any person who . . . arranged for disposal or treatment . . . of hazardous substances . . . at any facility...

(4) .... from which there is a release, or threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for –

Gordon & Rees LLP
101 West Broadway
Suite 1600
San Diego, CA 92101

(B) any other necessary costs of response incurred by any other person consistent with the national contingency plan.

122.   As detailed in the general allegations above, each Defendant qualifies as a "covered person" as defined by Section 107(a) of CERCLA, 42 U.S.C. § 9607(a).

123.   The chemicals and substances which Defendants used, stored, disposed of, discharged and released into the Shipyard Sediment Site were "hazardous substances" within the meaning of CERCLA Section 101(14), 42 U.S.C. §9601(14).  Such hazardous substances included the COCs.

124.   A "release" or "threatened release" of hazardous substances within the meaning of CERCLA Section 101(22), 42 U.S.C. § 9601(22), has occurred at the Shipyard Sediment Site from each of Defendants' ownership, operations or arrangements for disposal of hazardous substances at facilities at or adjacent to the Shipyard Sediment Site.  Defendants, and each of them, conducted themselves in their ownership and/or operations and/or disposal arrangement activities at or around the Shipyard Sediment Site so as to directly, proximately and/or causally contribute to the damages as alleged herein.

125.   The release(s) or threatened release(s) have occurred from a "facility" or facilities into the Shipyard Sediment Site within the meaning of CERCLA Section 101(9), 42 U.S.C. § 9601(9).

126.   As a result of the "release(s)" and/or threatened "releases(s)" of "hazardous substances," by Defendants, Plaintiff has conducted and is conducting a "response" within the meaning of CERCLA Section 101(25), 42 U.S.C. § 9601(25), and has incurred and will incur response costs.

127.   Plaintiff has incurred, and will continue to incur, substantial costs consistent with the National Contingency Plan to investigate and remediate releases and/or threatened releases of hazardous substances in the environment at and around the Site.

128.   Plaintiff requests that judgment be entered in its favor and against Defendants pursuant to 42 U.S.C. § 9607(a) for all response costs that Plaintiff has incurred and will in the

Gordon & Rees LLP
101 West Broadway
Suite 1600
San Diego, CA 92101

- 32 -

1   future incur to investigate, remove or remediate hazardous substances, and alleged property

2   damage, including but not limited to alleged damage to aquatic life, at the Site.

3                                   **SECOND CAUSE OF ACTION**

4                        **(Contribution Under CERCLA against all Defendants)**

5          129.   Plaintiff realleges all prior paragraphs and incorporate them by reference.

6          130.   Each Defendant is a "covered person" as defined by Section 107(a) of CERCLA,

7   42 U.S.C. § 9607(a). Each Defendant therefore is a "covered person," liable for contribution and

8   other relief to Plaintiff under 42 U.S.C. § 9613(f).

9          131.   As responsible parties under section 9607(a) of CERCLA, Defendants, and each

10   of them, are liable to Plaintiff for contribution toward any costs it incurs in responding to and/or

11   reimbursing Plaintiff for the alleged release and/or threatened release of hazardous substances at

12   or into the Shipyard Sediment Site as alleged in herein, including without limitation, the costs of

13   investigation, clean-up, removal of contaminated sediments and soils, and completing any

14   additional investigation, monitoring, and remediation at the Shipyard Sediment Site, in amounts

15   to be determined at the trial of this matter.

16          132.   Plaintiff requests that judgment be entered in its favor and against Defendants

17   pursuant to 42 U.S.C. § 9613 for contribution to the response costs that Plaintiff has incurred,

18   and will incur in the future, to investigate and/or remediate hazardous substances, and alleged

19   property damage, including but not limited to alleged damage to aquatic life, at the Site.

20                                   **THIRD CAUSE OF ACTION**

21                    **(Declaratory Judgment Under CERCLA against all Defendants)**

22          133.   Plaintiff realleges all prior paragraphs and incorporates them by reference.

23          134.   CERCLA Section 113(g)(2), 42 U.S.C. § 9613(g)(2), provides that in an action to

24   recover costs, "the court shall enter a declaratory judgment on liability for response costs or

25   damages that will be binding on any subsequent action or actions to recover further response

26   costs or damages."

27          135.   This action is an action of the type described in CERCLA Section 113(g)(2), 42

28   U.S.C. § 9613(g)(2).

Gordon & Rees LLP
101 West Broadway
Suite 1600
San Diego, CA 92101

Gordon & Rees LLP
101 West Broadway
Suite 1600
San Diego, CA 92101

1    136.    An actual controversy has arisen and now exists among Plaintiff and Defendants

2    in that Plaintiff contends, and Defendants deny, that Defendants are liable under CERCLA for

3    the costs incurred and to be incurred by Plaintiff to investigate, remove or remediate hazardous

4    substances at the Site.

5    137.    Unless all of the rights, duties and obligations of Plaintiff and each Defendant are

6    determined in this action, there will be a multiplicity of actions.  Judicial determination of the

7    liability of each party is necessary and appropriate in order that Plaintiff may ascertain its rights

8    as against each Defendant.

9    138.    Pursuant to 28 U.S.C. § 2201(a) and 42 U.S.C. § 9613(g)(2), this Court has

10   jurisdiction to award declaratory relief.  Plaintiff, therefore, request a judicial determination of its

11   rights, and the duties and obligations of each Defendant, and all others, with respect to the

12   alleged release and/or threatened release of hazardous substances at the Shipyard Sediment Site

13   and the alleged property damage, including but not limited to alleged damage to aquatic life

14   resulting therefrom.  Plaintiff further requests that this Court apply all equitable factors and

15   principles in determining the fault and liability of each party in making an allocation and

16   apportionment for contributions by, between and among the parties.

17   **FOURTH CAUSE OF ACTION**

18   **(Contribution Under Hazardous Substance Account Act against all Defendants)**

19   139.    Plaintiff realleges all prior paragraphs and incorporates them by reference.

20   140.    The California Hazardous Substance Account Act ("HSAA") codified at

21   California Health & Safety Code §§ 25300 through 25395,45, states at § 25363(e):

22   Any person who has incurred removal or remedial action costs in accordance with this

23   chapter or the federal act [defined as the Comprehensive Environmental Response,

24   Compensation, and Liability Act of 1980, as amended (42 U.S.C. §§9601, et seq.)] may seek

25   contribution or indemnity from any person who is liable pursuant to this chapter.

26   141.    Plaintiff is a "person" who has incurred or will incur removal and remedial action

27   costs in accordance with Chapter 6.8 of the HSAA and with the federal act, within the meaning

28   of HSAA § 25319.

- 34 -

COMPLAINT

142.    Each Defendant is a "person who is liable" for removal and remedial action costs incurred by Plaintiff within the meaning of HSAA §§ 25319 and 25323.5.

143.    The contaminants released or discharged by Defendants are "hazardous substances" within the meaning of HSAA § 25316, and the federal act.

144.    The Shipyard Sediment Site is a "site" within the meaning of HSAA § 25323.9.

145.    The costs incurred by Plaintiff to investigate and remediate hazardous substances, alleged property damage, and alleged injury at the Shipyard Sediment Site have been incurred for "removal" or "remedial" actions within the meaning of HSAA §§ 25322 and 25323.

146.    All removal and remedial costs incurred, and to be incurred, by Plaintiff at the Shipyard Sediment Site are necessary costs of response that are consistent with HSAA § 25356.1.

147.    Plaintiff has given or will give written notice of this action to the Regional Board pursuant to HSAA § 25363(e).

148.    Defendants are liable to Plaintiff for all removal and remedial costs incurred to remedy the alleged effects of hazardous substances that Defendants have released or disposed at the Site.

149.    Plaintiff is entitled to contribution from Defendants for all response costs under California Health & Safety Code Section 25363(e). Accordingly, Plaintiff requests that judgment be entered in favor of Plaintiff and against Defendants as set forth below.

## FIFTH CAUSE OF ACTION

### (Declaratory Relief Under California Hazardous Substance Account Act against all Defendants)

150.    Plaintiff realleges all prior paragraphs and incorporates them by reference.

151.    Plaintiff has incurred costs in connection with its investigation of contamination at the Shipyard Sediment Site in accordance with the HSAA, California Health & Safety Code §25300, et seq.

152.    An actual controversy has arisen and now exists among Plaintiff and Defendants in that Plaintiff contends, and Defendants deny, that Defendants are liable under the HSAA for

- 35 -

COMPLAINT

Gordon & Rees LLP
101 West Broadway
Suite 1600
San Diego, CA 92101

1   the costs incurred and to be incurred by Plaintiff to investigate, remove or remediate hazardous

2   substances, and alleged property damage, including but not limited to alleged damage to aquatic

3   life, at the Site.

4      153.   Because the alleged contamination has not been fully mitigated according to

5   regulatory agencies, Plaintiff will incur necessary response costs under the HSAA in the future.

6      154.   Pursuant to California Health and Safety Code § 25363, Plaintiff is entitled to a

7   declaratory judgment establishing Defendants' liability for such response costs for the purposes

8   of this and any subsequent action or actions to recover further response costs. Accordingly,

9   Plaintiff requests that judgment be entered in favor of Plaintiff and against Defendants as set

10   forth below.

11              **SIXTH CAUSE OF ACTION**

12      **(Contribution under State law against all Defendants except NAVY)**

13      155.   Plaintiff incorporates the prior allegations by this reference as though fully set

14   forth herein.

15      156.   As a direct and proximate result of the releases and/or threatened releases of

16   hazardous substances into the environment, as alleged above, Plaintiff has incurred and will

17   incur response costs, beyond its share, for investigation and cleanup of the alleged

18   contamination.

19      157.   Plaintiff is informed and believes, and on that basis alleges, that the conduct of

20   Defendants was the proximate cause of the damages which Plaintiff has incurred because of

21   claims from third parties such as the Regional Board.

22      158.   Under Section 1432 of the California Civil Code, which states that "a party to a

23   joint, or joint and several obligation, who satisfies more than his share of the claim against all,

24   may require a proportionate contribution from all the parties joined with him," and under general

25   equitable principles and rules governing this action, Plaintiff is entitled to contribution from

26   Defendants for their share of the response costs and damages paid and to be paid by Plaintiff.

27

28

Gordon & Rees LLP
101 West Broadway
Suite 1600
San Diego, CA 92101

## SEVENTH CAUSE OF ACTION

### (Cost Recovery Pursuant to California Water Code

### Section 13304 against all Defendants)

159.   Plaintiff incorporates the prior allegations by this reference as though fully set forth herein.

160.   California Water Code section 13304(a) states in relevant part:

> Any person who has discharged or discharges waste into the waters of this state in violation of any waste discharge requirement or other order or prohibition issued by a regional board or state board, or who has caused or permitted, causes or permits, or threatens to cause or permit any waste to be discharged or deposited where it is, or probably will be, discharged into the waters of the state and creates, or threatens to create, a condition of pollution or nuisance, shall upon order of the regional board, clean up the waste, or, in the case of threatened pollution or nuisance, take other necessary remedial action, including, but not limited to, overseeing clean up and abatement efforts.

161.   California Water Code section 13304(c)(1) states in relevant part:

> If the waste is cleaned up or the effects of the waste are abated, or, in the case of threatened pollution or nuisance, other necessary remedial action is taken by any governmental agency, the person or persons who discharged the waste, discharges the waste, or threatened to cause or permit the discharge of the waste within the meaning of subdivision (a), are liable to that governmental agency to the extent of the reasonable costs actually incurred in cleaning up the waste, abating the effects of the waste, supervising cleanup or abatement activities, or taking other remedial action.  The amount of the costs is recoverable in a civil action by, and paid to, the governmental agency . . .

162.   Defendants, and each of them, through their operations at or adjacent to the Shipyard Sediment Site, discharged waste into the waters of the State in violation of their NPDES permits and the San Diego Basin Plan.  The discharges of waste by Defendants have caused a condition of pollution and nuisance.

163.   The waste discharged by Defendants, and each of them, and the alleged damage therefrom, have been and/or will be cleaned up and abated by Plaintiff, a governmental agency.  Plaintiff has incurred, and will continue to incur, reasonable costs to investigate, clean up and abate the Shipyard Sediment Site.

COMPLAINT

164.   Pursuant to Water Code section 13304(c)(1), Defendants, and each of them, are liable to Plaintiff for the costs it has and will incur in investigating, cleaning up and abating the waste discharged into the Shipyard Sediment Site by Defendants.

### EIGHTH CAUSE OF ACTION

### (Breach of Contract/Breach of Lease)

### (against NASSCO, NATIONAL STEEL & SHIPBUILDING CORPORATION & SDMCC DEFENDANTS)

165.   Plaintiff incorporates the prior allegations by this reference as though fully set forth herein.

166.   Plaintiff is informed and believes and, upon such information and belief, alleges that Defendants NASSCO, NATIONAL STEEL & SHIPBUILDING CORPORATION and the SDMCC DEFENDANTS entered into contracts and leases with Plaintiff to lease the land on which they conducted business operations on or in the vicinity of the Shipyard Sediment Site. Said leases were entered into pursuant to Plaintiff's role as the designated public trustee for the tidelands area prior to Plaintiff transferring that authority to Defendant PORT DISTRICT in or about February 1963.

167.   NASSCO and/or its predecessors leased the NAASCO Leasehold from Plaintiff for its operations from on or about 1945 to 1962.

168.   NATIONAL STEEL & SHIPBUILDING CORPORATION leased land within the NASSCO Leasehold from Plaintiff for its operations from on or about 1950 to 1960.

169.   The SDMCC DEFENDANTS leased land within the BAE Leasehold from Plaintiff for its operations from on or about 1915 to 1962.

170.   Plaintiff was a non-operating trustee as to each parcel of property leased to these Defendants.  Plaintiff did not conduct any operations on these parcels of property at any time; Plaintiff did not discharge any hazardous substances from these leaseholds; nor did Plaintiff cause or permit any hazardous substances to be discharged from these leaseholds.  All operations on the parcels of property leased to these Defendants were conducted by Defendants.

Gordon & Rees LLP
101 West Broadway
Suite 1600
San Diego, CA 92101

171.   In its leases with Plaintiff, NASSCO agreed to provide proper containers for trash and garbage and keep the demised premises free and clear of rubbish, debris and litter at all time, and, upon the expiration of the lease, to leave the premises in as good a condition as when first occupied by it.  Defendant NASSCO further agreed to be responsible for all repairs and alterations upon the leased premises.

172.   In its leases with Plaintiff, NATIONAL STEEL & SHIPBUILDING CORPORATION agreed to provide proper containers for trash and garbage and keep the demised premises free and clear of rubbish, debris and litter at all time, and, upon the expiration of the lease, to leave the premises in as good a condition as when first occupied by it.  Defendant NATIONAL STEEL & SHIPBUILDING CORPORATION further agreed to be responsible for all repairs and alterations upon the leased premises.

173.   In its leases with Plaintiff, the SDMCC DEFENDANTS agreed to do no work upon the premises that would materially decrease the amount of tidal waters in the San Diego Bay and to be responsible for all work or "change" upon the leased premises.

174.   Plaintiff performed all of its obligations in these leases.

175.   Defendants NASSCO and NATIONAL STEEL & SHIPBUILDING CORPORATION, and the SDMCC DEFENDANTS, have not performed their contractual obligations and duties expressly identified in their contracts with Plaintiff, as discussed above, given their respective releases of hazardous substances into the Shipyard Sediment Site during their historic operations thereat or in the vicinity thereof.

176.   As a direct and proximate result of the breach of these contractual duties by these Defendants, Plaintiff has sustained damages in a sum presently unascertained, but in an amount to be shown according to proof at trial.

177.   Plaintiff is informed and believes, and on such basis alleges, that these damages include, but are not limited to, costs incurred by Plaintiff to respond to the claims of regulatory agencies, including the Regional Board, and to investigate environmental contamination at the Shipyard Sediment Site, including at and about the parcels of property previously leased by Defendants from Plaintiff.  Plaintiff is continuing to be damaged, and will have to spend

Gordon & Rees LLP
101 West Broadway
Suite 1600
San Diego, CA 92101

1    additional sums for further investigation and remedial activity.

2         178.   Plaintiff is informed and believes, and on such basis alleges that Plaintiff's

3    damages are directly and proximately caused and contributed to by the sole fault and/or

4    negligence and/or strict liability or other actionable conduct of Defendants via their operations at

5    the parcels of property leased from Plaintiff.

6         179.   Plaintiff prays for judgment as hereinafter set forth.

7                          **NINTH CAUSE OF ACTION**

8    **(Express Indemnity Against NASSCO, NATIONAL STEEL & SHIPBUILDING**
     **CORPORATION and SDMCC DEFENDANTS)**

9         180.   Plaintiff incorporates the prior allegations by this reference as though fully set

10   forth herein.

11        181.   Defendants NASSCO, NATIONAL STEEL & SHIPBUILDING

12   CORPORATION and the SDMCC DEFENDANTS entered into written contracts and leases

13   with Plaintiff for the lease of property held in public trust by Plaintiff, as discussed above.

14        182.   Plaintiff's lease agreements with NASSCO contain indemnity provisions, which

15   require NASSCO to indemnify Plaintiff for costs incurred, or to be incurred, for cleaning up

16   alleged environmental contamination at the Shipyard Sediment Site from its activities thereat.

17   Defendant NASSCO expressly agreed to "save Lessor free and harmless and indemnify it against

18   all claims for labor or materials for or in connection with any and all work, change or

19   improvements in or upon the leased premises, and the costs of defending such claims, including

20   reasonable attorney fees." Defendant NASSCO also agreed to take out public liability insurance

21   to "protect against liability imposed by law or damages to any property or person caused directly

22   or indirectly by or from the acts or activities of the Lessee or any person acting for it or under its

23   control or direction...."

24        183.   Plaintiff's lease agreements with NATIONAL STEEL & SHIPBUILDING

25   CORPORATION contain indemnity provisions, which require NATIONAL STEEL &

26   SHIPBUILDING CORPORATION to indemnify Plaintiff for costs incurred, or to be incurred,

27   for cleaning up alleged environmental contamination at the Shipyard Sediment Site from its

28

Gordon & Rees LLP
101 West Broadway
Suite 1600
San Diego, CA 92101

- 40 -

activities there.  Defendant NATIONAL STEEL & SHIPBUILDING CORPORATION

expressly agreed to "save Lessor free and harmless and indemnify it against all claims for labor

or materials for or in connection with any and all work, change or improvements in or upon the

leased premises, and the costs of defending such claims, including attorney fees."  Defendant

NATIONAL STEEL & SHIPBUILDING CORPORATION also agreed to take out public

liability insurance to "protect against liability imposed by law or damages to any property or

person caused directly or indirectly by or from the acts or activities of the Lessee or any person

acting for it or under its control or direction...."

184.   Plaintiff's lease agreements with the SDMCC DEFENDANTS contain indemnity

provisions, which require the SDMCC DEFENDANTS to indemnify Plaintiff for costs incurred,

or to be incurred, for removing and abating the alleged environmental contamination at the

Shipyard Sediment Site from its activities there.  The SDMCC DEFENDANTS expressly agreed

to "save Lessor free and harmless and indemnify it against all claims for labor and materials in

connection with improvements, repairs and alterations in or upon the leased premises."

185.   Plaintiff has performed and satisfied all the conditions precedent to the

obligations of the Leases.

186.   None of the above-named Defendants have, to date, indemnified or held Plaintiff

free and harmless from the alleged property damage and alleged injury at issue resulting from

their acts, omissions and operations at or near the Site, and their changes and alterations to the

property leased from Plaintiff, as agreed in their Leases with Plaintiff.  Nor have any of the

above-named Defendants, to date, acknowledged a duty to do so.

187.   Plaintiff is informed and believes and, upon such information and belief, alleges

that Plaintiff's damages are directly and proximately caused and contributed to by the sole fault,

and/or negligence, and/or strict liability and/or other actionable conduct of Defendants in their

operations at or in the vicinity of the Shipyard Sediment Site.

188.   Plaintiff is entitled to indemnity from Defendants as expressly provided by

contract for all costs incurred, and to be incurred, by Plaintiff in connection with the

contamination at the Shipyard Sediment Site, including attorneys' fees where provided for by

Gordon & Rees LLP
101 West Broadway
Suite 1600
San Diego, CA 92101

1    contract.

2                         **TENTH CAUSE OF ACTION**

3                  **(Negligence against all Defendants except NAVY)**

4           189.    Plaintiff realleges and incorporates the prior allegations by this reference as

5    though fully set forth herein.

6           190.    Defendants had a duty of care with respect to their operations and actions at or

7    near the Shipyard Sediment Site and/or their ownership of and management of and authority over

8    property on which defendants operated and acted.

9           191.    Plaintiff is informed and believes, and on that basis alleges, that Defendants, and

10   each of them, breached their duty of care in connection with their operation of or activities at or

11   near the Shipyard Sediment Site by virtue of their actions as alleged herein.

12          192.    These breaches of duty by Defendants proximately caused the accidental releases

13   and/or threatened releases of hazardous substances at the Shipyard Sediment Site.  Plaintiff has

14   incurred costs in responding to those releases and expects to incur additional costs in the future

15   as a result of this negligence on the part of Defendants.

16          193.    Consequently, Plaintiff is entitled to damages according to proof at trial.

17                       **ELEVENTH CAUSE OF ACTION**

18                **(Negligence Per Se against all Defendants except NAVY))**

19          194.    Plaintiff realleges and incorporates the prior allegations by this reference as

20   though fully set forth herein.

21          195.    Plaintiff is informed and believes, and on that basis alleges, that Defendants'

22   conduct, as detailed herein, leading to the release and/or threatened accidental releases of

23   hazardous substances at the Site violated applicable legal requirements governing the transport,

24   handling, storage, treatment, use and disposal of hazardous substances. Such releases or

25   threatened releases are the type of occurrences which the aforementioned legal requirements are

26   designed to prevent.

27          196.    Plaintiff is informed and believes, and on that basis alleges, that Defendants had

28   knowledge or reasonable cause to believe that releases and/or threatened releases of hazardous

Gordon & Rees LLP
101 West Broadway
Suite 1600
San Diego, CA 92101

- 42 -

1   substances by Defendants have come or will come to be located on or about the Shipyard

2   Sediment Site in amounts required to be reported to a state or local agency pursuant to law, and

3   Defendants did not give Plaintiff timely and adequate written notice, if any, of the releases or

4   threatened releases or of that condition to Plaintiff.

5        197.   Plaintiff is among the class of persons which such legal requirements were

6   designed and intended to protect.

7        198.   The violations by Defendants of those legal requirements proximately caused

8   harm to Plaintiff, who has been required to respond to said releases and/or threatened releases of

9   hazardous substances at the Shipyard Sediment Site, and who will be required to continue to

10  respond to them in the foreseeable future.  As a result of Defendants' actions, Plaintiff is entitled

11  to damages according to proof at trial.

12       199.   The foregoing acts and omissions of Defendants, as detailed in the general

13  allegations herein, violate various statutory provisions, including but not limited to, California

14  Health and Safety Code §§ 25359, et. seq.; California Health and Safety Code §§ 25249.5 et

15  seq.; California Health and Safety Code §§ 25100 et seq.; Health & Safety Code §§ 25189(c)-

16  (d); California Water Code §§ 13000 et. seq. (including § 13400); and Fish & Game Code §§

17  5650, et. seq.

18       200.   Defendants failed to comply with the state law as detailed above.  Plaintiff has

19  sustained injury as a result of Defendants' negligent conduct, including investigative costs,

20  removal and remedial costs, attorney's fees and expert costs, and other costs, as described herein.

21  As a further direct and proximate cause of the negligence per se by Defendants, Plaintiff has

22  suffered damages as previously described herein, including other consequential, incidental, and

23  general damages to be proven at trial.

24       201.   As a result of Defendants' statutory violations, Plaintiff prays for damages and

25  any other relief appropriate under the law as set forth below.

## TWELFTH CAUSE OF ACTION

### (Private Nuisance against all Defendants except NAVY)

28       202.   Plaintiff realleges and incorporates the prior allegations by this reference as

Gordon & Rees LLP
101 West Broadway
Suite 1600
San Diego, CA 92101

- 43 -

though fully set forth herein.

203.    Plaintiff is informed and believes, and on that basis alleges, that Defendants released and/or discharged hazardous substances into the Shipyard Sediment Site in violation of the law and public and private safety by improperly releasing, discharging, handling, and disposing of hazardous substances, resulting in contamination of the Site, as discussed in detail herein.

204.    Plaintiff is informed and believes, and on that basis alleges, that the contamination at the Site constitutes a nuisance under California Civil Code sections 3479 and 3481, because it is injurious to health and interferes with the customary use of the Shipyard Sediment Site and surrounding area.

205.    Plaintiff has sustained injury as a result of this nuisance, including investigative costs, removal and remedial costs, attorney's fees and expert costs, and other costs, as described herein. Plaintiff has and will continue to suffer economic damages as previously described herein, including other consequential, incidental, and general damages in an amount to be proven at trial for investigating and responding to this nuisance.

## THIRTEENTH CAUSE OF ACTION

### (Public Nuisance against all Defendants except NAVY)

206.    Plaintiff realleges and incorporates the prior allegations by this reference as though fully set forth herein.

207.    Defendants' discharge, deposit, disposal and release of hazardous substances at the Shipyard Sediment Site has resulted in conditions that are injurious to health, offensive to the senses, and an interference with the free use of property so as to interfere with the comfortable enjoyment of life and property.  The conditions caused by Defendants constitute a nuisance within the meaning of California Civil Code § 3479.

208.    The nuisance caused by Defendants is a public nuisance because it affects an entire area or neighborhood and a considerable number of persons within the meaning of California Civil Code § 3480.

209.    Plaintiff has standing to bring this action to abate the public nuisance because it

- 44 -
COMPLAINT

Gordon & Rees LLP
101 West Broadway
Suite 1600
San Diego, CA 92101

1    has been specially injurious to Plaintiff within the meaning of California Civil Code § 3495.

2        210.    The public nuisance is continuing because, among other things, it can be abated

3    and it varies over time.

4        211.    As a direct and proximate result of the public nuisance caused by Defendants,

5    Plaintiff has been damaged as alleged herein. In accordance with California Code of Civil

6    Procedure § 731, Plaintiff is entitled to damages as well as injunctive relief requiring Defendants

7    to abate the continuing public nuisance.

8        212.    As a result of the public nuisance, Plaintiff prays for injunctive relief and damages

9    as set forth below.

10    **FOURTEENTH CAUSE OF ACTION**

11    **(Trespass against all Defendants except NAVY)**

12        213.    Plaintiff realleges and incorporates the prior allegations by this reference as

13    though fully set forth herein.

14        214.    From on or about 1914 to 1962, Plaintiff served as the trustee of the NASSCO

15    and BAE SYSTEMS' leaseholds on behalf of the People of the State of California. Furthermore,

16    from on or about 1914 to present, Plaintiff has been in lawful possession of its MS4 storm water

17    system which is located at and about the Shipyard Sediment Site, including its SW4 outfall at the

18    BAE SYSTEMS leasehold.

19        215.    Defendants caused hazardous substances to intrude on the above-described

20    property that was lawfully in the possession of Plaintiff. Such intrusion was not permitted.

21        216.    Plaintiff is informed and believes, and on that basis alleges, that this intrusion was

22    intentional or negligent or resulted from ultra hazardous conduct.

23        217.    Defendants' trespass directly and proximately caused damages that have been,

24    and will continue to be, sustained by Plaintiff.

25        218.    Consequently, Plaintiff is entitled to damages according to proof at trial.

26    **FIFTEENTH CAUSE OF ACTION**

27    **(Declaratory Relief Under State Law against all Defendants except NAVY)**

28        219.    Plaintiff realleges and incorporates the prior allegations by this reference as

Gordon & Rees LLP
101 West Broadway
Suite 1600
San Diego, CA 92101

though fully set forth herein.

220.    An actual controversy exists between Plaintiff and Defendants with respect to their respective rights and obligations under federal and state laws. Plaintiff seeks a judicial determination of the respective rights and duties of the parties with respect to the rights, claims and damages alleged herein.

221.    Plaintiff also seeks a declaration by this court that Defendant NASSCO and the SDMCC DEFENDANTS are obligated contractually to investigate and clean up the contamination at issue, and to indemnify and hold Plaintiff harmless; that Plaintiff complied with all conditions and obligations under the leases at issue; and that because of Defendants' breach of lease, negligence, nuisance, trespass, and statutory violations, Plaintiff has been damaged according to proof.

222.    The requested declaration is necessary and appropriate at this time to allow Plaintiff to ascertain its rights and duties with respect to the claims at issue in this action.

223.    As a result, Plaintiff prays for declaratory relief as set forth below.

### PRAYER FOR RELIEF

Plaintiff prays for judgment against Defendants as follows:

1.    For recovery of costs from Defendants for costs which Plaintiff has incurred and expects to incur in responding to releases of hazardous substances at the Shipyard Sediment Site including without limitation, the costs of investigation, clean-up, removal of contaminated soils, and completing any additional investigation, monitoring, and remediation at the Shipyard Sediment Site, in amounts to be determined at the trial of this matter;

2.    For contribution toward any costs which Plaintiff has incurred or will incur in responding to the releases of hazardous substances at the Shipyard Sediment Site as alleged in Plaintiffs' complaint, including without limitation, the costs of investigation, clean-up, dredging of contaminated sediments, and completing any additional investigation, monitoring, and remediation at the Shipyard Sediment Site, in amounts to be determined at the trial of this matter;

2.    For indemnification and/or contribution in full or in part to any costs, damages and liabilities arising from the alleged contamination of the Shipyard Sediment Site which

Gordon & Rees LLP
101 West Broadway
Suite 1600
San Diego, CA 92101

1   Plaintiff incurs in responding to the releases and/or threatened releases of hazardous substances

2   at the Shipyard Sediment Site including without limitation, the costs of investigation, clean-up,

3   dredging of contaminated sediments, monitoring, and completing any additional investigation

4   and remediation at the Property, in amounts to be determined at the trial of this matter;

5        3.     For a declaration determining of the rights of Plaintiff, and the duties and

6   obligations of each Defendant, and all others, with respect to the releases and/or threatened

7   releases of hazardous substances at and into the Shipyard Sediment Site and the alleged damages

8   resulting therefrom;

9        4.     For a declaration that Defendant NASSCO and the SDMCC DEFENDANTS are

10  obligated to indemnify and hold Plaintiff harmless from and against any and all claims arising

11  out of their alleged contamination at or into the Shipyard Sediment Site;

12       5.     For an order directing Defendants to cease any ongoing unlawful releases and/or

13  threatened releases of hazardous substances at the Shipyard Sediment Site;

14       6.     For damages according to proof at trial, including but not limited to all costs and

15  expenses paid and to be paid in complying with the Regional Board's claims relating to

16  investigation and cleanup of the Site;

17       7.     For an award of the costs of this litigation including but not limited to costs that

18  Plaintiff has incurred and will continue to incur to defend against claims relating to the

19  investigation and cleanup of alleged contamination on the Site, reasonable attorneys' fees and

20  experts' fees;

21       8.     For any and all remedies authorized under section California Health and Safety

22  Code §§ 25359, et. seq.; California Health and Safety Code §§ 25249.5 et seq.; California Health

23  and Safety Code §§ 25100 et seq.; Health & Safety Code §§ 25189(c)(d); California Water Code

24  §§ 13000 et. seq.; and Fish & Game Code §§ 5650, et. seq.;

25       9.     For prejudgment interest at the maximum rate permitted by law;

26       10.     For such other and further relief as the Court may deem appropriate.

27

28

Gordon & Rees LLP
101 West Broadway
Suite 1600
San Diego, CA 92101

## JURY DEMAND

Plaintiff hereby demands a trial by jury of all issues triable by jury.

Dated: _October 13_, 2009

GORDON & REES, LLP

By: _____
Brian M. Ledger
Kristin N. Reyna
Attorneys for City of San Diego

Gordon & Rees LLP
101 West Broadway
Suite 1600
San Diego, CA 92101

# EXHIBIT "A"

# TENTATIVE

## CALIFORNIA REGIONAL WATER QUALITY CONTROL BOARD
## SAN DIEGO REGION

### TENTATIVE CLEANUP AND ABATEMENT ORDER
### NO. R9-2005-0126

NATIONAL STEEL AND SHIPBUILDING COMPANY

BAE SYSTEMS SAN DIEGO SHIP REPAIR, INC.
(FORMERLY SOUTHWEST MARINE, INC.)

CITY OF SAN DIEGO

MARINE CONSTRUCTION AND DESIGN COMPANY
AND CAMPBELL INDUSTRIES, INC.

SAN DIEGO GAS AND ELECTRIC,
A SUBSIDIARY OF SEMPRA ENERGY COMPANY

UNITED STATES NAVY

### SHIPYARD SEDIMENT SITE
### SAN DIEGO BAY
### SAN DIEGO, CALIFORNIA

The California Regional Water Quality Control Board, San Diego Region (hereinafter Regional Board), finds that:

*JURISDICTION*

1. **WASTE DISCHARGE.** Elevated levels of pollutants above San Diego Bay background conditions exist in the San Diego Bay bottom marine sediment along the eastern shore of central San Diego Bay in an area extending approximately from the Sampson Street Extension to the north and Chollas Creek to the south and from the National Steel and Shipbuilding Company Shipyard facility (hereinafter "NASSCO") and the BAE Systems San Diego Ship Repair Facility (hereinafter "BAE Systems") shoreline out to the San Diego Bay

1 of 28

main shipping channel to the west. This area is hereinafter collectively referred to as the
"Shipyard Sediment Site". NASSCO; BAE Systems San Diego Ship Repair, Inc.; City of
San Diego; Marine Construction and Design Company and Campbell Industries, Inc.; San
Diego Gas and Electric, a subsidiary of Sempra Energy Company; and the United States
Navy have each caused or permitted the discharge of waste to the Shipyard Sediment Site
resulting in the accumulation of waste in the marine sediment. The contaminated marine
sediment has caused conditions of contamination or nuisance in San Diego Bay that
adversely affects aquatic life, aquatic-dependent wildlife, human health, and San Diego Bay
beneficial uses. A map of the Shipyard Sediment Site region is provided in Attachment 1 to
this Order.

### PERSONS RESPONSIBLE

2. **NATIONAL STEEL AND SHIPBUILDING COMPANY (NASSCO), A SUBSIDIARY
   OF GENERAL DYNAMICS COMPANY.** The National Steel and Shipbuilding
   Company, (hereinafter NASSCO) has (1) discharged waste from its shipyard operations into
   San Diego Bay in violation of waste discharge requirements; and (2) caused or permitted
   waste to be discharged or deposited where it was discharged into San Diego Bay and created,
   or threatens to create, a condition of pollution or nuisance. These wastes contained metals
   (arsenic, cadmium, chromium, copper, lead, mercury, nickel, silver, and zinc), butyl tin
   species, polychlorinated biphenyls (PCBs), polychlorinated terphenyls (PCTs), polynuclear
   aromatic hydrocarbons (PAHs), and total petroleum hydrocarbons (TPH). Based on these
   considerations NASSCO is referred to as "Discharger(s)" in this Cleanup and Abatement
   Order.

   NASSCO, a subsidiary of General Dynamics Company, owns and operates a full service ship
   construction, modification, repair, and maintenance facility on 126 acres of tidelands
   property leased from the San Diego Unified Port District (SDUPD) on the eastern waterfront
   of central San Diego Bay at 2798 Harbor Drive in San Diego. Shipyard operations have been
   conducted at this site by NASSCO over San Diego Bay waters or very close to the waterfront
   since 1945. Shipyard facilities operated by NASSCO over the years at the Site have included
   concrete platens used for steel fabrication, a graving dock, shipbuilding ways, and berths on
   piers or land to accommodate the berthing of ships. An assortment of waste is generated at
   the facility including spent abrasive, paint, rust, petroleum products, marine growth, sanitary
   waste, and general refuse.

3. **BAE SYSTEMS SAN DIEGO SHIP REPAIR, INC., FORMERLY SOUTHWEST MARINE, INC.** BAE Systems San Diego Ship Repair, Inc. has (1) discharged waste from its shipyard operations into San Diego Bay in violation of waste discharge requirements; and (2) caused or permitted waste to be discharged or deposited where it was discharged into San Diego Bay and created, or threatens to create, a condition of pollution or nuisance. These wastes contained metals (arsenic, cadmium, chromium, copper, lead, mercury, nickel, silver, and zinc), butyl tin species, polychlorinated biphenyls (PCBs), polychlorinated terphenyls (PCTs), polynuclear aromatic hydrocarbons (PAHs), and total petroleum hydrocarbons (TPH). Based on these considerations BAE Systems San Diego Ship Repair, Inc. is referred to as "Discharger(s)" in this Cleanup and Abatement Order.

From 1979 to the present, Southwest Marine, Inc. and its successor BAE Systems San Diego Ship Repair, Inc., hereinafter collectively referred to as BAE Systems, have owned and operated a ship repair, alteration, and overhaul facility on approximately 39.6 acres of tidelands property on the eastern waterfront of central San Diego Bay. The facility, currently referred to as BAE Systems San Diego Ship Repair, is located on land leased from the San Diego Unified Port District (SDUPD) at 2205 East Belt Street, foot of Sampson Street in San Diego, San Diego County, California. Shipyard facilities operated by BAE Systems over the years have included concrete platens used for steel fabrication, two floating dry docks, five piers, and two marine railways. An assortment of waste has been generated at the facility including spent abrasive, paint, rust, petroleum products, marine growth, sanitary waste, and general refuse.

4. **CITY OF SAN DIEGO.** The City of San Diego owns and operates a municipal separate storm sewer system (MS4) through which it discharges waste commonly found in urban runoff to San Diego Bay subject to the terms and conditions of a NPDES Storm Water Permit. The City of San Diego has discharged urban storm water containing waste directly to San Diego Bay at the Shipyard Sediment Site in violation of waste discharge requirements. The waste includes metals (arsenic, cadmium, chromium, copper, lead, mercury, nickel, silver, and zinc), total suspended solids, sediment (due to anthropogenic activities), petroleum products, and synthetic organics (pesticides, herbicides, and PCBs) through its SW4 (located on the BAE Systems leasehold) and SW9 (located on the NASSCO leasehold) MS4 conduit pipes.

The City of San Diego has also discharged urban storm water containing waste in violation of waste discharge requirements, through its MS4 to Chollas Creek resulting in the exceedances of chronic and acute California Toxics Rule copper, lead, and zinc criteria for the protection of aquatic life, in violation of waste discharge requirements prescribed by the Regional Board. Studies indicate that during storm events, storm water plumes toxic to marine life emanate from Chollas Creek up to 1.2 kilometers into San Diego Bay, and contribute to pollutant levels at the Shipyard Sediment Site. The urban storm water containing waste that has discharged from the on-site and off-site MS4 has contributed to the accumulation of pollutants in the marine sediments at the Shipyard Sediment Site to levels, that cause, and threaten to cause, conditions of pollution, contamination, and nuisance by exceeding applicable water quality objectives for toxic pollutants in San Diego Bay. Based

on these considerations the City of San Diego is referred to as "Discharger(s)" in this
Cleanup and Abatement Order.

5. **MARINE CONSTRUCTION AND DESIGN COMPANY AND CAMPBELL
   INDUSTRIES, INC.** Marine Construction and Design Company and Campbell Industries,
   Inc. (hereinafter collectively referred to as "SDMC") has (1) discharged pollutants from its
   shipyard operations into San Diego Bay in violation of waste discharge requirements; and (2)
   caused or permitted waste to be discharged or deposited where it was discharged into San
   Diego Bay and created, or threatens to create, a condition of pollution or nuisance. These
   wastes contained metals (arsenic, cadmium, chromium, copper, lead, mercury, nickel, silver,
   and zinc), butyl tin species, polychlorinated biphenyls (PCBs), polychlorinated terphenyls
   (PCTs), polynuclear aromatic hydrocarbons (PAHs), and total petroleum hydrocarbons
   (TPH). Based on these considerations, Marine Construction and Design Company and
   Campbell Industries, Inc. are referred to as "Discharger(s)" in this Cleanup and Abatement
   Order.

   Between 1914 and 1979, San Diego Marine Construction Company and its successor San
   Diego Marine Construction Corporation, a wholly owned subsidiary of Campbell Industries,
   Inc., a wholly owned subsidiary of Marine Construction and Design Company (MARCO),
   collectively referred to as SDMC, operated a ship repair, alteration, and overhaul facility on
   what is now the BAE Systems leasehold at the foot of Sampson Street in San Diego.
   Shipyard operations were conducted at this site by SDMC over San Diego Bay waters or
   very close to the waterfront. An assortment of waste was generated at the facility including
   spent abrasive blast waste, paint, rust, petroleum products, marine growth, sanitary waste,
   and general refuse.

6. **CHEVRON, A SUBSIDIARY OF CHEVRONTEXACO.** Chevron owns and operates the
   Chevron Terminal, a bulk fuel storage facility currently located at 2351 East Harbor Drive in
   the City of San Diego adjacent to the NASSCO and BAE Systems leaseholds. Fuel products
   containing petroleum hydrocarbons have been stored at the Chevron Terminal since the early
   1900s at both the currently operating 7 million gallon product capacity upper tank farm and
   the closed 5 million gallon capacity lower tank farm. Based on the information that the
   Regional Board has reviewed to date, there is insufficient evidence to find that discharges
   from the Chevron Terminal contributed to the accumulation of pollutants in the marine
   sediments at the Shipyard Sediment Site to levels, which create, or threaten to create,
   conditions of pollution or nuisance. Accordingly, Chevron is not referred to as
   "Discharger(s)" in this Cleanup and Abatement Order.

7. **BP AS THE PARENT COMPANY AND SUCCESSOR TO ATLANTIC RICHFIELD**. BP owns and operates the Atlantic Richfield Company (ARCO) Terminal, a bulk fuel storage facility with approximately 9 million gallons of capacity located at 2295 East Harbor Drive in the City of San Diego. Fuel products containing petroleum hydrocarbons and related constituents such as polynuclear aromatic hydrocarbons (PAHs) have been stored at ARCO Terminal since the early 1900s. ARCO owned and operated ancillary facilities include a wharf, fuel pier (currently BAE Systems Pier 4), and a marine fueling station used for loading and unloading petroleum products and fueling from 1925 to 1978, and five pipelines connecting the terminal to the pier and wharf in use from 1925 to 1978. Storm water flows from ARCO Terminal enter a City of San Diego MS4 storm drain that terminates in San Diego Bay in the Shipyard Sediment Site approximately 300 feet south of the Sampson Street extension. Based on the information that the Regional Board has reviewed to date, there is insufficient evidence to find that discharges from the ARCO Terminal contributed to the accumulation of pollutants in the marine sediments at the Shipyard Sediment Site to levels, which create, or threaten to create, conditions of pollution or nuisance. Accordingly, BP and ARCO are not referred to as "Discharger(s)" in this Cleanup and Abatement Order.

8. **SAN DIEGO GAS AND ELECTRIC, A SUBSIDIARY OF SEMPRA ENERGY**. SDG&E (1) has discharged waste from its power plant operations, including metals (copper, nickel, and zinc) into San Diego Bay in violation of waste discharge requirements; and (2) caused or permitted waste (including metals [chromium, copper, lead, nickel, and zinc], polychlorinated biphenyls [PCBs], polynuclear aromatic hydrocarbons [PAHs], and total petroleum hydrocarbons [TPH-d and TPH-h]) to be discharged or deposited where it was discharged into San Diego Bay and created, or threatens to create, a condition of pollution or nuisance. Based on these considerations SDG&E is referred to as "Discharger(s)" in this Cleanup and Abatement Order.

San Diego Gas and Electric, a subsidiary of Sempra Energy Company (hereinafter SDG&E) owned and operated the Silver Gate Power Plant along the north side of the BAE Systems leasehold from approximately 1943 to the 1990s. SDG&E utilized an easement to San Diego Bay along BAE Systems' north property boundary for the intake and discharge of cooling water via concrete tunnels at flow rates ranging from 120 to 180 million gallons per day. SDG&E operations included discharging waste to holding ponds above the tunnels near the Shipyard Sediment Sites.

Revised Tentative Cleanup and Abatement Order No. R9-2005-0126                    April 4, 2008
Shipyard Sediment Site

9.   **UNITED STATES NAVY.**  The U.S. Navy owns and operates a municipal separate storm
     sewer system (MS4) at NAVSTA San Diego through which it has caused or permitted the
     discharge of waste commonly found in urban runoff to Chollas Creek and San Diego Bay,
     including excessive concentrations of copper, lead, and zinc in violation of waste discharge
     requirements.  Technical reports by the U.S. Navy and others indicate that Chollas Creek
     outflows during storm events convey elevated sediment and urban runoff chemical pollutant
     loading and its associated toxicity up to 1.2 kilometers into San Diego Bay over an area
     including the Shipyard Sediment Site.  The U.S. Navy has caused or permitted marine
     sediment and associated waste to be resuspended into the water column as a result of shear
     forces generated by the thrust of propellers during ship movements at NAVSTA San Diego.
     The resuspended sediment and pollutants can be transported by tidal currents and deposited
     in other parts of San Diego Bay, including the Shipyard Sediment Site.  The above
     discharges have contributed to the accumulation of pollutants in marine sediment at the
     Shipyard Sediment Site to levels that cause, and threaten to cause, conditions of pollution,
     contamination, and nuisance by exceeding applicable water quality objectives for toxic
     pollutants in San Diego Bay.  Based on the preceding considerations, the U.S. Navy is
     referred to as "Discharger(s)" in this Cleanup and Abatement Order.

     From the year 1921 to the present, the U.S. Navy has provided shore support and pier-side
     berthing services to U.S. Pacific fleet vessels at Naval Station San Diego (NAVSTA San
     Diego) located at 3445 Surface Navy Boulevard in the City of San Diego.  NAVSTA San
     Diego currently occupies 1,029 acres of land and 326 water acres adjacent to San Diego Bay
     to the west, and Chollas Creek to the north near Pier 1.  Between the years 1938 and 1956 the
     NAVSTA San Diego leasehold included a parcel of land, referred to as the 28th Street Shore
     Boat Landing Station, located at the south end of the present day NASSCO leasehold at the
     foot of 28th Street and including the 28th Street Pier.  At this location, the U.S. Navy
     conducted operations similar in scope to a small boatyard including solvent cleaning and
     degreasing of vessel parts and surfaces, abrasive blasting and scraping for paint removal and
     surface preparations, metal plating, and surface finishing and painting.  Prevailing industry-
     wide boatyard operational practices employed during the 1930s through the 1980s were often
     not sufficient to adequately control or prevent pollutant discharges and often led to excessive
     discharges of pollutants and accumulation of pollutants in marine sediment in San Diego
     Bay.  The types of pollutants found in elevated concentrations at the Shipyard Sediment Site
     (metals, butyltin species, polychlorinated biphenyls (PCBs), polychlorinated terphenyls
     (PCTs), polynuclear aromatic hydrocarbons (PAHs), and total petroleum hydrocarbons
     (TPH)) are associated with the characteristics of the waste the U.S. Navy operations
     generated at the 28th Street Shore Boat Landing Station site.

## FACTUAL BACKGROUND

10. **CLEAN WATER ACT SECTION 303(d) LIST.** Approximately 55 acres of San Diego Bay shoreline between Sampson and 28th Streets is listed on the Clean Water Act Section 303(d) list of water quality limited segments for elevated levels of copper, mercury, zinc, PAHs, and PCBs in the marine sediment. These pollutants are impairing the aquatic life, aquatic-dependent wildlife, and human health beneficial uses designated for San Diego Bay. The Shipyard Sediment Site occupies this shoreline. The Regional Board has determined that issuance of a cleanup and abatement order (in lieu of a Total Maximum Daily Load program) is the appropriate regulatory tool to use for correcting the impairment at the Shipyard Sediment Site.

11. **SEDIMENT QUALITY INVESTIGATION.** NASSCO and BAE Systems (formerly Southwest Marine) conducted a detailed sediment investigation at the Shipyard Sediment Site in San Diego Bay within and adjacent to the NASSCO and BAE Systems leaseholds. Two phases of fieldwork were conducted, Phase I in 2001 and Phase II in 2002. The results of the investigation are provided in the Exponent report *NASSCO and Southwest Marine Detailed Sediment Investigation, September 2003* (Shipyard Report). Unless otherwise explicitly stated, the Regional Board's finding and conclusions in this Cleanup and Abatement Order are based on the data and other technical information contained in the Shipyard Report prepared by NASSCO's and BAE Systems' consultant, Exponent.

## AQUATIC LIFE BENEFICIAL USE IMPAIRMENT

12. **AQUATIC LIFE IMPAIRMENT.** Aquatic life beneficial uses designated for San Diego Bay are impaired due to the elevated levels of pollutants present in the marine sediment at the Shipyard Sediment Site. Aquatic life beneficial uses include: Estuarine Habitat (EST), Marine Habitat (MAR), and Migration of Aquatic Organisms (MIGR). This finding is based on the considerations described below in this *Impairment of Aquatic Life Beneficial Uses* section of the Cleanup and Abatement Order.

13. **WEIGHT-OF-EVIDENCE APPROACH.** The Regional Board used a weight-of-evidence approach based upon multiple lines of evidence to evaluate the potential risks to aquatic life beneficial uses from pollutants at the Shipyard Sediment Site. The approach focused on measuring and evaluating exposure and adverse effects to the benthic macroinvertebrate community and to fish using data from multiple lines of evidence and best professional judgment. Pollutant exposure and adverse effects to the benthic macroinvertebrate community were evaluated using sediment quality triad measurements, bioaccumulation analyses, and interstitial water (i.e., pore water) analyses. The Regional Board evaluated pollutant exposure and adverse effects to fish using fish histopathology analyses and analyses of PAH breakdown products in fish bile.

14. **SEDIMENT QUALITY TRIAD MEASURES.** The Regional Board used lines of evidence organized into a sediment quality triad, to evaluate potential risks to the benthic community from pollutants present in the Shipyard Sediment Site. The sediment quality triad provides a "weight-of-evidence" approach to sediment quality assessment by integrating synoptic measures of sediment chemistry, toxicity, and benthic community composition. All three measures provide a framework of complementary evidence for assessing the degree of pollutant-induced degradation in the benthic community.

15. **REFERENCE SEDIMENT QUALITY CONDITIONS.** The Regional Board selected a group of reference stations from three independent sediment quality investigations to contrast pollution conditions at the Shipyard Sediment Site with conditions found in other relatively cleaner areas of San Diego Bay not affected by the Shipyard Sediment Site: (1) Southern California Bight 1998 Regional Monitoring Program (Bight 98), (2) 2001 Mouth of Chollas Creek and Mouth of Paleta Creek TMDL studies, and (3) 2001 NASSCO and Southwest Marine (now BAE Systems) Detailed Sediment Investigation. Stations from these studies were selected to represent selected physical, chemical, and biological characteristics of San Diego Bay. Criteria for selecting acceptable reference stations included low levels of anthropogenic pollutant concentrations, locations remote from pollution sources, similar biological habitat to the Shipyard Sediment Site, sediment total organic carbon (TOC) and grain size profiles similar to the Shipyard Sediment Site, adequate sample size for statistical analysis, and sediment quality data comparability. The reference stations selected for the Reference Sediment Quality Conditions are identified below.

### Reference Stations Used To Establish Reference Sediment Quality Conditions

| 2001 Chollas/Paleta Reference Station Identification Number | 2001 NASSCO/BAE Systems Reference Station Identification Number | 1998 Bight'98 Reference Station Identification Number |
|---|---|---|
| 2231 | 2231 | 2235 |
| 2243 | 2243 | 2241 |
| 2433 | 2433 | 2242 |
| 2441 | 2441 | 2243 |
| 2238 | | 2256 |
| | | 2257 |
| | | 2258 |
| | | 2260 |
| | | 2265 |

16. **SEDIMENT QUALITY TRIAD RESULTS.** The Regional Board categorized 14 of 30 Sediment Quality Triad sampling stations at the Shipyard Sediment Site as having sediment pollutant levels "likely" to adversely affect the health of the benthic community. These results are based on the synoptic measures of sediment chemistry, toxicity, and benthic community structure at the Shipyard Sediment Site. In addition, an evaluation of 27 of the sampling stations utilizing the State Water Resources Control Board's Draft Sediment Quality Objectives categorizes 20 of 27 stations as not protective of aquatic life.

17. **BIOACCUMULATION.** The Regional Board evaluated initial laboratory bioaccumulation test data to ascertain the bioaccumulation potential of the sediment chemical pollutants at the Shipyard Sediment Site. Examination of laboratory test data on the chemical pollutant concentrations in tissue of the clam (*Macoma nasuta*) relative to the pollutant concentrations in sediment indicates that bioaccumulation of chemical pollutants is occurring at the Shipyard Sediment Site. The data indicates for several chemical pollutants that concentrations in *Macoma nasuta* tissue increase in proportion to as chemical pollutant concentrations in sediment increase. Statistically significant relationships were found for arsenic, copper, lead, mercury, zinc, TBT, total PCBs, and high molecular weight polynuclear aromatic hydrocarbons (HPAHs). These chemical pollutants have a bioaccumulation potential at the Shipyard Sediment Site and are therefore considered bioavailable to benthic organisms. No statistically significant relationships were found for cadmium, chromium, nickel, selenium, silver, or PCTs.

18. **PORE WATER.** The Regional Board evaluated the chemistry of pore water, the water occupying the spaces between sediment particles, at the Shipyard Sediment Site to determine compliance with California Toxics Rule (CTR) water quality criteria and the potential risks to the benthic community from chemical pollutants present in the sediment. Comparisons were made to the CTR saltwater quality criterion continuous concentration, which is the highest concentration of a pollutant to which marine aquatic life can be exposed for an extended period of time without deleterious effects. Of the 12 site stations sampled for pore water (SW02 was excluded due to the presence of some suspended material remaining after centrifugation), 12 stations exceeded the copper CTR value, 6 stations exceeded the lead CTR value, and 12 stations exceeded the total PCBs CTR value. Although the comparisons to the CTR criteria identified several pollutants for which measured pore water concentrations are above levels of concern, the measured pore water concentrations may be biased high due to the possible presence of very fine suspended or colloidal material in the pore water samples that could not be removed by centrifugation.

19. **FISH HISTOPATHOLOGY.** The Regional Board evaluated fish histopathology data to determine the potential exposure and associated adverse effects on fish from chemical pollutants present within and adjacent to the Shipyard Sediment Site. A total of 253 spotted sand bass were examined for various histopathological lesions. These spotted sand bass were collected from four discrete assessment units at the Shipyard Sediment Site and at a reference area located across San Diego Bay near Reference Station 2240. The fish histopathology data indicates a total of 70 types of histopathological lesions were found in the spotted sand bass. Of the 70 types of lesions found, five lesions exhibited statistically significant elevations relative to reference conditions. The five lesions are abundant lipofuscin in liver,

abundant hemosiderin in liver, cholangitis/biliary hyperplasia (CBH) in liver, nephritis in kidney, and shiny gill foci. A sixth lesion (i.e., foci of cellular alteration in livers) was considered important even though no statistical differences were found because the existence of these lesions indicates a harmful effect strongly linked to PAH exposure. Of the six lesions identified as significantly elevated with respect to reference conditions, two, CBH and foci of cellular alteration, have been identified as being associated with contaminant exposure. Scientific literature describing lesions that are potential biomarkers of environmental stressors in fish does not attribute causation of lipofuscin, hemosiderin, nephritis, and shiny gill foci to pollution-related factors. It is plausible that the lesions could have been caused by naturally occurring environmental factors such as infectious parasites. Based on these considerations the fish histopathology data does not indicate that the fish lesions observed in the data set can be conclusively attributed to contaminant exposure at the Shipyard Sediment Site.

20. **FISH BILE.** The Regional Board evaluated fish bile sampling results to determine the potential exposure of fish to polynuclear aromatic hydrocarbon (PAH) compounds within and adjacent to the Shipyard Sediment Site. The bile samples were analyzed for fluorescent aromatic compounds (FACs) and total proteins. Three groups of FACs were measured that correspond to metabolites (PAH breakdown products) from naphthalene, phenanthrene, and benzo[a]pyrene. Metabolites were detected in bile of spotted sand bass captured inside and outside of the Shipyard Sediment Site and within a reference area located across the bay from the shipyard sites near Reference Station 2240. Metabolites of two contaminants exhibited elevated levels relative to reference conditions in spotted sand bass collected immediately outside of the Shipyard Sediment Site when their mean concentrations were compared against reference data. No metabolites were significantly elevated relative to reference conditions in spotted sand bass collected inside of the Shipyard Sediment Sites.

The upper prediction limit (UPL) at the 95 percent confidence interval was also calculated for the metabolites of the reference area fish and compared to replicate fish bile samples from the four areas of the Shipyard Sediment Site (i.e., inside and outside of both NASSCO and BAE Systems leaseholds). The inside and outside areas of NASSCO had samples that exceeded the UPL. Inside NASSCO accounted for six of the 19 UPL exceedances. Two fish bile samples from inside NASSCO exceeded the UPL for naphthalene, phenanthrene, and benzo[a]pyrene metabolites. From Outside NASSCO, 12 of the 13 UPL exceedances came from phenanthrene and benzo[a]pyrene metabolite samples.

For BAE Systems, all exceedances came from outside BAE Systems of which nine of 11 exceedances were for the benzo [a] pyrene metabolite samples. The remaining two exceedances were for the phenanthrene metabolite samples. No exceedances were found from inside BAE Systems; however, the PAH sediment chemistry data from inside BAE Systems showed the highest levels of sediment contamination.

The inconsistent relationship between the levels of FACs in fish and PAH contaminated sediment indicates that this data is inconclusive and the FAC concentrations observed in the fish cannot be exclusively attributed to contaminant exposure at the Shipyard Sediment Site. The variable nature of the sediment contamination found in bays and the mobility of the fish are confounding factors when attempting to correlate fish sampling results with sediment contamination.

21. **INDICATOR SEDIMENT CHEMICALS.**  The Regional Board evaluated the relationships between sediment chemical pollutants and biological responses to identify indicator chemical pollutants that may be impacting aquatic life and would therefore be candidates for assignment of cleanup levels or remediation goals.  A two-step process was conducted.  The first step in the selection of indicator chemicals was to identify chemicals representative of the major classes of sediment pollutants:  metals, butyltins, PCBs and PCTs, PAHs, and petroleum hydrocarbons.  The second step was the evaluation of relationships between these chemicals and biological responses.  Results of the three toxicity tests, benthic community assessment, and bioaccumulation testing conducted in Phase 1 of the Shipyard study were all used to evaluate the potential of such relationships.  Chemical pollutants were selected as indicator chemicals if they had any statistically significant relationship with amphipod mortality, echinoderm fertilization, bivalve development, total benthic macroinvertebrate abundance, total benthic macroinvertebrate richness, or tissue chemical concentrations in *Macoma nasuta*.  Chemical pollutants selected as indicator chemicals include arsenic, copper, lead, mercury, zinc, TBT, total PCB homologs, diesel range organics (DRO), and residual range organics (RRO).

*AQUATIC-DEPENDENT WILDLIFE BENEFICIAL USES IMPAIRMENT*

22. **AQUATIC-DEPENDENT WILDLIFE IMPAIRMENT.**  Aquatic-dependent wildlife beneficial uses designated for San Diego Bay are impaired due to the elevated levels of pollutants present in the marine sediment at the Shipyard Sediment Site.  Aquatic-dependent wildlife beneficial uses include:  Wildlife Habitat (WILD), Preservation of Biological Habitats of Special Significance (BIOL), and Rare, Threatened, or Endangered Species (RARE).  This finding is based on the considerations described below in the *Impairment of Aquatic-Dependent Wildlife Beneficial Uses* section of the Cleanup and Abatement Order.

23. **RISK ASSESSMENT APPROACH FOR AQUATIC-DEPENDENT WILDLIFE.**  The Regional Board evaluated potential risks to aquatic-dependent wildlife from chemical pollutants present in the sediment at the Shipyard Sediment Site based on a two-tier approach.  The Tier I screening level risk assessment was based on tissue data derived from the exposure of the clam *Macoma nasuta* to site sediments for 28 days using the protocols specified by American Society of Testing Material (ASTM).  The Tier II comprehensive risk assessment was based on tissue data derived from resident fish and shellfish caught within and adjacent to the Shipyard Sediment Site.

24. **TIER I SCREENING LEVEL RISK ASSESSMENT FOR AQUATIC-DEPENDENT WILDLIFE.** The Tier I risk assessment objectives were to determine whether or not Shipyard Sediment Site conditions pose a potential unacceptable risk to aquatic-dependent wildlife receptors of concern and to identify whether a comprehensive, site-specific risk assessment was warranted (i.e., Tier II baseline risk assessment). The receptors of concern selected for the assessment include: California least tern (*Sterna antillarum brownie*), California brown pelican (*Pelecanus occidentalis californicus*), Western grebe (*Aechmophorus occidentalis*), Surf scoter (*Melanitta perspicillata*), California sea lion (*Zalophus californianus*), and East Pacific green turtle (*Chelonia mydas agassizii*). Chemical pollutant concentrations measured in clam tissue derived from laboratory bioaccumulation tests were used to estimate chemical exposure to these receptors of concern. Based on the Tier I screening level risk assessment results, there is a potential risk to all receptors of concern ingesting prey caught at the Shipyard Sediment Site. The chemical pollutants in *Macoma* tissue posing a potential risk include arsenic, copper, lead, zinc, benzo[a]pyrene, and total PCBs.

25. **TIER II BASELINE RISK ASSESSMENT FOR AQUATIC-DEPENDENT WILDLIFE.** The Tier II risk assessment objective was to more conclusively determine whether or not Shipyard Sediment Site conditions pose an unacceptable risk to aquatic-dependent wildlife receptors of concern. The receptors of concern selected for the assessment include: California least tern (*Sterna antillarum brownie*), California brown pelican (*Pelecanus occidentalis californicus*), Western grebe (*Aechmophorus occidentalis*), Surf scoter (*Melanitta perspicillata*), California sea lion (*Zalophus californianus*), and East Pacific green turtle (*Chelonia mydas agassizii*). To focus the risk assessment, prey items were collected within four assessment units at the Shipyard Sediment Site and from a reference area located across the bay from the site. Chemical concentrations measured in fish were used to estimate chemical exposure for the least tern, western grebe, brown pelican, and sea lion and chemical concentrations in benthic mussels and eelgrass were used to estimate chemical pollutant exposure for the surf scoter and green turtle, respectively. Based on the Tier II risk assessment results, ingestion of prey items caught within all four assessment units at the Shipyard Sediment Site poses a risk to all receptors of concern (excluding the sea lion). The chemical in prey tissue posing a risk include benzo[a]pyrene, total PCBs, copper, lead, mercury, and zinc.

*HUMAN HEALTH BENEFICIAL USES IMPAIRMENT*

26. **HUMAN HEALTH IMPAIRMENT.** Human health beneficial uses designated for San Diego Bay are impaired due to the elevated levels of pollutants present in the marine sediment at the Shipyard Sediment Site. Human health beneficial uses include: Contact Water Recreation (REC-1), Non-contact Water Recreation (REC-2), Shellfish Harvesting (SHELL), and Commercial and Sport Fishing (COMM). This finding is based on the considerations described below in this *Impairment of Human Health Beneficial Uses* section of the Cleanup and Abatement Order.

27. **RISK ASSESSMENT APPROACH FOR HUMAN HEALTH.** The Regional Board evaluated potential risks to human health from chemical pollutants present in the sediment at the Shipyard Sediment Site based on a two-tier approach. The Tier I screening level risk assessment was based on tissue data derived from the exposure of the clam *Macoma nasuta* to site sediments for 28 days using American Society of Testing Material (ASTM) protocols. The Tier II comprehensive risk assessment was based on tissue data derived from resident fish and shellfish caught within and adjacent to the Shipyard Sediment Site. Two types of receptors (i.e., members of the population or individuals at risk) were evaluated:

    a. Recreational Anglers – Persons who eat the fish and/or shellfish they catch recreationally; and

    b. Subsistence Anglers – Persons who fish for food, for economic and/or cultural reasons, and for whom the fish and/or shellfish caught is a major source of protein in their diet.

28. **TIER I SCREENING LEVEL RISK ASSESSMENT FOR HUMAN HEALTH.** The Tier I risk assessment objectives were to determine whether or not Shipyard Sediment Site conditions potentially pose an unacceptable risk to human health and to identify if a comprehensive, site-specific risk assessment was warranted (i.e., Tier II baseline risk assessment). The receptors of concern identified for Tier I are recreational anglers and subsistence anglers. Recreational anglers represent those who eat the fish and/or shellfish they catch recreationally and subsistence anglers represent those who fish for food, for economic and/or cultural reasons, and for whom the fish and/or shellfish caught is a major source of protein in the diet. Chemical concentrations measured in *Macoma nasuta* tissue derived from laboratory bioaccumulation tests were used to estimate chemical exposure for these receptors of concern. Based on the Tier I screening level risk assessment results, there is a potential risk to recreational and subsistence anglers ingesting fish and shellfish caught at the Shipyard Sediment Site. The chemicals in *Macoma* tissue posing a potential risk include arsenic, BAP, PCBs, and TBT.

29. **TIER II BASELINE RISK ASSESSMENT FOR HUMAN HEALTH.** The Tier II risk assessment objective was to more conclusively determine whether Shipyard Sediment Site conditions pose unacceptable cancer and non-cancer health risks to recreational and subsistence anglers. Fish and shellfish were collected within four assessment units at the Shipyard Sediment Site and from two reference areas located across the bay from the Shipyard Site. Chemical concentrations measured in fish fillets and edible shellfish tissue were used to estimate chemical exposure for recreational anglers and chemical concentrations in fish whole bodies and shellfish whole bodies were used to estimate chemical exposure for subsistence anglers. Based on the Tier II risk assessment results, ingestion of fish and shellfish caught within all four assessment units at the Shipyard Sediment Site poses a theoretical increased cancer and non-cancer risk to recreational and subsistence anglers. The chemicals posing cancer risks include inorganic arsenic and PCBs. The chemicals posing non-cancer risks include cadmium, copper, mercury, and total PCBs.

### CLEANUP TO BACKGROUND SEDIMENT QUALITY CONDITIONS

30. **BACKGROUND SEDIMENT QUALITY.**  The Regional Board derived sediment
    chemistry levels for use in evaluating the feasibility of cleanup to background sediment
    quality conditions from the pool of San Diego Bay reference stations described in Finding
    15.  The background sediment chemistry levels based on these reference stations are as
    follows:

#### Background Sediment Chemistry Levels

| Chemical | Units (dry weight) | Background Sediment Chemistry Levels [1] |
|---|---|---|
| **Metals** | | |
| Arsenic | mg/kg | 7.5 |
| Cadmium | mg/kg | 0.33 |
| Chromium | mg/kg | 57 |
| Copper | mg/kg | 121 |
| Lead | mg/kg | 53 |
| Mercury | mg/kg | 0.57 |
| Nickel | mg/kg | 15 |
| Silver | mg/kg | 1.1 |
| Zinc | mg/kg | 192 |
| **Organics** | | |
| Dibutyltin | µg/kg | 21 |
| Monobutyltin | µg/kg | 14 |
| Tributyltin | µg/kg | 22 |
| Tetrabutyltin | µg/kg | (1.4) |
| HPAH [2] | µg/kg | 673 |
| PPPAH [3] | µg/kg | 1,234 |
| Benzo[a]pyrene | µg/kg | 202 |
| Total PCB Congeners [4] | µg/kg | 84 |
| Polychlorinated terphenyls | µg/kg | (142) |

(1) Based on the 95 percent upper prediction limit calculated from a pool of reference stations in San Diego
    Bay. Parentheses ( ) indicates non-detects accounted for more than or equal to half the values.
(2) HPAH = High Molecular Weight Polynuclear Aromatic Hydrocarbons
(3) PPPAH = Priority Pollutant Polynuclear Aromatic Hydrocarbons
(4) PCB = Polychlorinated Biphenyls
Note:  A regression analysis of the grain size:metals relationship is used in establishing background sediment
chemistry levels.  The background metals concentration is based on the 95% UPL using 50% fine grain
sediment.  These values are conservative concentrations because the mean fine grain sediment at the Shipyard
Investigation Site is 70% fine grain sediment.  See Appendix for Section 15 of the Draft Technical Report for
Tentative Cleanup and Abatement Order No. R9-2005-0126 for further details on the regression analysis.

31. **TECHNOLOGICAL FEASIBILITY CONSIDERATIONS.** It is technologically feasible to cleanup to background sediment quality levels at the Shipyard Sediment Site. The Regional Board considered three remedial technologies for the cleanup to background evaluation: (1) Natural Recovery, (2) Subaqueous Capping, and (3) Dredging. Based on current site use, natural recovery is considered to be technologically infeasible due to sediment disturbance from normal shipyard activities (e.g., vessel propeller wash, ship traffic, dry dock movements, maintenance/navigational dredging, engine tests, construction, etc.). Subaqueous capping is also considered to be technologically infeasible based on current site use because of the ever-larger ships being serviced at the shipyards, the associated navigational requirements, and the likelihood of cap disturbance resulting from normal shipyard activities (e.g., vessel propeller wash). Dredging, although difficult to implement because the Shipyard Sediment Site is currently a working shipyard, is considered to be technologically feasible. Dredging is a proven technology and it has been used not only in San Diego Bay but also throughout the United States for remediation of contaminated sediment.

32. **ECONOMIC FEASIBILITY CONSIDERATIONS.** The Regional Board evaluated a number of criteria to determine tradeoffs in risks, costs, and benefits associated with cleanups to background sediment chemistry levels and six alternative cleanup levels greater than background. The criteria included factors such as total cost, volume of sediment dredged, short- and long-term effects on beneficial uses (aquatic life, aquatic-dependent wildlife, and human health), effects on shipyards and associated economic activities, effects on local businesses and neighborhood quality of life, and effects on recreational, commercial, or industrial uses of aquatic resources. Based on these considerations, the Regional Board concludes that it is not economically feasible to cleanup to the background sediment chemistry levels.

*ALTERNATIVE SEDIMENT CLEANUP LEVELS*

33. **ALTERNATIVE CLEANUP LEVELS.** The Regional Board has selected the alternative cleanup levels presented below for the Shipyard Sediment Site. In approving alternative cleanup levels less stringent than background the Regional Board has considered the factors contained in Resolution 92-49 and the California Code of Regulations, Title 23, section 2550.4, subdivision (d)[1].

   a. *Alternative Cleanup Levels are Appropriate.* The Regional Board has determined that it is economically infeasible to cleanup to background sediment quality levels at the Shipyard Sediment Site. The overall benefit of remediating the site to the alternative cleanup levels is approximately equal to the overall benefit of cleaning up to background for considerably less cost.

---

[1] Resolution 92-49 provides that in approving any alternative cleanup levels less stringent than background sediment quality the Regional Board must consider the conditions described in California Code of Regulations, Title 23, section 2550.4. Resolution 92-49 further requires that any alternative cleanup levels shall (1) be consistent with maximum benefit to the people of the state; (2) not unreasonably affect present and anticipated beneficial use of such water; and (3) not result in water quality less than that prescribed in the Water Quality Control Plans and Policies adopted by the State and Regional Water Boards.

Revised Tentative Cleanup and Abatement Order No. R9-2005-0126                              April 4, 2008
Shipyard Sediment Site

b. ***Alternative Cleanup Levels Are Consistent With Water Quality Control Plans And
Policies.*** The alternative cleanup levels will not result in water quality less than
prescribed in water quality control plans and policies adopted by the State Water
Resources Control Board and the Regional Board[2]. The alternative sediment quality
levels are well below levels expected to cause toxicity to aquatic life and will
substantially reduce existing risks to aquatic dependent wildlife and human health.

c. ***Alternative Cleanup Levels Are Consistent With The Maximum Benefit To The People
Of The State.*** The level of water quality that will be attained upon implementation of the
alternative cleanup levels at the Shipyard Sediment Site is consistent with the maximum
benefit to the people of the state. The San Diego Bay shoreline between Sampson and
28th Streets is listed on the Clean Water Act 303(d) list for elevated levels of copper,
mercury, PAHs, and PCBs at the Shipyard Sediment Site. While it is impossible to
determine the precise level of water quality that will be attained given the residual
sediment pollutants constituents that will remain at the site, compliance with the
alternative cleanup levels will markedly improve water quality conditions in the Shipyard
Sediment Site and result in attainment of water quality standards at the site.

---

2 Applicable numerical and narrative water quality objectives for San Diego Bay Waters include the Regional Board's Toxicity Objective, the California Toxics Rule Water
Quality Criteria, and the State Water Board Policy for Implementation of Toxics Standards (the SIP) which provides that mixing zones shall not result in "objectionable bottom
deposits." This term is defined as "an accumulation of materials on or near the bottom of a water body which creates conditions that adversely impact aquatic life, human
health, beneficial uses, or aesthetics. These conditions include, but are not limited to, the accumulation of pollutants in the sediments (SWRCB, 2005).

Revised Tentative Cleanup and Abatement Order No. R9-2005-0126                     April 4, 2008
Shipyard Sediment Site

**Alternative Sediment Cleanup Levels**

| Chemical | Units (dry weight) | Alternative Sediment Cleanup Levels [1] |
|---|---|---|
| **Metals** | | |
| Arsenic | mg/kg | 10 |
| Cadmium | mg/kg | 1.0 |
| Chromium | mg/kg | 81 |
| Copper | mg/kg | 200 |
| Lead | mg/kg | 90 |
| Mercury | mg/kg | 0.7 |
| Nickel | mg/kg | 20 |
| Silver | mg/kg | 1.5 |
| Zinc | mg/kg | 300 |
| **Organics** | | |
| Tributyltin | µg/kg | 110 |
| Benzo[a]pyrene | µg/kg | 1,010 |
| Total PCB Congeners [2] | µg/kg | 420 |

1) Cleanup levels for tributyltin, benzo[a]pyrene, and total PCB congeners are based on 5 times background, constituents which, at 5 times background, determine the largest cleanup footprint. The other chemical concentrations are based on an evaluation of that cleanup footprint.
2) PCB = polychlorinated biphenyl

34. **LEGAL AND REGULATORY AUTHORITY**. This Order is based on (1) section 13267 and Chapter 5, Enforcement, of the Porter-Cologne Water Quality Control Act (Division 7 of the Water Code, commencing with section 13000), commencing with section 13300; (2) applicable state and federal regulations; (3) all applicable provisions of statewide Water Quality Control Plans adopted by the State Water Resources Control Board and the *Water Quality Control Plan for the San Diego Basin* (Basin Plan) adopted by the Regional Board including beneficial uses, water quality objectives, and implementation plans; (4) State Water Board policies for water quality control, including State Water Board Resolution No. 68-16 (*Statement of Policy with Respect to Maintaining High Quality of Waters in California*) and Resolution No. 92-49 (*Policies and Procedures for Investigation and Cleanup and Abatement of Discharges Under Water Code section 13304*); and (5) relevant standards, criteria, and advisories adopted by other state and federal agencies.

35. **CEQA EXEMPTION.** This enforcement action is exempt from the provisions of the California Environmental Quality Act (CEQA) because it falls within Classes 7, 8, and 21 of the categorical exemptions for projects that have been determined not to have a significant effect on the environment under section 21084 of CEQA. [14 CCR 15307, 15308, and 15321.] The Regional Board will not undertake any construction activity as a result of this Order, nor will the issuance of this Order allow environmental degradation.

36. **PUBLIC NOTICE.** The Regional Board has notified all known interested persons and the public of its intent to adopt this Cleanup and Abatement Order and has provided them with an opportunity to submit written comments and recommendations.

37. **PUBLIC HEARING.** The Regional Board has considered all comments pertaining to this Cleanup and Abatement Order submitted to the Regional Board in writing, or by oral presentations at the public hearing held on [date(s) to be inserted]. Detailed responses to relevant comments have been incorporated into the final Technical Report for the Cleanup and Abatement Order adopted by this Order.

38. **TECHNICAL REPORT.** The attached "Draft Technical Report for Tentative Cleanup and Abatement Order No. R9-2005-0126" is hereby incorporated as a finding in support of this Cleanup and Abatement Order as if fully set forth here verbatim.

*ORDER DIRECTIVES*

**IT IS HEREBY ORDERED** *that, pursuant to sections 13267 and 13304 of the Water Code, National Steel and Shipbuilding Company; BAE Systems San Diego Ship Repair Inc. (formerly Southwest Marine, Inc.); City of San Diego; Marine Construction and Design Company and Campbell Industries, Inc; San Diego Gas and Electric, a subsidiary of Sempra Energy Company; and the United States Navy (hereinafter Discharger(s)), shall comply with the following directives:*

A. **CLEANUP AND ABATE**

1. **Terminate Illicit Discharges.** The Discharger(s) shall terminate all illicit discharges to San Diego Bay in violation of waste discharge requirements or other order or prohibition issued by the Regional Board.

2. **Corrective Actions.** The Discharger(s) shall take all corrective actions[3] necessary to cleanup contaminated marine bay sediment at the Shipyard Sediment Site to attain the sediment quality levels specified below:

| Chemical | Units (dry weight) | Sediment Quality Levels |
|---|---|---|
| *Metals* | | |
| Arsenic | mg/kg | 10 |
| Cadmium | mg/kg | 1.0 |
| Chromium | mg/kg | 81 |
| Copper | mg/kg | 200 |
| Lead | mg/kg | 90 |
| Mercury | mg/kg | 0.7 |
| Nickel | mg/kg | 20 |
| Silver | mg/kg | 1.5 |
| Zinc | mg/kg | 300 |
| *Organics* | | |
| Tributyltin | µg/kg | 110 |
| Benzo[a]pyrene | µg/kg | 1,010 |
| Total PCB Congeners [1] | µg/kg | 420 |

(1) PCB = polychlorinated biphenyl

3. **Site Investigation.** San Diego Gas and Electric, a subsidiary of Sempra Energy Company, (SDG&E) shall prepare and submit a Site Investigation Report (Report) by [date based on 45 days after adoption to be inserted] containing the following information:

  a. *Site Conceptual Model.* The Report shall contain a site conceptual model showing all the current and former potential pathways for pollutants to potentially discharge from the SDG&E property to the Shipyard Sediment Site, including all elements of the Storm Water Conveyance System (SWCS) between the SDG&E property and San Diego Bay.

  b. *Source Characterization.* The Report shall describe the results of an investigation of all potential sources of waste discharges to surface soils and storm water conveyance systems based on historical records of operation, site reconnaissance, and previous sampling studies. Potential sources that should be investigated include current or

---

[3] Corrective Actions include the phases of cleanup and abatement described in Directives A through D of this Cleanup and Abatement order.

former locations of tanks, drains, sumps, areas of stained soil, container storage areas, transformers, and other areas where waste constituents were handled, stored, or used. All current or former locations of sources of waste constituents shall be located on a site map at a scale of 1 inch = 200 feet or larger, with graphics indicating surface water drainage directions on and adjacent to the SDG&E property.

c. *Storm Water Conveyance System (SWCS) Characterization.* The Report shall characterize the presence of waste constituents in loose and cemented sediment found in the SWCS, including catch basins tributary to the SWCS on and adjacent to the SDG&E property, and between the SDG&E property and San Diego Bay.

d. *Extent of Waste Constituent Characterization.* The Report shall characterize the lateral and vertical extent of each waste constituent above the background[4] value for that waste constituent.

e. *Chemical Analyses.* The report shall describe the laboratory analytical methods and protocols used for each sample analysis. The suite of chemical analyses must be adequate to identify the full range of site-specific waste constituents including, at a minimum, polychlorinated biphenyls, copper, lead, zinc, total petroleum hydrocarbons (TPH), and benzo(a)pyrene.[5]

f. *Sample Locations and Number.* The locations, type, and number of samples shall be identified and shown on a site map and cross sections. The number of samples and suite of chemical analyses must be sufficient to identify the nature of waste constituent sources, to define the distribution of waste constituents on the ground surface and in the SWCS on the SDG&E property and between the SDG&E property and San Diego Bay.

## B. REMEDIAL ACTION PLAN AND IMPLEMENTATION

1. *Remedial Action Plan (RAP).* The Discharger(s) shall submit a Remedial Action Plan (RAP) to the Regional Board by [date based on 90 days after adoption to be inserted]. The RAP shall contain the following information:

   a. *Implementation Activities.* A detailed description of all activities planned to implement the corrective actions necessary to comply with all the directives herein;

   b. *Shipyard Sediment Site Map.* A map(s), using an appropriate modeling program, illustrating the horizontal and vertical distribution of pollutants within the remediation area defined by the sediment quality cleanup levels described in Directive A.1;

   c. *Schedule.* A schedule detailing the sequence of events and time frame for each activity; and

---

[4] "Background" is defined as the concentration or mesures of constituents or indicator parameters in soil that have not been affected by waste constituents released from the SDG&E property.

[5] These waste constituents, except for benzo(a)pyrene, were reported in elevated concentrations in surface soil samples from the SDG&E property [see Section 8.9 of the Draft Technical Report]. Benzo(a)pyrene is a component of the TPH reported in elevated concentrations in the surface soil samples from the SDG&E property.

    *d.* **Short-Term Effectiveness Monitoring Activities.** A monitoring program as described in Directive C, Cleanup and Abatement Verification, to demonstrate the effectiveness of the RAP. The monitoring program shall be effective in determining compliance with the cleanup levels and in determining the success of the remedial action measures.

2. **Remedial Action Plan (RAP) Implementation.** In the interest of promoting prompt cleanup, the Discharger(s) may begin implementation of the RAP sixty (60) calendar days after submittal to the Regional Board, unless otherwise directed in writing by the Regional Board. Before beginning RAP implementation activities, the Discharger(s) shall:

    a. Notify the Regional Board of its intention to begin cleanup; and

    b. Comply with any conditions set by the Regional Board, including mitigation of adverse consequences from cleanup activities.

3. **Remedial Action Zone.** The Discharger(s) shall implement remedial action measures that ensure that marine sediment pollutants attain their respective cleanup levels at all monitoring points and throughout the Shipyard Sediment Site.

4. **Implementation Schedule.** Implementation of the RAP shall be completed on a schedule to be established by the Regional Board in a subsequent amendment to this Cleanup and Abatement Order.

5. **Monitoring, Evaluation, and Reporting.** The Discharger(s) shall monitor, evaluate, and report the results of implementation of the RAP on a schedule to be established by the Regional Board in a subsequent amendment to this Cleanup and Abatement Order.

6. **Modify or Suspend Cleanup Activities.** The Discharger(s) shall modify or suspend cleanup activities when directed to do so by the Regional Board.

## C. CLEANUP AND ABATEMENT COMPLETION VERIFICATION

1. **Cleanup and Abatement Completion Report.** The Discharger(s) shall submit a final Cleanup and Abatement Completion Report verifying completion of the Remedial Action Plan (RAP) for the Shipyard Sediment Site. The report shall provide a demonstration, based on a sound technical analysis that marine sediment quality cleanup levels specified in Directive A.1. for all pollutants are attained at all monitoring points and throughout the Shipyard Sediment Site.

### D. POST CLEANUP MONITORING

1. **Post Cleanup Monitoring Plan.** The Discharger(s) shall submit a Post Cleanup Monitoring Plan to the Regional Board by [Insert Date]. The Post Cleanup Monitoring Plan shall be designed to confirm the short-term and long-term effectiveness of the cleanup. The Post Cleanup Monitoring Plan shall contain the following information:

   a. *Monitoring Activities.* A detailed description of monitoring and sampling activities designed to assess the site conditions, including the benthic community health, after the RAP is completed. The monitoring activities shall include sampling for a period of not less than five years; and

   b. *Schedule.* A schedule detailing the sequence of events and time frame for each activity. The schedule shall also include the dates for submittal of the Post-Cleanup Monitoring annual progress reports and final report as detailed in Section D.2. below.

2. **Post Cleanup Monitoring Report.** The Discharger shall submit annual progress reports and a final Post Cleanup Monitoring Report, on a schedule to be established by the Regional Board in a subsequent amendment to this Cleanup and Abatement Order, containing the following information:

   a. *Monitoring Activities.* A detailed description of the post cleanup monitoring activities performed; and

   b. *Interpretations and Conclusions.* Interpretations and conclusions regarding the potential presence and chemical characteristics of any newly deposited sediment within the cleanup areas, and interpretations and conclusions regarding the health and recovery of the benthic communities.

### E. REGIONAL BOARD CONCURRENCE

1. **Regional Board Concurrence.** Upon concurrence with the findings of the Cleanup and Abatement Completion Report (Directive C.1) and the Post Cleanup Monitoring Report (Directive D.2) that remedial actions and monitoring are complete and that compliance with this Cleanup and Abatement Order is achieved, the Regional Board will inform the Discharger(s) and other interested persons in writing that no further remedial work is required at this time, based on available information. This written notice shall constitute Regional Board concurrence with the completed remedial actions.

## F. PROVISIONS

1. *Cost Recovery*. The Discharger(s) shall reimburse the State of California for all reasonable costs actually incurred by the Regional Board to investigate, oversee, and monitor cleanup and abatement actions required by this Cleanup and Abatement Order, according to billing statements prepared from time to time by the State Water Resources Control Board. If the Discharger(s) is enrolled in a reimbursement program managed by the State Water Resources Control Board for the discharge addressed by this Cleanup and Abatement Order, reimbursement shall be made pursuant to the procedures established in that program.

2. *Waste Management*. The Discharger(s) shall properly manage, store, treat, and dispose of contaminated soils and ground water in accordance with applicable federal, state, and local laws and regulations. The storage, handling, treatment, or disposal of contaminated marine sediment and associated waste shall not create conditions of pollution, contamination or nuisance as defined in Water Code section 13050. The Discharger(s) shall, as required by the Regional Board, obtain, or apply for coverage under, waste discharge requirements or a conditional waiver of waste discharge requirements for the removal of waste from the immediate place of release and discharge of the waste to (a) land for treatment, storage, or disposal or (b) waters of the state.

3. *Request to Provide Information*. The Discharger(s) may present characterization data, preliminary interpretations and conclusions as they become available, rather than waiting until a final report is prepared. This type of on-going reporting can facilitate a consensus being reached between the Discharger(s) and the Regional Board and may result in overall reduction of the time necessary for regulatory approval.

4. *Waste Constituent Analysis*. Unless otherwise permitted by the Regional Board, all analyses shall be conducted at a laboratory certified for such analyses by the State Department of Health Services. Specific methods of analysis must be identified. If the Discharger(s) proposes to use methods or test procedures other than those included in the most current version of *"Test Methods for Evaluating Solid Waste, Physical/Chemical Methods, SW-846"* (U.S. Environmental Protection Agency) or 40 CFR 136, *"Guidelines Establishing Test Procedures for the Analysis of Pollutants; Procedures for Detection and Quantification "*, the exact methodology must be submitted for review and must be approved by the Regional Board prior to use. The director of the laboratory whose name appears on the certification shall supervise all analytical work in his/her laboratory and shall sign all reports submitted to the Regional Board.

5. *Duty to Operate and Maintain*. The Discharger(s) shall, at all times, properly operate and maintain all facilities and systems of treatment, control, storage, disposal and monitoring (and related appurtenances) which are installed or used by the Discharger(s) to achieve compliance with this Cleanup and Abatement Order. Proper operation and maintenance also includes adequate laboratory controls and appropriate quality assurance procedures. This provision requires the operation of back-up or auxiliary facilities, which are installed by the Discharger(s) only when the operation is necessary to achieve compliance the conditions of this Cleanup and Abatement Order.

6. *Duty to Use Registered Professionals.* The Discharger(s) shall provide documentation that plans and reports required under this Cleanup and Abatement Order are prepared under the direction of appropriately qualified professionals. California Business and Professions Code sections 6735, 7835 and 7835.1 require that engineering and geologic evaluations and judgments be performed by or under the direction of registered professionals. A statement of qualifications and registration numbers of the responsible lead professionals shall be included in all plans and reports submitted by the Discharger(s). The lead professional shall sign and affix their registration stamp to the report, plan or document.

7. *Corporate Signatory Requirements.* All reports required under this Order shall be signed and certified by a responsible corporate officer(s) of the Discharger(s) described in paragraph 5.a. of this provision or by a duly authorized representative of that person as described in paragraph 5.b.of this provision.

   a. *Responsible Corporate Officer(s).* For the purposes of this provision, a responsible corporate officer means: (i) A president, secretary, treasurer, or vice-president of the corporation in charge of a principal business function, or any other person who performs similar policy - or decision-making functions for the corporation, or (ii) the manager of one or more manufacturing, production, or operating facilities, provided, the manager is authorized to make management decisions which govern the operation of the regulated facility including having the explicit or implicit duty of making major capital investment recommendations, and initiating and directing other comprehensive measures to assure long term environmental compliance with environmental laws and regulations; the manager can  ensure that the necessary systems are established or actions taken to gather complete and accurate information for permit application requirements; and where authority to sign documents has been assigned or delegated to the manager in accordance with corporate procedures.

   b. *Duly Authorized Representative.* A person is a duly authorized representative only if:

      (1) The authorization is made in writing by a person described in paragraph (a) of this provision;

      (2) The authorization specifies either an individual or a position having responsibility for the overall operation of the regulated facility or activity such as the position of plant manager, operator of a well or a well field, superintendent, position of equivalent responsibility, or an individual (A duly authorized representative may thus be either a named individual or any individual occupying a named position.); and

      (3) The written authorization is submitted to the Regional Board.

Revised Tentative Cleanup and Abatement Order No. R9-2005-0126                                   April 4, 2008
Shipyard Sediment Site

    c. *Changes to Authorization*.  If an authorization under paragraph (b) of this provision is no longer accurate because a different individual or position has responsibility for the overall operation of the facility, a new authorization satisfying the requirements of paragraph (b) of this provision must be submitted to the Regional Board prior to or together with any reports or information to be signed by an authorized representative.

    d. *Certification Statement*.  Any person signing a document under paragraph a. or b. of this provision shall make the following certification:

"I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations."

8. ***Duty to Submit Other Information***.  When the Discharger(s) becomes aware that it failed to submit any relevant facts in any report required under this Cleanup and Abatement Order, or submitted incorrect information in any such report, the Discharger(s) shall promptly submit such facts or information to the Regional Board.

9. ***Electronic and Paper Media Reporting Requirements***.  The Discharger(s) shall submit both electronic and paper copies of all reports required under this Cleanup and Abatement Order including work plans, technical reports, and monitoring reports.

10. ***Report Submittals***.  All monitoring and technical reports required under this Cleanup and Abatement Order shall be submitted to:

Executive Officer
California Regional Water Quality Control Board
San Diego Region
9174 Sky Park Court, Suite 100
San Diego, CA 92123-4340

11. ***Identify Documents Using Code Number***.  In order to assist the Regional Board in the processing of correspondence and reports submitted in compliance with this Cleanup and Abatement Order, the Discharger(s) shall include the following code number in the header or subject line portion of all correspondence or reports submitted to the Regional Board:

For all correspondences: **Shipyards CAO: 03-0284.05**
For all reports: **Shipyards CAO: 03-0284.051**

25 of 28

12. *Amendment.* This Cleanup and Abatement Order in no way limits the authority of this Regional Board to institute additional enforcement actions or to require additional investigation and cleanup consistent with the California Water Code. This Cleanup and Abatement Order may be revised by the Regional Board as additional information becomes available.

13. *Time Extensions.* If, for any reason, the Dischargers are unable to perform any activity or submit any documentation in compliance with requirements in this Cleanup and Abatement Order, including the RAP, or in compliance with associated implementation schedules, including the RAP implementation schedule, the Dischargers may request, in writing, an extension of time. The written extension request shall include justification for the delay and shall be received by the Regional Board reasonably (but not less than 15 calendar days) in advance of the deadline sought to be extended. An extension may be granted for good cause, in which case this Cleanup and Abatement Order will be accordingly amended.

## G. NOTIFICATIONS

1. *Enforcement Discretion.* The Regional Board reserves its right to take any enforcement action authorized by law for violations of the terms and conditions of this Cleanup and Abatement Order.

2. *Enforcement Notification.* The Porter-Cologne Water Quality Control Act commencing with Chapter 5, Enforcement and Implementation, section 13308, provides that if there is a threatened or continuing violation of a cleanup and abatement order, the Regional Board may issue a Time Schedule Order prescribing a civil penalty in an amount not to exceed $10,000 per day for each day compliance is not achieved in accordance with that time schedule. Section 13350 provides that any person may be assessed administrative civil liability by the Regional Board for violating a cleanup and abatement order in an amount not to exceed $5,000 for each day the violation occurs, or on a per gallon basis, not to exceed $10 for each gallon of waste discharged. Alternatively the court may impose civil liability in an amount not to exceed $15,000 for each day the violation occurs, or on a per gallon basis, not to exceed $20 for each gallon of waste discharged. Section 13385 provides that any person may be assessed administrative civil liability by the Regional Board for violating a cleanup and abatement order for an activity subject to regulation under Division 7, Chapter 5.5 of the Water Code, in an amount not to exceed the sum of both of the following: (1) $10,000 for each day in which the violation occurs; and (2) where there is a discharge, any portion of which is not susceptible to cleanup or is not cleaned up, and the volume discharged but not cleaned up exceeds 1,000 gallons, an additional liability not to exceed $10 multiplied by the number of gallons by which the volume discharged but not cleaned up exceeds 1,000 gallons. Alternatively the civil liability may be imposed by the court in an amount not to exceed the sum of both of the following: (1) $25,000 for each day in which the violation occurs; and (2) where there is a discharge, any portion of which is not susceptible to cleanup or is not cleaned up, and the volume discharged but not cleaned up exceeds 1,000 gallons, an additional liability not to exceed $25 multiplied by the number of gallons by which the volume discharged but not cleaned up exceeds 1,000 gallons.

Revised Tentative Cleanup and Abatement Order No. R9-2005-0126                    April 4, 2008
Shipyard Sediment Site

I, John H. Robertus, Executive Officer, do hereby certify the forgoing is a full, true, and correct copy of a Cleanup and Abatement Order issued on [Insert Date].


_____
John H. Robertus
Executive Officer

Attachment 1. Map of Shipyard Sediment Site (Exponent, 2003)



✎ JS 44 (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| CITY OF SAN DIEGO | NATIONAL STEEL & SHIPBUILDING COMPANY, (PLEASE SEE ATTACHMENT "A") |

F I L E D
'09 OCT 14 PH 12: 29
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY: _____ DEPUTY

| (b) County of Residence of First Listed Plaintiff SAN DIEGO | County of Residence of First Listed Defendant |
|---|---|
| (EXCEPT IN U.S. PLAINTIFF CASES) | (IN U.S. PLAINTIFF CASES ONLY) |
| | NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED. |

(c) Attorney's (Firm Name, Address, and Telephone Number)
Brian M. Ledger
GORDON & REES LLP
101 W. Broadway, Ste. 1600
San Diego, CA  92101
Tel. (619) 696-6700 / Fax (619) 696-7124

Attorneys (If Known)

'09 CV 2275 W     CAB

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

| | |
|---|---|
| ☐ 1  U.S. Government Plaintiff | ☐ 3  Federal Question (U.S. Government Not a Party) |
| ☒ 2  U.S. Government Defendant | ☐ 4  Diversity (Indicate Citizenship of Parties in Item III) |

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                   and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

FAXED

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury— | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury — | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | ☐ 870 Taxes (U.S. Plaintiff | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | or Defendant) | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | 26 USC 7609 | ☐ 900 Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | **IMMIGRATION** | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | ☐ 462 Naturalization Application | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | ☐ 463 Habeas Corpus – | | ☐ 950 Constitutionality of |
| | Other | | Alien Detainee | | State Statutes |
| | ☐ 440 Other Civil Rights | | ☐ 465 Other Immigration Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | Transferred from ☐ 5 another district (specify) | ☐ 6 Multidistrict Litigation | Appeal to District ☐ 7 Judge from Magistrate Judgment |
|---|---|---|---|---|---|---|

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
42 U.S.C. Section 9607 Et Seq.

Brief description of cause:
Environmental cost Recovery Action

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23      DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):      JUDGE _____      DOCKET NUMBER _____

| DATE | SIGNATURE OF ATTORNEY OF RECORD |
|---|---|
| October 13, 2009      BRIAN M. LEDGER | _Brian M Ledger_ |

**FOR OFFICE USE ONLY**

RECEIPT # 6252      AMOUNT 350.00      APPLYING IFP _____      JUDGE _____      MAG. JUDGE _____

MS 10/14/09

American LegalNet, Inc.
www.FormsWorkflow.com

JS 44 Reverse (Rev. 12/07)

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

I.        **(a) Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

        (b) County of Residence. For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

        (c) Attorneys. Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

II.        **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.

United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; federal question actions take precedence over diversity cases.)

III.        **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

IV.        **Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

V.        **Origin.** Place an "X" in one of the seven boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.

Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment. (7) Check this box for an appeal from a magistrate judge's decision.

VI.        **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.**        Example:        U.S. Civil Statute: <u>47 USC 553</u>
                                                Brief Description: <u>Unauthorized reception of cable service</u>

VII.        **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand. In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

VIII.        **Related Cases.** This section of the JS 44 is used to reference related pending cases if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.
**Date and Attorney Signature.** Date and sign the civil cover sheet.

COSD/1043756/7134387v 1

American LegalNet, Inc
www.FormsWorkflow.com

*City of San Diego vs. National Steel & Shipbuilding Company, et al.*

1

## ATTACHMENT "A"
## TO
## CIVIL COVER SHEET

2

3

4    NATIONAL STEEL & SHIPBUILDING CORPORATION; NATIONAL IRON
     WORKS; MARTINOLICH SHIP BUILDING COMPANY; SOUTHWEST MARINE,
5    INC.; BAE SYSTEMS SAN DIEGO SHIP REPAIR, INC.; SAN DIEGO MARINE
     CONSTRUCTION COMPANY; STAR AND CRESCENT BOAT COMPANY; STAR AND
6    CRESCENT BOAT COMPANY, a
     division of SAN DIEGO MARINE CONSTRUCTION COMPANY; STAR AND
7    CRESCENT BOAT COMPANY; STAR AND CRESCENT INVESTMENT
     COMPANY; STAR AND CRESCENT FERRY COMPANY; SAN DIEGO MARINE
8    CONSTRUCTION CORPORATION; MCCSD; CAMPBELL INDUSTRIES; SAN
     DIEGO GAS & ELECTRIC; UNITED STATES NAVY; SAN DIEGO UNIFIED PORT
9    DISTRICT; AND DOES 1-100, inclusive.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COSD/1043756/7134737v1

```
Court Name: USDC California Southern
Division: 3
Receipt Number: CAS006252
Cashier ID: msweaney
Transaction Date: 10/14/2009
Payer Name: SAN DIEGO LEGAL SUPPORT SVCS
----------------------------------
CIVIL FILING FEE
 For: CITY OF SD V NATIONAL STEEL
 Case/Party: D-CAS-3-09-CV-002275-001
 Amount:        $350.00
----------------------------------
CHECK
 Check/Money Order Num: 83231
 Amt Tendered:  $350.00
----------------------------------
Total Due:      $350.00
Total Tendered: $350.00
Change Amt:     $0.00


There will be a fee of $45.00
charged for any returned check.
```