1

2

3

4

5

6

7    **UNITED STATES DISTRICT COURT**

8    **SOUTHERN DISTRICT OF CALIFORNIA**

9

10   CITY OF SAN DIEGO,                        CASE NO. 09cv2275 WQH (JLB)

11                        Plaintiff,
                                              ORDER
         vs.
12
     NATIONAL STEEL &
13   SHIPBUILDING COMPANY; *et al.*,

14                        Defendants.

15   AND RELATED CROSS-ACTIONS
     AND COUNTERCLAIMS
16
     HAYES, Judge:

17          The matters before the Court are: (1) the Joint Motion for Order Confirming

18   Good Faith Settlement and Barring Claims (ECF No. 354) filed by San Diego Gas &

19   Electric Company, BAE Systems San Diego Ship Repair, Inc., and Southwest Marine,

20   Inc.; (2) the Motion for Order Determining Good Faith Settlement and Barring Claims

21   (ECF No. 366) filed by the United States Navy; (3) the Motion for Determination of

22   Good Faith Settlement Between National Steel Shipbuilding Company and United

23   States of America (ECF No. 367) filed by National Steel & Shipbuilding Company; (4)

24   the Motion for Determination of Good Faith Settlement and Partial Claims Bar (ECF

25   No. 368) filed by BAE Systems San Diego Ship Repair, Inc. and Southwest Marine,

26   Inc.; and (5) the Joint Motion for Order Confirming Settlement Between National Steel

27   and Shipbuilding Company and San Diego Unified Port District Barring and Dismissing

28   Claims (ECF No. 370) filed by San Diego Unified Port District.

**BACKGROUND**

The Shipyard Sediment Site ("the Site") is an area of bottom marine sediment located along the eastern shore of the central San Diego Bay.  The Site consists generally of two leaseholds presently occupied by BAE Systems San Diego Ship Repair ("BAE Systems") and the National Steel and Shipbuilding Company ("NASSCO"). The "North Yard" consists of the BAE Systems leasehold and certain surrounding tidelands, and the "South Yard" consists of the NASSCO leasehold and certain surrounding tidelands. BAE Systems and its predecessors, including Southwest Marine, Inc. ("Southwest Marine"), have operated at the North Yard for nearly one hundred years.  NASSCO has operated at the South Yard since at least the 1960's.

In or about 1991, the California Regional Water Quality Control Board ("Regional Board") commenced an initial investigation of impacts to marine sediment at the Site.  Initially, the Regional Board's investigation focused on BAE Systems and NASSCO.  The Regional Board directed BAE Systems and NASSCO to address sediment contamination directly adjacent to their facilities.

In February 2001, the Regional Board commenced administrative proceedings in connection with historical discharges at the Site.  The Regional Board compelled NASSCO, BAE Systems, and other parties to undertake studies and submit information concerning the nature and extent of contamination resulting from the historical discharges.  The result of this fact-gathering process was an extensive Administrative Record compiled from over a decade of submissions and studies related to the historical discharges at the Site.

On April 29, 2005, the Regional Board issued a Tentative Cleanup and Abatement Order ("tentative CAO"), that named NASSCO, BAE Systems, the City of San Diego (the "City"), Campbell Industries ("Campbell"), San Diego Gas & Electric ("SDG&E"), and the U.S. Navy (the "Navy") as "Dischargers" or  "Persons Responsible" for the contamination at the Site, and set forth proposed cleanup requirements for the Site. (ECF No. 1 at 50-77). On August 24, 2007, April 4, 2008,

December 22, 2009, and September 15, 2010, the Regional Board issued revised versions of the Tentative Cleanup and Abatement Order.

In June 2008, the "Dischargers," each represented by experienced counsel, entered into arm's-length mediation regarding cleanup, liability, and allocation issues before environmental litigation mediator Timothy Gallagher.  Since that time, the "Dischargers" have been engaged in regular settlement discussions.

On October 14, 2009, the City initiated this action by filing a Complaint for Environmental Cost Recovery and Contribution, Injunctive Relief, Declaratory Relief and Damages against BAE Systems, NASSCO, SDG&E, Campbell, the Navy, the San Diego Unified Port District (the "Port District"), San Diego Marine Construction Company, San Diego Marine Construction Corporation, Martinolich Shipbuilding Company, National Iron Works, National Steel & Shipbuilding Corporation, Southwest Marine, Inc., Star and Crescent Boat Company ("Star and Crescent"), Star and Crescent Ferry Company, Star and Crescent Investment Company, and Does 1-100, inclusive ("the parties").  (ECF No. 1).  The City alleged contribution and cost recovery claims under both state and federal law.  The City also alleged contractual and express indemnity claims against NASSCO, and intentional tort claims for nuisance and trespass against all Defendants except the Navy.  The subject matter of the Complaint relates to, and derives from the underlying administrative Regional Board proceedings and the tentative cleanup and abatement orders.  All of the parties named in the tentative cleanup and abatement orders as "Dischargers" or "Responsible Parties" are parties to this action.

Defendants filed contribution and cost-recovery counterclaims against the City, and contribution and cost-recovery cross-claims and supplemental cross-claims against each other, under both state and federal law.  In addition, the Port District asserted claims for express contractual indemnity and breach of contract against Campbell, BAE Systems, SDG&E, NASSCO, San Diego Marine Construction Company, as well as a

claim for implied contractual indemnity against the City.

On July 7, 2010, NASSCO, Campbell, BAE Systems, SDG&E, the Port District, the Navy, and Star and Crescent met with mediator Timothy Gallagher, and filed a Joint Motion seeking the Court's approval of a discovery plan.

On July 15, 2010, the Magistrate Judge issued an order adopting a phased discovery plan proposed by the parties. Phase I discovery was limited to certain categories of information, and was divided into three segments:

- Phase I(a), a seven-month phase during which each party served limited initial disclosures and was permitted to issue "Interrogatories, Requests for Admission, Requests for Production of Documents and Things."
- Phase I(b), fact depositions limited to the topics addressed in Phase I.
- and Phase I(c), court-ordered mediation during which no discovery would take place.

(ECF No. 125 at 3-6). Phase I(c) mediation with Timothy Gallagher began in May 2011, and continued through June 2013.

In November 2011, the parties participated in a three-day evidentiary hearing as part of the Regional Board's administrative proceedings.

On March 14, 2012, the Regional Board issued its final Cleanup and Abatement Order (No. R9-2012-0024) ("the Final CAO"), along with a Technical Report, in which it (1) found various parties to be "Dischargers" or "Persons Responsible" for environmental contamination at the Shipyard Sediment Site, (2) concluded that the sediments at the Site posed a risk to aquatic and human receptors, and (3) mandated an extensive cleanup. (ECF No. 367-3 at 7-44).

Specifically, the Regional Board found that "[e]levated levels of pollutants above San Diego Bay background conditions exist in the San Diego Bay bottom marine sediment" along the Shipyard Sediment Site. *Id*. at 7. The Regional Board found

NASSCO, BAE Systems, the City, San Diego Marine Construction Company,[1] Campbell, SDG&E, the Navy, and the Port District:

> [H]ave each caused or permitted the discharge of waste to the Shipyard Sediment Site resulting in the accumulation of waste in the marine sediment. The contaminated marine sediment has caused conditions of pollution, contamination or nuisance in the San Diego Bay that adversely affect aquatic life, aquatic-dependent wildlife, and human health San Diego Bay beneficial uses.

*Id.*

The Final CAO identifies the following "Dischargers" or "Persons Responsible" finding that each caused or permitted wastes to be discharged or deposited into the San Diego Bay and created or threatened to create a condition of pollution or nuisance.

Persons Responsible

1.   NASSCO

NASSCO owns and operates a full service ship construction, modification, repair, and maintenance facility on 126 acres of tidelands property leased from the Port District on the eastern waterfront of central San Diego Bay at 2798 Harbor Drive in San Diego. Shipyard operations have been conducted at this site by NASSCO over San Diego Bay waters or very close to the waterfront since at least 1960. Shipyard facilities operated by NASSCO over the years at the site have included concrete platens used for steel fabrication, a graving dock, shipbuilding ways, and berths on piers or land to accommodate the berthing of ships. An assortment of waste is generated at the facility including spent abrasive, paint, rust, petroleum products, marine growth, sanitary waste, and general refuse.

*Id.* at 7-8.

2.   BAE Systems

From 1979 to the present, Southwest Marine, Inc. and its successor BAE Systems have owned and operated a ship repair, alteration, and overhaul facility on approximately 39.6 acres of tidelands property on the eastern waterfront of central San Diego Bay. The facility, currently referred to as BAE Systems San Diego Ship Repair, is located on land leased from the Port District at 2205 East Belt Street, foot of Sampson Street in San Diego, San Diego County, California. Shipyard facilities operated by BAE Systems

---

[1] San Diego Marine Construction Company is not identified in the CAO as a discharger with responsibility for compliance because "San Diego Marine Construction Company no longer exists and no corporate successor with legal responsibility for San Diego Marine Construction Company's liabilities has been identified." (ECF No. 367-3 at 7 n.1).

1    over the years have included concrete platens used for steel
     fabrication, two floating dry docks, five piers, and two marine
2    railways. An assortment of waste has been generated by the facility
     including spent abrasive, paint, rust, petroleum products, marine
3    growth, sanitary waste, and general refuse.

4    *Id*. at 8.

5         3.    City of San Diego

6    From the early 1900s through February 1963, when the relevant tideland
     areas were transferred from the City of San Diego to the Port District, the
7    City was the trustee of and leased to various operators, all relevant
     portions of the Shipyard Sediment Site. The ... City of San Diego caused
8    or permitted [waste] to be discharged, or to be deposited where they were
     discharged into the San Diego Bay through its ownership of the Shipyard
9    Sediment Site...

10   The City of San Diego also owns and operates a municipal separate storm
     sewer system (MS4) through which it discharges waste commonly found
11   in urban runoff to San Diego Bay subject to the terms and conditions of a
     National Pollutant Discharge Elimination System (NPDES) Storm Water
12   Permit. The [Regional Board] finds that the City of San Diego has
     discharged urban storm water containing waste directly to San Diego Bay
13   at the Shipyard Sediment Site.

14   [The Regional Board] finds that the City of San Diego has also discharged
     urban storm water containing waste through its MS4 to Chollas Creek
15   resulting in the exceedances of chronic and acute California Toxics Rule
     copper, lead, and zinc criteria for the protection of aquatic life. Studies
16   indicate that during storm events, storm water plumes toxic to marine life
     emanate from Chollas Creek up to 1.2 kilometers into San Diego Bay, and
17   contribute to pollutant levels at the Shipyard Sediment Site. The urban
     storm water containing waste that has discharged from the on-site and off-
18   site MS4 has contributed to the accumulation of pollutants in the marine
     sediments at the Shipyard Sediment Site to levels, that cause, and threaten
19   to cause, conditions of pollution, contamination, and nuisance by
     exceeding applicable water quality objectives for toxic pollutants in San
20   Diego Bay.

21   *Id.* at 8-9.

22        4.    Campbell

23   From July 1972 through 1979, Campbell's wholly owned subsidiaries
     MCCSD and later San Diego Marine Construction Corporation operated
24   a ship repair, alteration, and overhaul facility on what is now the BAE
     Systems leasehold at the foot of Sampson Street in San Diego. Shipyard
25   operations were conducted at this site by Campbell over San Diego Bay
     waters or very close to the waterfront. An assortment of waste was generated at the
26   facility including spent abrasive blast waste, paint, rust, petroleum products, marine
     growth, sanitary waste, and general refuse.
27
     *Id.* at 10.
28
          5.    SDG&E

SDG&E owned and operated the Silver Gate Power Plant along the north side of the BAE Systems leasehold from approximately 1943 to the 1990s. SDG&E utilized an easement to San Diego Bay along BAE Systems' north property boundary for the intake and discharge of cooling water via concrete tunnels at flows ranging from 120 to 180 million gallons per day. SDG&E operations included discharging waste to holding ponds above the tunnels near the Shipyard Sediment Site.

*Id.* at 11.

6.   U.S. Navy

The U.S. Navy owns and operates a municipal separate storm sewer system (MS4) at the Naval Base San Diego (NBSD), formerly Naval Station San Diego or NAVSTA, through which it caused or permitted the discharge of waste commonly found in urban runoff to Chollas Creek and San Diego Bay...Technical reports by the U.S. Navy and others indicate that Chollas Creek outflows during storm events convey elevated sediment and urban runoff chemical pollutant loading and its associated toxicity up to 1.2 kilometers into San Diego Bay over an area included in the Shipyard Sediment Site.

[The Regional Board] finds that the U.S. Navy has caused or permitted marine sediment and associated waste to be resuspended into the water column as a result of shear forces generated by the thrust of propellers during ship movements at NBSD.  The resuspended sediment and pollutants can be transported by tidal currents and deposited in other parts of San Diego Bay, including the Shipyard Sediment Site.  The above discharges have contributed to the accumulation of pollutants in marine sediment at the Shipyard Sediment Site to levels that cause, and threaten to cause, conditions of pollution, contamination, and nuisance by exceeding applicable water quality objectives for toxic pollutants in San Diego Bay.

Also, from 1921 to the present, the U.S. Navy has provided shore support and pier-side berthing services to U.S. Pacific fleet vessels at NBSD located at 3445 Surface Navy Boulevard in the City of San Diego.  NBSD currently occupies 1,029 acres of land and 326 water acres adjacent to San Diego Bay to the west, and Chollas Creek to the north near Pier 1. Between 1938 and 1956, the NBSD leasehold included a parcel of land within the Shipyard Settlement Site referred to as the 28th Street Shore Boat Landing Station, located at the south end of the present day NASSCO leasehold at the foot of 28th Street and including the 28th Street Pier. [The Regional Board] finds that the U.S. Navy caused or permitted wastes to be deposited where they were discharged into San Diego Bay and created, or threatened to create, a condition of pollution or nuisance at this location when it conducted operations similar in scope to a small boatyard, including solvent cleaning and degreasing vessel parts and surfaces, abrasive blasting and scraping for paint removal and surface preparations, metal plating, and surface finishing and painting. Prevailing industry-wide boatyard operational practices employed during the 1930s through the 1980s were often not sufficient to adequately control or prevent pollutant discharges, and often led to excessive discharges of pollutants in marine sediment in San Diego Bay.  The types of pollutants found in elevated concentrations at the Shipyard Sediment Site ... are associated with the characteristics of the waste the U.S. Navy operations generated at the 28th Street Shore Boat Landing Station site.

1 | *Id*. at 11-12.

2 |     7.    Port District

3 |     The Port District is a special government entity, created in 1962 by
4 | the San Diego Unified Port District Act, California Harbors and
    Navigation Code Appendix I, in order to manage San Diego Harbor,
    and administer certain public lands along San Diego Bay. The Port
5 | District holds and manages as trust property on behalf of the People
    of the State of California the land occupied by NASSCO, BAE
6 | Systems, and the cooling water tunnels for SDG&E's former Silver
    Gate Power Plant. The Port District is also the trustee of the land
7 | formerly occupied by the San Diego Marine Construction Company
    and by Campbell at all times since 1963 during which they
8 | conducted shipbuilding and repair activities. The Port District's
    own ordinances, which date back to 1963, prohibit deposit or
9 | discharge of any chemicals or waste to the tidelands or San Diego
    Bay and make it unlawful to discharge pollutants in non-storm
10 | water directly or indirectly into the storm water conveyance system.

11 | *Id*. at 12. The Regional Board stated that it has discretion to name the Port District in

12 | its capacity as the State's trustee as a "Discharger," and does so in the Final CAO. The

13 | Regional Board did not accord the Port District secondary liability status, finding:

14 |     The Port District also owns and operates a municipal separate storm
    sewer system (MS4) through which it discharges waste commonly
15 | found in urban runoff to San Diego Bay subject to the terms and
    conditions of an NPDES [National Pollutant Discharge Elimination
16 | System] Storm Water Permit. [The Regional Board] finds that the
    Port District has discharged urban storm water containing waste
17 | directly or indirectly to San Diego Bay at the Shipyard Sediment
    Site.
18 |     ....

19 |     The urban storm water containing waste that has discharged from
    the on-site and off-site MS4 has contributed to the accumulation of
20 | pollutants in the marine sediments at the Shipyard Sediment Site to
    levels, that cause, and threaten to cause, conditions of pollution,
21 | contamination, and nuisance by exceeding applicable water quality
    objectives for toxic pollutants in San Diego Bay.
22 |
23 | *Id*. at 13.

24 | <u>Waste Discharge/Use Impairments</u>

25 |     The Final CAO identified the types of waste discharge, as well as the use

26 | impairments caused by the contamination. The San Diego Bay shoreline occupied by

27 | the Shipyard Sediment Site is "listed on the Clean Water Act section 303(d) list of

Water Quality Limited Segments for elevated levels of copper, mercury, zinc, PAHs,
28 | and PCBs in the marine sediment." *Id*. at 13. The Regional Board found that "[t]hese

pollutants are impairing the aquatic life, aquatic-dependent wildlife, and the human health beneficial uses designated for San Diego Bay and are causing the Bay's narrative water quality objective for toxicity not to be attained." *Id*. The Regional Board based its findings and conclusions in the Final CAO on "data and other technical information contained in the Shipyard Report prepared by NASSCO's and BAE's consultant, Exponent," after a detailed sediment investigation at the Shipyard Sediment Site within and adjacent to the NASSCO and BAE Systems leaseholds. *Id*.

The Final CAO identified constituents of primary concern ("primary COCs") for the Shipyard Sediment Site to be copper, mercury, HPAHs, PCBs, and TBT, "which are associated with the greatest exceedance of background and highest magnitude of potential risk at the Shipyard Sediment Site." *Id*. at 19. Secondary COCs are arsenic, cadmium, lead, and zinc. *Id*. The Regional Board determined that "[a]lthough there are complexities and difficulties that would need to be addressed and overcome ... it is technologically feasible to cleanup to the background sediment quality levels utilizing one or more remedial and disposal techniques." *Id.* at 20.

The Final CAO "evaluated a number of criteria to determine risks, costs, and benefits associated with no action, cleanups to background sediment chemistry levels, and alternative cleanup levels greater than background concentrations." *Id*.

> The criteria included factors such as total cost, volume of sediment dredged, exposure pathways of receptors to contaminants, short- and long-term effects on beneficial uses (as they fall into the broader categories of aquatic life, aquatic-dependent wildlife, and human health). The [Regional Board] then compared these cost criteria against the benefits gained by diminishing exposure to the primary COCs to estimate the incremental benefit gained from reducing exposure based on the incremental costs of doing so.

*Id*.

Based on the above considerations, the Regional Board concluded that "cleaning up to background sediment chemistry levels is not economically feasible." *Id*. The Regional Board prescribed alternative, less stringent, cleanup levels in compliance with State Water Board Resolution No. 92-49, *Policies and Procedures for Investigation and Cleanup and Abatement of Discharges under Water Code Section 13304. Id*. at 21.

The alternative cleanup levels will result in significant contaminant mass removal and therefore risk reduction from San Diego Bay. Remediated areas will approach reference area sediment concentrations for most contaminants. Compared to cleaning up to background cleanup levels, cleaning up to the alternative cleanup levels will cause less diesel emission, less greenhouse gas emission, less noise, less truck traffic, have a lower potential for accidents, and less disruption to the local community. Achieving the alternative cleanup levels also requires less barge and crane movement on San Diego Bay, has a lower risk of re-suspension of contaminated sediments, and reduces the amount of landfill capacity required to dispose of sediment wastes. The alternative cleanup levels properly balance reasonable protections of San Diego Bay beneficial uses with the significant economic and service activities provided by the City of San Diego, the NASSCO and BAE Systems Shipyards and the U.S. Navy.

*Id*. at 22.

The Regional Board set out a "Remedial Monitoring Program" which provides for monitoring during remediation activities, as well as post-remediation monitoring stating in part:

The Dischargers have proposed a remedial action implementation schedule and a description of specific remedial actions they intend to undertake to comply with this CAO. The remedial action implementation schedule will begin with the adoption of this CAO and will end with the submission of final reports documenting that the alternative sediment cleanup levels have been met. From start to finish, remedial action implementation is expected to take approximately 5 years to complete.

*Id*. at 24.

Order Directives

The Final CAO ordered all Dischargers to comply with several directives, including the following:

1.   Cleanup and Abate

Dischargers shall terminate all illicit discharges, if any, to the Shipyard Sediment Site in violation of waste discharge requirements or other order or prohibition issued by the [Regional Board].... The Dischargers shall take all corrective actions necessary to remediate the contaminated marine bay sediment at the Shipyard Sediment Site....

*Id*. at 27. The Final CAO set forth a detailed corrective action design ordering Dischargers to dredge remedial areas to attain specific "post remedial surface-area weighted average concentrations ('SWACs')." *Id*. at 27-28.

In addition, with respect to the municipal separate storm sewer system ("MS4"),

the Regional Board ordered that after the adoption of the Final CAO:

> [T]he City of San Diego and the San Diego Unified Port District within the tideland area shall take interim remedial actions, as necessary, to abate or correct the actual or potential effects of the releases from the MS4 system that drains to outfall SW4....

> The City of San Diego and the San Diego Unified Port District within the tideland area shall prepare and submit a municipal separate storm system (MS4) Investigation and Mitigation Plan (Plan) within 90 days after adoption of the CAO. The plan shall be designed to identify, characterize, and mitigate pollutants and pollutant sources in the watershed that drains to the MS4 outfall SW-4 at the Shipyard Sediment Site....

*Id*. at 28-29. The Final CAO identified required components of the MS4 Investigation and Mitigation Plan, as well as an Activity Completion Schedule.

### 2.   Remedial Action Plan and Implementation

The Regional Board ordered that "[a]ll Dischargers shall prepare and submit a Remedial Action Plan (RAP) to the [Regional Board] no later than 90 days after adoption of the CAO." *Id*. at 30. The Regional Board required specific components in the RAP including an introduction, a description of the selected remedies, a health and safety plan, a community relations plan, a quality assurance project plan, a sampling and analysis plan, a description of wastes generated, results of pilot testing, a design criteria report, an equipment, services and utilities list, regulatory permits and approvals, a remediation monitoring plan, a site map, contingencies, and a remediation schedule. *Id*. at 30-32.

### 3.   Cleanup and Abatement Completion Verification

> The Dischargers shall submit a final Cleanup and Abatement Completion Report verifying completion of the RAP activities for the Shipyard Sediment Site within 90 days of completion of remediation. The report shall provide a demonstration, based on sound technical analysis, that sediment quality cleanup levels in Directive A.2 have been achieved.

*Id*. at 32.

### 4.   Post Remedial Monitoring

The Regional Board ordered that no later than 90 days after the adoption of the CAO, "[t]he Dischargers shall prepare and submit a Post Remedial Monitoring Plan to the [Regional Board]...The Post Remedial Monitoring Plan shall be designed to verify

1    that the remaining pollutant concentrations in the sediments will not unreasonably affect

2    San Diego Bay beneficial uses." *Id.* at 32. The Final CAO provided several specific

3    elements that are required to be included in the Post Remedial Monitoring Plan,

4    including a quality assurance project plan, a sampling and analysis plan, sediment

5    chemistry, bioaccumulation testing, sediment chemistry for benthic exposure, sediment

6    toxicity, a benthic community assessment, and a schedule detailing the sequence of

7    sampling events and the time frame for each activity. *Id.* at 32-35. The Regional Board

8    further ordered that the Dischargers submit "Post Remedial Monitoring Reports"

9    containing specified information, including an analysis of whether or not remedial goals

10   have been attained at Year 2, Year 5, and Year 10. *Id.* at 35-36.

11          5.      Quarterly Progress Reports

12          The Regional Board ordered that by the 15th day of March, June, September, and

13   December of each year after the Final CAO goes into effect, the Dischargers shall

14   submit "written quarterly progress reports." *Id.* at 37-38. The Regional Board ordered

15   that these reports continue until the submission of the final Cleanup and Abatement

16   Completion Report verifying completion of the Remedial Action Plan for the Shipyard

17   Sediment Site.

18          6.      No Further Action

19          The Regional Board ordered that upon its approval of the Final Cleanup and

20   Abatement Order and the Post Remedial Monitoring Reports, "remedial actions and

21   monitoring will be complete and compliance with this CAO will be achieved." *Id.* at

22   38.

23   Settlements

24          On June 24, 25, and 26, 2013, the parties attended a Mandatory Settlement

25   Conference with the Magistrate Judge. A settlement was not reached. On July 19,

26   2013, the Magistrate Judge issued a Case Management Conference Order regulating

27

28

Phase I(b) and Phase II of discovery.[2]

In or around October and November, 2013, three settlement agreements were reached between various parties. The parties filed the pending motions seeking determinations that the settlement agreements were reached in good faith, and approval of requested bars to future claims.

### 1.   Settlement 1 – SDG&E and BAE Systems

On October 11, 2013, SDG&E and BAE Systems filed the Joint Motion for Order Confirming Good Faith Settlement and Barring Claims, stating that they had reached a final settlement resolving SDG&E's alleged liability for past and future response costs for remediation of contamination at the Shipyard Sediment Site. (ECF No. 354). On December 5, 2013, the City filed a Response in Opposition. (ECF No. 382). On December 6, 2013, Campbell filed a Conditional Non-Opposition to the Motion, stating that it has no opposition "provided this Court adopts Section 6 of the Uniform Comparative Fault Act...." (ECF No. 388 at 5). On December 6, 2013, the Port District filed a Response in Opposition. (ECF No. 397). On January 9, 2014, SDG&E filed two replies in support of the Joint Motion. (ECF Nos. 404, 405). BAE Systems filed a separate reply in support of the Joint Motion. (ECF No. 410).

### 2.   Settlement 2 – U.S. Navy, BAE Systems, and NASSCO

On September 26, 2013, the U.S. Navy, NASSCO, and BAE Systems informed the Magistrate Judge that they had entered into a settlement agreement pending approval of the United States Department of Justice. (ECF No. 333). After the approval was obtained, the U.S. Navy, NASSCO, and BAE Systems executed a settlement agreement. (ECF No. 366-2). On November 4, 2013, the U.S. Navy filed the Motion for Settlement and Order Determining Good Faith Settlement and Barring Claims, based on its settlement with BAE Systems and NASSCO. (ECF No. 366). On

---

[2] On November 7, 2013, the Magistrate Judge issued an Amended Case Management Conference Order extending the deadlines for fact and expert discovery, and allowing for increased numbers of Interrogatories, Requests for Admission, and Requests for Production of Documents and Things. (ECF No. 376).

December 6, 2013, the City filed a Response in Opposition.  (ECF No. 389).  On December 6, 2013, Campbell filed a Conditional Non-Opposition to the Motion, stating that it has no opposition "provided this Court adopts Section 6 of the Uniform Comparative Fault Act...." (ECF No. 387 at 5).  On December 6, 2013, the Port District filed a Notice of Non-Opposition.  (ECF No. 396).  On January 9, 2014, the U.S. Navy filed a reply in support of its Motion.  (ECF No. 403).

On November 5, 2013, NASSCO filed a Motion for Determination of Good Faith Settlement pursuant to the same settlement agreement between the U.S. Navy, NASSCO, and BAE Systems.  (ECF No. 367).  On December 6, 2013, the City filed a Response in Opposition.  (ECF No. 392).  On December 6, 2013, Campbell filed a Conditional Non-Opposition to the Motion, stating that it has no opposition "provided this Court adopts Section 6 of the Uniform Comparative Fault Act...."  (ECF No. 388 at 5).  On December 6, 2013, the Port District filed a Notice of Non-Opposition.  (ECF No. 394).  On January 9, 2014, NASSCO filed a reply in support of its Motion.  (ECF No. 406).

On November 5, 2013, BAE Systems filed a Motion for Determination of Good Faith Settlement and Partial Claims Bar based upon the same settlement agreement between the U.S. Navy, NASSCO and BAE Systems. (ECF No. 368).  On December 5, 2013, the City filed a Response in Opposition.  (ECF No. 383).  On December 6, 2013, Campbell filed a Response in Opposition. (ECF No. 384).  On December 6, 2013, the Port District filed a Notice of Non-Opposition.  (ECF No. 395).  On January 9, 2014, BAE Systems filed a reply in support of its Motion.  (ECF No. 410).

3.      Settlement 3 – NASSCO and Port District

On November 6, 2013, NASSCO and the Port District filed the Joint Motion for Order Confirming Settlement, indicating that a settlement agreement had been entered regarding the cleanup of the "South Yard" portion of the Shipyard Sediment Site.  (ECF No. 370).  On December 6, 2013, the City filed a Response in Opposition.  (ECF No. 393).  On December 6, 2013, Campbell filed a Notice of Non-Opposition.  (ECF No.

386).  On January 9, 2014, NASSCO and the Port District filed a reply in support of their Joint Motion.  (ECF No. 408).

On April 25, 2014, the Court held a hearing on the five pending motions for determination of good faith settlement.

### CONTENTIONS OF THE PARTIES

SDG&E and BAE Systems, the U.S. Navy, NASSCO and BAE Systems, and the Port District and BAE Systems ("the Moving Parties") assert that the settlements were the result of significant investigation and discovery, that the settlements were reached through arm's-length negotiations, and that the settlements are fair, adequate, and reasonable.  The Moving Parties contend that the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. § 9601 *et seq.* ("CERCLA") favors settlements and allows for contribution bars.  The Moving Parties contend that Section 6 of the Uniform Comparative Fault Act, 12 U.L.A. 126 (1996) ("UCFA") applies in this CERCLA action, and the contribution bars requested in the motions for good faith settlement are authorized under Section 6 of the UCFA.

The City opposes all motions for a determination of good faith settlement.  The City contends that it is entitled to further discovery in order to determine whether the proposed settlements are reasonable.  The City contends that these settlements resolve certain claims between certain parties and that separate claims by non-settling parties cannot be barred as a result of these settlements.  The City contends that there are multiple matters that fall outside the "Covered Matters" under the settlement agreements that cannot be barred by the settlement agreements as proposed.

Campbell opposes BAE Systems' motion for a determination of good faith settlement.  Campbell makes no objection to a determination that the settlement between BAE Systems and the Navy was made in good faith.  However, Campbell contends that BAE Systems' request for an order to bar and dismiss contribution claims against BAE by non-settling parties is not authorized by Section 6 of the UCFA.

The Port District opposes the joint motion for good faith settlement filed by

1   SDG&E and BAE Systems.  The Port District contends that the joint motion improperly

2   seeks to bar state-law contract claims that the Port District has brought against SDG&E

3   based on claims raised in the administrative proceedings.  The Port District contends

4   that contract claims, including claims for express contractual indemnity, survive any

5   good faith motion and cannot be barred.

6                                      **APPLICABLE LAW**

7   **I.      CERCLA Liability**

8           CERCLA imposes "strict liability for environmental contamination" upon four

9   classes of potentially responsible parties.  *Burlington N. & Santa Fe Ry. Co. v. United*

10  *States*, 556 U.S. 599, 608 (2009).  Enacted as a part of the Superfund Amendments and

11  Reauthorization Act of 1986, § 113(f) authorizes one potentially responsible party to

12  sue another for contribution in certain circumstances.  42 U.S.C. § 9613(f).  CERCLA

13  liability is joint and several, meaning that a responsible party may be held liable for the

14  entire cost of cleanup even where other parties contributed to the contamination.

15  *Fireman's Fund Ins. Co. v. City of Lodi*, 302 F.3d 928, 945 (9th Cir. 2002).  Parties

16  required to pay cleanup costs may, in turn, sue other potentially responsible parties for

17  contribution.  *Id.*

18  **II.     CERCLA Favors Settlement and Allows Contribution Bars**

19          CERCLA encourages responsible parties to remediate hazardous sites without

20  delay.  *Burlington N. & Santa Fe Ry. Co.*, 556 U.S. at 602;  *Fireman's Fund Ins. Co.*,

21  302 F.3d at 947 ("A fundamental purpose and objective of CERCLA is to encourage

22  the timely cleanup of hazardous waste sites.").  The Courts have recognized a strong

23  federal interest in promoting settlement of complex CERCLA actions.  *See e.g.*, *Cal.*

24  *Dep't of Toxic Substances Control v. Hearthside Residential Corp.*, 613 F.3d 910, 915

25  (9th Cir. 2010) ("Another important purpose of CERCLA is to encourage early

26  settlement between potentially responsible parties and environmental regulators.");

27  *Fireman's Fund Ins. Co.*, 302 F.3d at 948 (finding "early settlement[s]" under

28  CERCLA allow "energy and resources to be directed at site cleanup rather than

protracted litigation."); *Carson Harbor Vill. Ltd. v. Unocal Corp.*, 270 F.3d 863, 880,884 (9th Cir. 2001) (en banc) (discussing CERCLA's policies of "encouraging early settlement" and promoting the "expeditious and efficient cleanup of hazardous waste sites.").

"To facilitate settlement in multi-party litigation, a court may review settlements and issue bar orders that discharge all claims of contribution by nonsettling defendants against settling defendants." *Adobe Lumber, Inc. v. Hellman*, Civ. No. 05-1510 WBS EFB, 2009 WL 256553, at *2 (E.D. Cal. Feb. 3, 2009); *see AmeriPride Servs., Inc. v. Valley Indus. Servs., Inc.*, Civ. No. S-00-113-LEK JAM, 2007 WL 1946635, at *2 (E.D. Cal. July 6, 2007) ("Within the Ninth Circuit, a court's authority to review and approve settlements and to enter bar orders has been expressly recognized."). The Court can bar related state law claims in a federal action. *See In Re Heritage Bond Lithog.*, 546 F.3d 667, 670-71 (9th Cir. 2008) (recognizing that the court can enter bar order under California Code of Civil Procedure section 877.6 that addresses related state law claims for "contribution and indemnity or disguised claims for such relief"); *see also Fed. Sav. and Loan Ins. Corp. v. Butler*, 904 F.2d 505, 511 (9th Cir. 1990).

**III.   Fairness, Adequacy, and Reasonableness of the Settlement**

"'The initial decision to approve or reject a settlement proposal is committed to the sound discretion of the trial judge.'" *S.E.C. v. Randolph*, 736 F.2d 525, 529 (9th Cir. 1984) (quoting *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 625 (9th Cir. 1982)). "In deciding whether to approve a proposed settlement in a CERCLA case, a district court must weigh the 'fairness, adequacy and reasonableness' of the proposed settlement." *Stearns & Foster Bedding Co. v. Franklin Holding Corp.*, 947 F. Supp. 790, 813 (D.N.J. 1996) (quoting *United States v. Rohm & Haas Co.*, 721 F. Supp. 666, 685 (D.N.J. 1989)). The Court of Appeals for the Ninth Circuit has indicated that "[a] settlement should be approved if it is fundamentally fair, adequate, and reasonable." *Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1375 (9th Cir. 1993). When evaluating a settlement, the Court does not conduct a trial on the merits, nor should the proposed

settlement "be judged against a hypothetical or speculative measure of what might have been achieved by the negotiators." *Officers for Justice,* 688 F.2d at 625.  Instead, a presumption of fairness arises where: (1) counsel is experienced in similar litigation; (2) settlement was reached through arm's-length negotiations; and (3) investigation and discovery are sufficient to allow counsel and the court to act intelligently.  *Linney v. Alaska Cellular P'ship*, No. C-96-3008 DLJ, 1997 WL 450064, at *5 (N.D. Cal. Jul. 18, 1997), *aff'd* 151 F.3d 1234 (9th Cir. 1998); *Ellis v. Naval Air Rework Facility*, 87 F.R.D. 15, 18 (N.D. Cal. 1980), *aff'd*, 661 F.3d 939 (9th Cir. 1981).

## IV.  Appropriate Method for Allocation of Response Costs

CERCLA section 113(f)(2) instructs courts to "allocate response costs among liable parties using such equitable factors as the court determines are appropriate."  42 U.S.C. § 9613(f)(1).  In order to facilitate settlements in multi-party litigation, courts have adopted two main alternative methods for review of settlements and issuance of bar orders: proportionate share and pro tanto (dollar-for-dollar).  *See generally McDermott, Inc. v. AmClyde*, 511 U.S. 202, 211 (1994) (defining the proportionate share and pro tanto methods).  The pro tanto approach, embodied in the Uniform Contribution Among Tortfeasors Act (UCATA), provides for the reduction of nonsettling defendants' liability by the dollar amount of the settlement.  UCATA § 4, 12 U.L.A. 194 (1996).  Alternatively, the proportionate share approach contained in the Uniform Comparative Fault Act (UCFA) reduces the liability of the nonsettling defendants by the equitable share of the settling parties' obligations.  UCFA § 6, 12 U.L.A. 126 (1996).

CERCLA does not specify which method of apportionment courts should apply in evaluating settlements, and the Ninth Circuit Court of Appeals has not issued a guiding decision on the issue.  *See* 42 U.S.C. § 9613(f); *Adobe Lumber*, 2009 WL 256553, at *3 (noting that the Ninth Circuit "has never addressed the question of proper credit method for settlements...").  *But cf. In Re Exxon Valdez*, 229 F.3d 790, 796 (99th Cir. 2000) (stating generally in a non-CERCLA case that "[t]he proportionate share

approach is the law in the Ninth Circuit"). District courts in the Ninth Circuit, however, have uniformly employed the proportionate share method of the UCFA. *See, e.g.*, *Tyco Thermal Controls LLC v. Redwood Indus.*, No. C 06-07164 JF (PVT), 2010 WL 3211926 at *5 (N.D. Cal. Aug. 12, 2010); *Adobe Lumber*, 2009 WL 256553, at *7; *Acme Fill Corp. v. Althin CD Med.*, *Inc.*, No. C 91-4268-MMC, 1995 WL 822663, at *1 (N.D. Cal. Nov. 8, 1995); *United States v. W. Processing Co.*, 756 F.Supp. 1424, 1432 (W.D. Wash. 1990). District courts nationwide have similarly adopted the proportionate share method. *See, e.g.*, *Tosco Corp. v. Koch Indust.*, 216 F.3d 886, 897 (10th Cir. 2000) ("[T]he majority of courts deciding contribution suits between private parties...have applied the [UCFA] to reduce a nonsettling party's liability by the amount of the settling parties' liability, not the settlement amount."); *State v. Solvent Chem. Co., Inc.*, 984 F.Supp. 160, 168 (W.D.N.Y. 1997); *United States v. SCA Serv.*, *Inc.*, 827 F.Supp. 526, 535 (N.D. Ind. 1993).

Under the proportionate share method, Section 6 of the UCFA provides:

> A release, covenant not to sue, or similar agreement entered into between a claimant and a person liable discharges that person from all liability for contribution, but it does not discharge any other person liable upon the same claim unless it so provides. However, the claim of the releasing person against other persons is reduced by the amount of the released person's equitable share of the obligation, determined in accordance with the provisions of Section 2.

UCFA § 6, 12 U.L.A. 147 (1996).

Section 2 of the UCFA provides that the court will make findings as to "the percentage of the total fault that is allocated to each claimant, defendant, third-party defendant, and person who has been released from liability under Section 6." UCFA § 2(a)(2). Under the proportionate share approach of the UCFA, the court is not required to hold a hearing to evaluate the settlement amount and the manner in which it was calculated in order to approve the agreement. The shares of liability left after a partial settlement remain to be adjudicated and will be proportionate to the fault of the respective parties. The equitable share of each responsible party, including those who have been released through settlement, is determined at trial. Under the UCFA, a

claimant bears the risk that he has settled with a responsible person for too little.  The claimant cannot recover for his own equitable share of the liability or for the equitable share of responsible parties with whom claimant has settled earlier.  This rule protects non-settling parties by assuring that their liability will reflect only their own equitable share of the clean-up costs.  *See Comerica Bank-Detroit v. Allen Indus., Inc.*, 769 F. Supp. 1408, 1414 (E.D. Mich. 1991); *United States v. Western Processing Co., Inc.*, 756 F. Supp. 1424, 1427 (W.D. Wash. 1990); *Allied Corp. v. ACME Solvent Reclaiming, Inc.*, 771 F. Supp. 219, 223 (N.D. Ill. 1990); and *Edward Hines Lumber Co. v. Vulcan Materials Co.*, No. 85 C 1142, 1987 WL 27368, at *2-3 (N.D. Ill. Dec. 4, 1987).

The contribution provision of the UCFA "aims to avoid a variety of scenarios by which a comparatively innocent [party] might be on the hook for the entirety of a large cleanup bill." *Carson*, 270 F.3d at 871.  The proportionate share approach furthers the underlying policy of the contribution provision by "ensuring...that damages are apportioned equitably among the liable parties." *American Cyanamid Co. v. Capuano*, 381 F.3d 6, 20 (1st Cir. 2004).  In this case, there is no dispute among the parties that the proportionate share approach of the UCFA is an equitable method of apportioning liability.  The Court finds that the UCFA's proportionate share approach is consistent with the underlying goals of section 113(f)(1) and provides an equitable method of apportioning fault.

## V.    State Law Claims

Where a settlement agreement involves the resolution of state law claims, federal courts may apply the criteria set forth by the California Supreme Court in *Tech-Bilt, Inc. v. Woodward-Clyde Assoc.*, 38 Cal. 3d 488 (1985) to determine whether a particular settlement was made in good faith, and extinguishes any equitable right of contribution or indemnity from non-settling parties.  *Heritage Bond*, 546 F.3d at 680-681; *see also Shawmut Bank N.V. v. Kress Assoc.*, 33 F.3d 1477, 1504 (9th Cir. 1994). District courts have the discretion to enter a bar order that applies the UCFA contribution bar to state law claims for "contribution or indemnity or artfully pled

claims that amount to claims for contribution or indemnity." *Heritage Bond*, 546 F.3d at 681; *See, e.g., Acme Fill Corp.*, 1995 WL 822664, at *8. In *Acme Fill*, non-settling defendants challenged the settling parties' proposed order applying the UCFA contribution bar to all state law claims asserted in this CERCLA case. The district court explained:

> The rationale for dismissal of all claims is that unless the related state claims that arise out of the same set of facts and involve identical subject matter are also dismissed, the finality of the settlement gained by applying UCFA becomes meaningless. As a result, '[federal district] courts have held that the contribution protection accorded to defendants settling their liability under CERCLA discharges related claims made under state law.' A settling defendant freed from federal contribution claims, but not from state law claims, would gain little from the settlement payment. The incentive to reach settlement in CERCLA actions would likely disappear under a policy that allowed related state law claims to survive imposition of a contribution bar. The CERCLA policy that encourages early settlement would be circumvented by lingering state law claims.

*Id*. (quoting *Hillsborough Cnty. v. A&E Road Oiling Svc., Inc.*, 853 F. Supp. 1402, 1408 (M.D. Fla. 1994)).

# DISCUSSION

## I.   Settlement 1 – SDG&E and BAE Systems

### 1.   Terms of the Settlement Agreement

SDG&E has "entered into a conditional cashout agreement with BAE, as reflected by terms of the Settlement Agreement." (ECF No. 354-2 at 9). Under the terms of the Settlement Agreement, "SDG&E has agreed to settle its alleged liability for 'Covered Matters' in this action, in exchange for a payment of $4.3 million in full and final satisfaction of all of BAE Systems' claims against SDG&E for 'Past Response Costs' and 'Future Response Costs' (as such terms are defined in the Settlement Agreement)." *Id*. at 9-10.

The Settlement Agreement defines "Covered Matters" as:

> (i) any and all claims that were, that could have been, that could now be, or could hereafter be asserted by either party against the other party, as of the Effective Date, that arise out of or in connection to the Shipyard Sediment Area (identified on Attachment 2 to the CAO), including the Site; and (ii) any and all costs incurred by the Parties that have arisen out of, or that arise out of, or in connection with, the investigation and remediation required to comply with all legally enforceable requirements

imposed by the Regional Board (as defined in Section 1.12) in connection with the implementation of the CAO, including all reasonably necessary measures required to satisfy the requirements of the CAO or any amendments thereto, but, excluding any Excluded Matters (as defined in Section 1.6). Covered Matters shall include all claims for breach of contract, contractual indemnification and/or contribution that arise out of or in connection to the Shipyard Sediment Area (identified on Attachment 2 to the CAO).

(ECF No. 354-3 at 4, Settlement Agreement § 1.5).

The Settlement Agreement expressly carves out "Excluded Matters" from the released claims, which are defined as:

[A]ny claims and liabilities associated with or involving (i) any natural resource damages claim filed by the natural resources trustee or otherwise; (ii) any portion of polygon SW29 (as defined in the CAO) that is excluded in the CAO; and (iii) alleged liability for contamination of or at the SDG&E Tidelands Property (as defined in Section 1.17 [of the agreement]) ("Tidelands Claims"); and (iv) or brought by or on behalf of the United States Environmental Protection Agency.

(ECF No. 354-3 at 10, Settlement Agreement § 1.7).

SDG&E and BAE Systems agree that SDG&E's payment of $4.3 million "represents its fair, reasonable and equitable share of all past and future response costs at the Site." *Id*. at 11. SDG&E and BAE Systems agree that SDG&E's $4.3 million payment will be made to the San Diego Bay Environmental Restoration Fund – North ("North Trust"), which is the entity responsible for coordinating and performing the remedial work associated with the North Shipyard as required by the CAO. (ECF No. 354-3 at 6-7, Settlement Agreement §§ 2.1 - 2.2(a)). SDG&E and BAE Systems agree that "the North Trust shall perform...and provide the funding necessary to perform the remedial work required by and in compliance with the CAO at the North Shipyard to satisfy SDG&E's obligations under the CAO, until issuance of a written determination by the Regional Board that the conditions of the CAO have been fully satisfied." *Id*.

SDG&E and BAE Systems request that the Court "bar and dismiss all claims by BAE Systems and the non-settling parties against SDG&E with respect to Covered Matters under the Settlement Agreement, with prejudice, excepting BAE Systems' claims with respect to Excluded Matters under the Agreement. SDG&E has agreed to dismiss its Tidelands Claims, without prejudice, and all other claims in the Action, with

1    prejudice." (ECF No. 354-2 at 11-12).

2          2.    Good Faith of the Settlement

3          SDG&E and BAE Systems  contend that the Settlement Agreement represents

4    a 'good faith settlement' pursuant to California Code of Civil Procedure sections 877

5    and 877.6, and the UCFA.  SDG&E and BAE Systems contend that the agreement was

6    entered into in good faith and after more than two years of extensive discovery and in-

7    depth, continuous settlement discussions and private mediations in this action alone,

8    including numerous briefings of facts and legal issues and presentations by certain

9    expert witnesses offered by the parties in this action.  SDG&E and BAE Systems

10   contend that the agreement is a result of an intensive, court-supervised mediation

11   process that lasted more than two years, in which all parties actively participated and

12   were represented by experienced environmental counsel.  SDG&E and BAE Systems

13   contend that the settlement terms were negotiated based on the alleged contributions by

14   the Settling Parties, as well as other parties, to the contamination at the Site, as well as

15   past and projected future response costs.  SDG&E and BAE Systems contend that the

16   settlement amount also takes into account all equitable consideration under CERCLA,

17   including the respective degree of involvement by the parties in the disposal of waste

18   at the Site, as well as the complexities and uncertainties of the litigation.

19         The City opposes the joint motion on the grounds that "the settlement amount to

20   be paid to BAE by SDG&E is not fair or reasonable nor within the ballpark of

21   SDG&E's potential liability." (ECF No. 382 at 7).  The City contends that the joint

22   motion is conclusory and fails to set forth sufficient facts and evidence demonstrating

23   the settlement is fair and reasonable.  The City also contends that BAE Systems and

24   SDG&E have specific contractual issues amongst themselves, which shows there are

25   claims in play between these two parties that have resulted in a settlement value that is

26   not reflective of the claims of others, like the City, where such express indemnity cross-

27   claims do not exist.

28         The Port District also filed an opposition to SDG&E and BAE Systems' joint

1  motion.  However, the Port District's opposition addresses the requested bar order, and

2  does not dispute that the agreement was fair, reasonable, and entered into in good faith.[3]

3       Campbell filed a conditional non-opposition to SDG&E and BAE Systems' joint

4  motion.  (ECF No. 388).  Campbell does not oppose SDG&E and BAE Systems'

5  contention that their settlement was made in good faith or oppose the joint motion

6  provided the Court adopts Section 6 of the UCFA "for purposes of determining the legal

7  effect of the SDG&E's Settlement Agreement with BAE...." *Id.* at 5-6.

8       The Court finds that there is a strong federal and state interest in the expeditious

9  cleanup of the San Diego Bay.  As the Regional Board found in the final CAO, the

10  contaminated marine sediment has caused conditions of pollution, contamination, and

11  nuisance that adversely impact aquatic life, aquatic-dependent life, and human health.

12  (ECF No. 367-3 at 7-44).  The cleanup must be completed in a timely manner.

13  Consistent with the fundamental purposes of CERCLA, it is paramount that the

14  responsible parties remediate the Bay conditions without additional delay.  *See*

15  *Burlington N. & Santa Fe Ry. Co.*, 129 S. Ct. at 1874; *Fireman's Fund Ins. Co.*, 302

16  F.3d at 947.

17       The initial investigation of the San Diego Bay contamination began in 1991, and

18  the Regional Board initiated administrative proceedings in February of 2001. (ECF No.

19  354-2 at 2-4).  Since that time, the parties have undergone extensive mediation,

20  negotiations, and hearings.  The parties began arm's-length mediation sessions with an

21  experienced environmental mediator in June 2008. (ECF No. 370-2 at 5). In November

22  2011, the parties participated in a three-day evidentiary hearing as part of the

23  administrative proceedings.  In June 2013, the parties attended a three-day Mandatory

24  Settlement Conference with the Magistrate Judge. (ECF No. 279).  Upon consideration

25  of the extensive investigation, discovery, mediation, and good faith negotiation, the

26  Court finds that the Settlement Agreement between SDG&E and BAE Systems is

27

28       [3]At the April 25, 2014 motions hearing, counsel for the Port District stated: "We're not objecting to the fairness of SDG&E's payment." (ECF No. 421 at 13:13-14, April 25, 2014 Mots. Hr'g. Tr.).

fundamentally fair, adequate, and reasonable. *Torrisi*, 8 F.3d at 1375. The City's objection to the amount of the settlement does not preclude the determination that the settlement is reasonable. Under the proportionate share method of Section 6, the liability of the City and other non-settling parties will remain to be adjudicated, and will be proportionate to the fault of the respective parties. BAE Systems' claims against non-parties to the settlement will be reduced by the amount of SDG&E's equitable share of the obligation, which will be determined by the Court when any remaining contribution claims are resolved pursuant to Section 2 of the UCFA. *See Comerica Bank-Detroit*, 769 F. Supp. at 1414; *Western Processing Co., Inc.*, 756 F. Supp. at 1427.

### 3. Bar Order

SDG&E and BAE Systems request that the Court bar and dismiss "any and all claims against SDG&E by BAE Systems and any other party to this action with respect to 'Covered Matters' under the Settlement Agreement," with prejudice, exempting BAE Systems' claims with respect to Excluded Matters under the Agreement. (*See* SDG&E & BAE Systems' Proposed Order).[4] SDG&E has agreed to dismiss its "Tidelands Claims" without prejudice, as well as all other claims "against BAE Systems and any other party to this action with respect to 'Covered Matters.'" *Id*. SDG&E and BAE Systems contend that "[t]he benefit of the settlement...would be lost if SDG&E was forced to continue defending claims by other parties relating to the matters addressed in the Agreement. Entry of an order barring all such present and future claims will promote the above settlement and the purposes of CERCLA." (ECF No. 354-1 at 21).

The City objects to the bar proposed by SDG&E and BAE Systems. The City contends that the Court should not bar its contribution and indemnity claims against SDG&E because the City is not a party to the Settlement Agreement. The City contends that "SDG&E and BAE have chosen to settle the claims between themselves

---

[4] Counsel for SDG&E and BAE Systems emailed SDG&E and BAE Systems' Proposed Order to the Court on November 13, 2014.

only, and this does not settle the full universe of the plaintiff's claims nor the claims brought against it by any other party...."  (ECF No. 382 at 16).  The City further contends that "there are expressly several matters which are not, or cannot be, covered by the Settlement Agreement which cannot be made the subject of any bar order: 1) claims involving the Tidelands Property (expressly excluded by the Agreement); 2) the City's claims against SDG&E for contamination of the South portion of the Shipyard Sediment Site; 3) the City's intentional tort claims and non-contribution based claims; and 4) the City's claims against SDG&E as to releases to its MS4 system."  *Id*. at 7.

SDG&E and BAE Systems state that the settling parties "acknowledge that any claims related to any non-marine sediment–including 'Tidelands Claims' and all claims related to 'landside' areas–are not 'Covered Matters' under the Agreement.  Therefore, such claims are not included in the requested Bar Order."  (ECF No. 405 at 7).  SDG&E and BAE Systems state that "SDG&E has agreed to pay $4.3 million to resolve its alleged liability for the <u>entire</u> Site, including the North and South Shipyards.  BAE Systems acknowledges and agrees that SDG&E's settlement payment represents SDG&E's fair share of the total response costs for the North Shipyard, and, more generally, the Site."  *Id*. at 7 (citing Goldberg Decl., ¶ 5; ECF No. 354-5).

With respect to the City's intentional tort and other claims against SDG&E, SDG&E and BAE Systems contend "the City's remaining claims against SDG&E are merely 'disguised' contribution claims that should be barred."  *Id*. at 8.  Finally, with respect to the City's claims against SDG&E concerning the MS4 system, SDG&E and BAE Systems contend that "[i]n designating SDG&E as a 'discharger' under the CAO, the Regional Board expressly alleged that a mechanism for releases of pollutants from the former Silvergate facility to the San Diego Bay was via the City's MS4 System.... Thus, such claims are clearly encompassed by the settlement."  *Id*. at 8-9 (citing the CAO at 23-25).

The Port District opposes SDG&E and BAE Systems' joint motion, and contends that the bar against all claims by non-settling parties as to "Covered Matters" includes

state-law contract claims that the Port District brought against SDG&E based on claims raised in the administrative proceedings. (ECF No. 397 at 6). "Specifically, the Port District opposes SDG&E's improper effort to dismiss and bar the Port District's state-law claims against SDG&E for breach of contract and express contractual indemnity arising from the claims raised in the administrative proceedings before the San Diego Regional Water Quality Control Board and in this lawsuit regarding liability for the contamination at the Shipyard Sediment Site." *Id*. The Port District contends that "the well established law governing contribution and indemnity bars in California and the federal courts...makes clear that contract claims, including claims for express contractual indemnity, survive any 'good faith' determination under California Code of Civil Procedure section 877.6 and the [UCFA] and cannot be barred." *Id*. (citing cases). The Port District contends that its claims for contractual indemnity and breach of contract "would be totally independent claim[s] under the *Heritage Bond* case." (ECF No. 421 at 13:14-18). The Port District contends that its "attorney's fees, defense costs, and investigation costs are not part and parcel of what SDG&E are paying for to get out of this case." *Id*. at 13:8-10. The Port District requests that "any Bar Order granted by the Court expressly state that claims by the Port District against SDG&E for breach of contract and express contractual indemnity are not barred or dismissed." (ECF No. 397 at 8). The Port District requests that any bar order issued by the Court specifically state that the Twentieth Claim for Relief for Express Contractual Indemnity Against SDG&E, and the Twenty-First Claim for Relief for Breach of Contract Against SDG&E in the Port District's Third Amended and Supplemental Crossclaims (ECF No. 308) are not barred.

In SDG&E and BAE Systems' reply to the Port District's opposition, the settling parties contend that "the Port District admits that its so-called 'contract-based claims' against SDG&E seek the exact same relief as its 'equitable' claims: contribution towards the Site response costs already incurred by the Port District, and indemnity against any Site response cost liability in the future. Regardless of the alleged basis,

these are the classic sort of 'disguised claims' for contribution and indemnity that courts routinely order barred in CERCLA actions." (ECF No. 404 at 4). SDG&E and BAE Systems contend that "all the Port District's claims for contribution and indemnity, 'contractual' and otherwise, [should be] fully barred." *Id.* at 12. However, SDG&E states that its requested bar would not apply to the Port District's contract-based claims "to the extent any damages could be established for the breach of contract claim which were not derivative of the CERCLA claims." *Id.* at 5 (citing *U.S. v. Pretty Products, Inc.*, 780 F. Supp. 1488, 1496-97 (S.D. Oh. 1991).

As discussed above, the Court applies Section 6 of the UCFA as the appropriate method for allocating comparative fault in this case. Section 6 of the UCFA provides that "a release, covenant not to sue, or similar agreement entered into by a claimant [BAE Systems] and a responsible person [SDG&E] discharges that person [SDG&E] from all liability for contribution, but it does not discharge any other persons liable to upon the same claim." UCFA § 6. To the extent that the bar that SDG&E and BAE Systems request discharges the responsible person, SDG&E, from all liability for contribution, it is consistent with the UCFA. BAE Systems' claims against other non-parties to the settlement is reduced by the amount of SDG&E's equitable share of the obligation, which will be determined by the Court when any remaining contribution claims are resolved pursuant to Section 2 of the UCFA.

With respect to the City's argument that claims involving the Tidelands Property cannot be covered by the bar order, the Court finds that SDG&E and BAE Systems have expressly excluded claims involving the Tidelands Property from their Settlement Agreement, and such claims are not covered by their requested bar order. However, the Court finds that the City's claim against SDG&E for contamination of the South portion of the Shipyard Sediment Site is covered by the requested bar order because the Settlement Agreement between SDG&E and BAE Systems resolves SDG&E's alleged liability for the entire Site, including both the North and South Shipyards. (*See* ECF No. 405 at 7).

With respect to the City's argument regarding its claims against SDG&E for releases to its MS4 system, the Court finds that such claims are barred by the requested bar order. "Covered Matters" under the Settlement Agreement expressly include any and all claims that could arise, or have arisen, out of or in connection to the Site, as well as any and all costs incurred by the settling parties that have arisen out of or in connection with the "investigation and remediation required to comply with all legally enforceable requirements imposed by the Regional Board...in connection with the implementation of the CAO." (*See* ECF No. 354-3, Settlement Agreement § 1.5). The Regional Board named the City as a "discharger" and alleged that the City's MS4 system was a mechanism for releases of pollutants to the San Diego Bay. The City has failed to establish that its claims against SDG&E for releases of contaminants to the Site via the MS4 system are somehow different from other contribution claims. Accordingly, such claims are included in the bar order.

With respect to the City's intentional tort claims against SDG&E, the City contends that intentional torts are explicitly not subject to any bar order issued under the UCFA Section 6. (ECF No. 382 at 19). The City's Twelfth, Thirteenth, and Fourteenth Causes of Action allege private nuisance, public nuisance, and trespass claims against all Defendants except the Navy. (ECF No. 1 ¶¶ 202-218). The City cites to the comments section of the UCFA section 1, which states "The Act does not include intentional torts." However, the Court finds that the City's claims for private nuisance, public nuisance, and trespass are "artfully pled claims that amount to claims for contribution," and may be barred. *Heritage Bond*, 546 F.3d at 681 (court can enter a bar order under CCP section 877.6 that addresses related state law claims for "contribution and indemnity or disguised claims for such relief."). These claims arise out of the same set of facts and involve identical subject matter. CERCLA policies encouraging early settlement would be circumvented by allowing these state law claims to avoid the bar. The City's Twelfth, Thirteenth, and Fourteenth Causes of Action are subject to SDG&E and BAE's proposed bar order.

With respect to the Port District's contract-based claims, the Court finds that these claims are independent and cannot be barred by the bar order. The Port District has asserted claims for express contractual indemnity and breach of contract against SDG&E based upon the provisions of the Tidelands Use and Occupancy Permits ("TUOPs") granted to SDG&E by the Port District. (ECF No. 308 ¶¶ 282-312). The TUOPs contains two provisions which raise contractual obligations of SDG&E to defend and indemnify the Port District in this action and in administrative proceedings for claims arising from SDG&E's use, occupancy, operation, or possession of the Tidelands premises. (ECF No. 397 at 8, 9). Specifically, the TUOPs contain a Hold Harmless provision, which provides that SDG&E is obligated to:

> defend, indemnify, and hold harmless District for any and all liability, claims, judgments, damages, proceedings, orders, directives, costs, including reasonable attorneys' fees, or demands arising directly or indirectly out of the obligations undertaken in connection with the TUOPs, or SDG&E's use, occupancy, possession, or operation of the premises leased....

(ECF No. 308 ¶ 286).

Similarly, the Hazardous Materials provision of the TUOPs provides that SDG&E is expressly liable and responsible for any contaminants relative to the use and occupancy of the premises, including removal of contaminants, damages, claims, fines and any other liability provided by law, and that SDG&E must "defend, indemnify and hold harmless the District...from any and all such responsibilities, damages, claims, fines, liabilities, including without limitation, any costs, expenses and attorney's fees therefor." *Id.* ¶ 287.

Section 6 of the UCFA provides that a court may issue a bar order discharging a responsible person "from all liability for contribution...." U.C.F.A § 6. The UCFA does not explicitly state that contract claims cannot be barred. However, the comments of Section 1 of the UCFA state that "[a]n action for breach of warranty is held to sound sometimes in tort and sometimes in contract. There is no intent to include in coverage of the Act actions that are fully contractual in their gravamen and in which the plaintiff is suing solely because he did not recover what he contracted to receive." U.C.F.A §

1.   In the *In Re Heritage Bond Litigation* case, cited by both SDG&E and the Port District, the Court of Appeals for the Ninth Circuit considered whether a district court can issue a bar order barring future claims other than those for contribution and indemnity in the securities fraud context. *Heritage Bond*, 546 F.3d at 676-77. The Court of Appeals held that a bar order under the Private Securities Litigation Reform Act of 1995 ("PSLRA"), and CCP section 877.6 may not encompass independent claims, meaning claims other than those for contribution and indemnity. *Id*. at 677. The Court of Appeals further held that the standard for determining whether claims are independent is whether the injured party can assert "independent damages." *Id*. at 679.

In the *Bank One* case, which is relied upon by SDG&E, the parties asserted federal CERCLA claims and state law claims in the District of Colorado for the purpose of apportioning contamination cleanup costs. *Bank One v. C.V.Y Corp., et al.*, No. 01-cv-01807-MSK-MJW, 2008 WL 501412, at *1 (D. Colo. Feb. 21, 2008). The state law claims included contract claims for breach of contract, indemnification, and enforcement of defense obligations arising from various lease and purchase agreements. *Id*. All of the claims sought compensation for contamination caused by other parties. *Id*. The court found that although the parties characterized the state law claims as "contractual" and creating "indemnification" and "defense" obligations, by their terms the claims "merely restate customary principles of contribution." *Id*. at *3. The court barred all of the state law claims based upon principles of contribution, but acknowledged that "claims for reimbursement of legal costs incurred" could not be barred. *Bank One*, 2008 WL 501412 at *5. The court declined to exercise supplemental jurisdiction over the remaining state law claims. *Id*.

This Court finds that the Port District's Twentieth and Twenty-First Claims for Relief in its Third Amended Crossclaim asserts independent contract claims that cannot be covered by the bar order. The Port District has asserted claims for independent damages for attorney's fees and investigative costs incurred that may not be recoverable under a CERCLA contribution claim. The Court finds that the Port District's claims for

1   contractual indemnity and breach of contract are the type of claims that were intended

2   to be excluded from the UCFA.  The injury alleged in the Port District's Twentieth and

3   Twenty-First Claims for Relief goes beyond SDG&E's liability to the Port District for

4   contamination costs, and these claims cannot be covered by the bar order.

5   **II.    Settlement 2–U.S. Navy, BAE Systems, and NASSCO**

6            1.    <u>Terms of the Settlement Agreement</u>

7            The Settlement Agreement between the U.S. Navy, BAE Systems, and NASSCO

8   provides that the United States, on behalf of the Navy, will pay "a minimum of

9   $21,189,454.33 to resolve its responsibility at the North Yard and the South Yard."

10  (ECF No. 366-1 at 10).  In return, NASSCO and BAE Systems have agreed to perform

11  the cleanups required under the CAO.  The United States, on behalf of the Navy, will

12  pay $991,024.78 to NASSCO, and $883,429.55 to BAE Systems in full and final

13  resolution of the Shipyards' claims against the United States for Past Response Costs.

14  (ECF No. 366-2 at 11, Settlement Agreement §§ 2.3(a), (b)).  The United States also

15  agrees to pay $12,600,000 into the North Trust and $6,765,000 into the South Trust to

16  cover future response costs.  (ECF No. 366-2 at 11, 12, Settlement Agreement § 2.3(c),

17  (d)).

18          In the event that the North Yard cleanup ends up costing more than
            $45,000,000 or the South Yard cleanup more than $20,500,000, the United
19          States is obligated to make additional payments.  Specifically, if the cost
            of remediating the North Yard exceeds $45,000,000, and if the Trustee for
20          the North Trust certifies that $45,000,000 has been paid from the North
            Trust toward Future Response Costs, then the United States is obligated
21          to reimburse 28% of those costs incurred in excess of $45,000,000 on a
            quarterly basis...Similarly, if the cost of remediating the South Yard
22          exceeds $20,500,000, and if the Trustee for the South Trust certifies that
            $20,500,000 has been paid from the South Trust toward Future Response
23          Costs, then the United States must reimburse 33% of the costs incurred in
            excess of $20,500,000 on a quarterly basis.

24  (ECF No. 366-2 at 12-17, Settlement Agreement §§ 2.3(e), (f)).

25          BAE Systems and NASSCO agree to accept complete and sole responsibility for

26  performance of the work required by the CAO in their respective leaseholds until

27  notification by the Regional Board that no further remedial work is required.  (ECF No.

28  366-2 at 10-11, Settlement Agreement §§ 2.1(a), 2.2(a)).  BAE Systems and NASSCO

are also required to create a North Trust and a South Trust, respectively, which will hold all of the funds committed towards the remediation.  (ECF No. 366-2 at 18, Settlement Agreement §§ 3.2, 3.3).

Under the Settlement Agreement, the Navy, BAE Systems and NASSCO "release and covenant not to sue each other with respect to 'any and all claims, causes of action, suits or demands of any kind whatsoever, in law or in equity, that they, or their subsidiaries, parents, affiliates, assigns, consultants, insurers, or any other related entities, may have had, or hereafter has' relating to Covered Matters."  (ECF No. 366-2 at 19, Settlement Agreement § 4.1).  "Covered Matters" is defined in the Settlement Agreement as:

> (1) any and all claims that were, could have been, that could now be, or that could hereafter be asserted by any of the Settling Parties against any of the Settling Parties, as of the Effective Date of this Agreement, that arise out of or in connection with the Action; (2) any and all costs incurred by the Settling Parties that have arisen out of, or that arise out of, or in connection with, the investigation and remediation required to comply with all legally enforceable requirements imposed by the [Regional Water Quality Control Board] in connection with the implementation of the CAO, including all reasonably necessary measures required to satisfy the requirements of the CAO or any amendments thereto; and (3) Past State Oversight Costs owed by the United States, but excluding any Excluded Matters (as defined in Section 1.8).

(ECF No. 366-2 at 6-7, Settlement Agreement § 1.5).

"Excluded Matters" are defined by the Settlement Agreement as:

> [A]ny claims and liabilities associated with (i) future regulation of the Site that is not a part of the CAO...(ii) other ongoing and future enforcement actions at the Site that are not part of the CAO...(iii) acts or omissions of third parties; (iv) any claims involving natural resource damages or any claims brought by or on behalf of the United States [EPA] or a natural resource trustee; and (v) any amendment to the CAO relating to [a defined area outside of the remedial footprint]...

(ECF No. 366-2 at 7, Settlement Agreement § 1.8).

The Settlement Agreement includes a provision that the Settling Parties' claims against each other will be dismissed with prejudice immediately upon the Effective Date of the Settlement Agreement.  (ECF No. 366-2 at 24, Settlement Agreement § 6.3).

2.      Good Faith of the Settlement

The Navy, NASSCO, and BAE Systems have each filed a separate motion for good faith settlement in support of their Settlement Agreement. (ECF Nos. 366, 367, 368). The Navy, NASSCO and BAE Systems contend that the Settlement Agreement was reached in good faith after extensive negiotiations. Specifically, the Navy contends that, "[t]he Settlement Agreement is fundamentally fair, promotes the resolution of this complex CERCLA litigation, and allows limited resources to be used towards environmental cleanup rather than wasteful and unnecessary litigation." (ECF No. 366-1 at 13). The Navy contends that there exists a strong presumption that the Settlement Agreement is fair because it was "forged through the mediation process ordered by the Court–a process that lasted more than two years and in which all parties actively participated and were represented by experienced environmental counsel." *Id*. at 14. The Navy contends that "[t]he administrative record and extensive written discovery conducted during Phase I discovery provided abundant information...allowing the parties, the Mediator, and the Court to intelligently evaluate the fairness and adequacy of the Settlement Agreement." *Id.* at 15.

NASSCO contends that the proposed settlement takes into consideration the current factual record, the potential litigation risk, and the parties' interests in avoiding the substantial costs of completing fact and expert discovery, preparing for trial, and presenting its defense and prosecution of claims. NASSCO contends that the proposed settlement "was entered into after extensive mediation and litigation of the facts and law, is procedurally and substantively fair, reasonable, and furthers the intent and goals of CERCLA and California Code of Civil Procedure sections 877 and 877.6." (ECF No. 367-1 at 18). NASSCO contends that:

> Here, the settlement agreement was entered into in good faith after extensive, arm's length settlement discussions between sophisticated parties represented by counsel experienced in these matters, with the oversight of an experienced mediator. Further, the settlement agreement is the result of years of investigation and litigation in the administrative proceeding, and years of litigation in this federal court, which, collectively, involved depositions, document productions, hearings, discovery responses, compilation of a voluminous administrative record, and extensive settlement discussions.

1  *Id*. at 19 (citing Richardson Decl. ¶¶ 7, 10).

2  BAE Systems contends that a presumption of fairness of the Settlement
3  Agreement arises because "the settlement agreement was entered into in good faith after
4  extensive arm's length settlement discussions between sophisticated parties represented
5  by counsel experienced in these matters.  Further, the Settlement Agreement results
6  from years of investigation and litigation in the administrative proceeding, and years of
7  litigation in this federal court." (ECF No. 368-1 at 19).  BAE Systems contends that the
8  administrative proceedings "involved depositions, document productions, hearings,
9  discovery responses, a record of more than a million pages, and extensive settlement
10 discussions."  *Id*. (citing Tracy Decl. ¶¶ 2, 10).  BAE Systems contends that its
11 settlement with the Navy is both procedurally and substantively fair, even absent a
12 presumption of fairness.  BAE Systems further contends that the Settlement Agreement
13 is consistent with CERCLA's objectives because it "enables the North Yard to be
14 cleaned up under the CAO."  *Id*. at 22.

15 The City opposes each of the three motions filed in support of the Settlement
16 Agreement between the Navy, NASSCO and BAE Systems.  (ECF Nos. 389, 392, 383).
17 The City contends that "the Navy, NASSCO and BAE brazenly attempt to leave the
18 City of San Diego and its taxpayers 'holding the bag' for an orphan share of potentially
19 tens of millions of dollars of cleanup costs for many decades of operations by the Navy,
20 NASSCO, and BAE that have caused substantial contamination to the Shipyard
21 Sediment Site." (ECF No. 389 at 7).  The City contends that the settlement between the
22 Navy, NASSCO and BAE Systems "excludes much, if not most, of the Navy's liability
23 for contamination of the Shipyard Sediment Site, both in terms of the scope of the
24 matters covered by the settlement, and the time frame."  *Id*.  The City contends that "the
25 settlement amount paid to NASSCO and BAE by the Navy is not fair or reasonable nor
26 within the ballpark of the Navy's potential liability."  *Id*. at 8.  The City contends that
27 the motions filed by the Navy, NASSCO, and BAE Systems in support of their
28 Settlement Agreement are "merely conclusory and fail[] to set forth facts and evidence

demonstrating the settlement is fair and reasonable...." *Id.*

Campbell has filed a conditional non-opposition to the Navy's motion. Campbell does not oppose the Navy's contention that their settlement was made in good faith. Campbell does not oppose the motion provided the Court adopts Section 6 of the UCFA "for purposes of determining the legal effect of the Settlement Agreement." (ECF No. 387 at 2). Campbell filed an opposition to BAE Systems' requested bar order. Campbell states that, "[p]rovided this Court adopts Section 6 of the UCFA as the federal common law in this case for purposes of determining the legal effect of the BAE's settlement agreement with the Navy, Campbell has no opposition to a determination that BAE's settlement with the Navy was made in good faith." (ECF No. 384 at 14).

This Court concludes that the settlement materially advances the federal interest in the expeditious cleanup of the San Diego Bay. The settlement is consistent with the purposes of CERCLA, encouraging responsible parties to remediate the bay conditions to the satisfaction of the CAO without undue delay. *See Burlington N. & Santa Fe Ry. Co.*, 129 S.Ct. at 1874; *Fireman's Fund. Ins. Co.*, 302 F.3d at 947. CERCLA favors settlement over continued litigation, and the Settlement Agreement reached by the Navy, NASSCO, and BAE Systems is consistent with the overarching principles of CERCLA, requiring accountability and a prompt response to the CAO. By BAE Systems agreeing to implement the remediation through the North Trust, and NASSCO agreeing to implement the remediation through the South Trust, the parties enable the cleanup of the Shipyard Sediment Site to proceed without further delay. In arriving at the Settlement Agreement, all of the parties were represented by experienced counsel, and all of the parties conducted extensive discovery and investigations sufficient for adequate evaluation of the strengths and weaknesses of each parties' position. The parties conducted several years of extensive arm's-length bargaining under the oversight of both an experienced environmental mediator, and the Magistrate Judge.

Upon consideration of the extensive investigation, discovery, mediation, and negotiation, the Court finds that the Settlement Agreement between the Navy, BAE

Systems, and NASSCO is fundamentally fair, adequate, and reasonable. *Torrisi*, 8 F.3d at 1375. The City's objection to the amount of the settlement does not preclude the determination that the settlement is reasonable. Under the proportionate share method of Section 6, the liability of the City and other non-settling parties will remain to be adjudicated, and will be proportionate to the fault of the respective parties. The claims of BAE Systems and NASSCO against non-parties to the settlement will be reduced by the amount of the Navy's equitable share of the obligation, which will be determined by the Court when any remaining contribution claims are resolved pursuant to Section 2 of the UCFA. *See Comerica Bank-Detroit*, 769 F. Supp. at 1414; *Western Processing Co., Inc.*, 756 F. Supp. at 1427.

       3.    <u>The Navy's Proposed Bar Order</u>

The Navy requests an Order from the Court stating:

> [A]ny and all claims for contribution or indemnity against the Navy, arising out of the facts alleged in the Action (except such claims which are specifically excluded by the terms of the Settlement Agreement), are BARRED. Such claims by any non-settling party are barred regardless of whether they are brought pursuant to Section 107 of CERCLA, Section 113 of CERCLA, or any other theory, as any claims against the Navy arising out of facts alleged in the Action are in the nature of contribution claims arising out of a common liability, whether framed in terms of federal or state statute or common law.

(Navy Proposed Order).[5] The Navy also requests that the Court dismiss with prejudice all claims by non-settling parties against the Navy, and all of the Navy's claims against non-settling parties. *Id.*

The City opposes the Navy's proposed bar, contending that the City's claims cannot be barred under Section 6 because the City is not a party to the Settlement Agreement. The City also contends there are matters covered by the Settlement Agreement between the Navy, NASSCO and BAE Systems which cannot be made subject to any bar order. Specifically, the City contends that it has cost recovery claims against the Navy which cannot be barred by the bar order. The City also contends that

---

[5] Counsel for the Navy emailed the Navy's Proposed Order to the Court on November 4, 2013.

it maintains claims against the Navy based on its "direct discharges...which ultimately went into the City's MS4 system." (ECF No. 389 at 25). The City contends that "[t]he Navy's potential liability to the City as to this specific mode of release–contaminants which got into the City's MS4–cannot be a part of any settlement with NASSCO or BAE and no bar order can be issued covering this specific matter, which is undisputedly an issue and claim discrete to the City and the Navy." *Id.* at 25. Finally, the City contends that its claims against the Navy for activities or releases prior to 1962 cannot be barred by the settlement, because these activities occurred before BAE Systems or NASSCO were operating at the Site, and they are therefore not covered by the Settlement Agreement.

In its reply to the City's opposition, the Navy contends that "all claims asserted against the Navy by the City are in the form of contribution and stem from a single joint harm–the contamination of the Site and the same shared obligation to clean up the Site under the CAO. As there can be no valid dispute that the claims against the Navy are solely in the form of contribution under federal and state law, such claims should be barred under the applicable federal common law." (ECF No. 403 at 8).

Section 6 of the UCFA provides that "a release, covenant not to sue, or similar agreement entered into by a claimant [BAE Systems and NASSCO] and a responsible person [the Navy] discharges that person [the Navy] from all liability for contribution, but it does not discharge any other persons liable upon the same claim. U.C.F.A § 6 (1997). The Navy's requested order barring "any and all claims for contribution or indemnity against the Navy" by non-settling parties, is consistent with Section 6. The UCFA provides that BAE Systems' and NASSCO's claims against other non-settling parties are reduced by the amount of the Navy's equitable share of the obligation, which will be determined by the Court when any remaining contribution claims are resolved pursuant to Section 2 of the UCFA.

With respect to the City's argument that it maintains cost recovery claims against the Navy, the City fails to identify any specific cause of action. However, the Navy's

proposed bar order bars claims for "contribution and indemnity" and not cost recovery claims.  To the extent the City has cost recovery claims against the Navy that are not based on contribution or indemnity, such claims are not covered by the requested bar.

With respect to the City's argument that its claims against the Navy for its releases to the MS4 system cannot be barred, the Court finds that such claims are barred by the application of Section 6 to the settlement.  "Covered Matters" under the Settlement Agreement expressly includes "any and all costs incurred by the Settling Parties that have arisen out of, or that arise out of, or in connection with, the investigation and remediation required to comply with all legally enforceable requirements imposed by the [Regional Water Quality Control Board] in connection with the implementation of the CAO...." *Id.* at 11-12 (citing Settlement Agreement § 1.5).  The Regional Board named the City as a "discharger" and alleged that the City's MS4 system was a mechanism for releases of pollutants to the San Diego Bay.  The City has failed to establish that its claims against the Navy for releases of contaminants to the Site via the MS4 system are independent from other contribution claims. Accordingly, such claims are barred by application of Section 6 to the settlement.

Finally, with respect to the City's argument that application of Section 6 to the settlement cannot bar its claims against the Navy for activities or releases of contamination prior to 1962, the Court finds that the Settlement Agreement between the Navy, BAE Systems, and NASSCO encompasses all of the Navy's responsibility for activities during that time period are covered by the settlement.

> THE COURT: Excuse me.  Before you begin, just one or two questions. Is it the case that the settlement agreement you've reached with BAE and NASSCO, is it the Navy's position that [] settlement includes all of the Navy's responsibility for the North and South sites, and it's entirety of the Navy's responsibility from the beginning of time, that [] includes everything?
>
> MR. SPEAR [counsel for the Navy]: Absolutely, Your Honor.  And I was going to say from the beginning of time, the settlement, agreement, the allocated share includes all of the Navy's responsibility at that site from the beginning of time.

(ECF No. 421 at 59:6-16). Under Section 6, BAE Systems' and NASSCO's claims

1   against other non-settling parties are reduced by the amount of the equitable share of

2   the Navy's obligation for activities covered by the settlement.

3       4.   NASSCO's Proposed Bar Order

4       NASSCO requests an Order from the Court which states in full:

5       Upon the Effective Date of [the Settlement Agreement], each Settling
        Party is entitled to contribution protection for Covered Matters pursuant
6       to Section 113(f) of CERCLA, 42 U.S.C. § 9613(f), the Uniform
        Comparative Fault Act, the California Code of Civil Procedure, §§ 877
7       and 877.6 and any other applicable provision of federal or state law,
        whether by statute or common law, for matters addressed in this
8       Settlement Agreement.

9   (See NASSCO Proposed Order).[6]

10      In the City's opposition to NASSCO's motion for a determination of good faith

11  settlement, the City contends that it has several claims against NASSCO which cannot

12  be the subject of any bar order.  First, the City contends that it has intentional tort claims

13  for nuisance and trespass against NASSCO which cannot be barred.  (ECF No. 392 at

14  20).  The City also contends that it maintains "express indemnity and breach of contract

15  claims" against NASSCO which "are purely contractual and cannot be subject to any

16  bar order."  Id.  The City contends that it has cost recovery claims against NASSCO

17  which cannot be barred.   The City contends that its claims against NASSCO relating

18  to its MS4 system are "an issue and claim discrete between the City and NASSCO" and

19  cannot be barred.  Id. at 21-22.  Finally, the City contends that it has successor liability

20  claims against NASSCO for liability of earlier shipyard operators in the South Yard,

21  which cannot be barred.

22      In its reply, NASSCO contends all of the City's claims are "disguised"

23  contribution or indemnity claims, and should be barred "because the common law

24  claims are employed for the same purpose–to achieve contribution for cleanup costs–a

25  settlement as to the CERCLA claims necessarily must bar the remaining common law

26  claims."  (ECF No. 406 at 7-8).

27

28      _____
        [6] Counsel for NASSCO emailed NASSCO's Proposed Order to the Court on
        November 5, 2013.

The Court finds the proposed order submitted by NASSCO does not request that the Court issue any bar against liability for contribution.  Under Section 6, NASSCO would not be entitled to a bar discharging NASSCO from liability for contribution, as Section 6 only provides for a bar discharging the person responsible (the Navy) from liability for contribution.  UCFA § 6.

### 5.   BAE Systems' Proposed Bar Order

BAE Systems requests an Order from the Court stating:

> Pursuant to Section 6 of UCFA and California Code of Civil Procedure section 877.6, any and all claims described as follows are barred, except as specifically exempted below in Section 4:
> a. All claims against BAE Systems for contribution or indemnity by non-settlors or any non-party, arising out of any facts alleged in the instant litigation or any pleading filed in the instant litigation, and as further identified and provided for in the Settlement Agreement, the terms of which are incorporated herein, regardless of when such claims are asserted or by whom.   Such claims are barred regardless of whether they are brought pursuant to [CERCLA] or any other federal or state law;
> b. All other claims against BAE Systems seeking a declaration as to the various Parties' liability for costs to be incurred in the future, relating to the implementation of the [CAO].

(*See* BAE Systems Proposed Order at 2).[7]  BAE Systems states that the requested bar does not apply to "all claims against BAE Systems brought under CERCLA § 107(a)...seeking cost recovery for costs allegedly incurred in response to the release or threatened release of hazardous substances at the Site." *Id.* at 3.  BAE Systems requests that the Court dismiss with prejudice all of the Navy's claims against BAE Systems, all of BAE Systems' claims against the Navy, and "[a]ll claims, including direct claims, cross-claims, counter-claims, or third-party claims asserted by any party against BAE Systems, except for claims described above in Section 4 of this Order...." *Id.*

The City opposes BAE Systems' requested bar on the grounds that Section 6 does not permit a bar of claims against BAE Systems as the "settling tortfeasor." (ECF No. 383 at 7).  The City contends that there are several matters covered by the Settlement

---

[7] Counsel for BAE Systems emailed BAE Systems' Proposed Order to the Court on November 5, 2013.  Counsel for BAE Systems emailed a revised Proposed Order to the Court on January 9, 2014.  The quotation above is from BAE Systems' revised Proposed Order.

Agreement between the Navy, NASSCO and BAE Systems which cannot be made subject to any bar order, including the City's cost recovery claims, intentional tort claims, non-contribution claims, and claims "relating to BAE's releases to the City's MS4 system." *Id.*

Campbell opposes BAE Systems' requested bar. (ECF No. 384). Campbell contends that Section 6 of the UCFA does not authorize the Court to bar and dismiss contribution claims against BAE Systems by non-settling parties. *Id.* Campbell contends that BAE Systems is the "claimant" as the term is used in Section 6, and that Section 6 does not discharge the "claimant" from liability for contribution. *Id.*

BAE Systems responds to the City's opposition arguing that the City's purported independent tort claims are disguised contribution and indemnity claims, and are therefore barred. (ECF No. 410 at 14, 15). BAE Systems also contends that the City's claims that relate to the MS4 system are not separate from its basic contribution claims, and are therefore subject to the bar order. *Id.* at 18. BAE Systems contends that "[t]he Regional Board expressly alleged that a mechanism for releases of pollutants to the San Diego Bay was through the City's MS4 system." *Id.* BAE Systems contends that "remediation under the CAO will fully address all impacts associated with the City's MS4 line" and that claims relating to the MS4 system are no different from contribution claims. *Id.*

Section 6 of the UCFA provides that "a release, covenant not to sue, or similar agreement entered into by a claimant [BAE and NASSCO] and a responsible person [the Navy] discharges that person [the Navy] from all liability for contribution, but it does not discharge any other persons liable upon the same claim." U.C.F.A § 6 (1997), 12 U.L.A. 44, 56 (Supp. 1992). BAE Systems' request to bar "all claims against BAE Systems for contribution or indemnity by non-settlors," is not consistent with Section 6. As the claimant, BAE Systems is not entitled to be discharged from liability for contribution pursuant to Section 6. Under Section 6, a bar may only extend to claims against the Navy for contribution, and cannot discharge any other persons liable. The

UCFA provides that BAE Systems' and NASSCO's claims against other non-parties are reduced by the amount of the Navy's equitable share of the obligation, which will be determined by the Court when any remaining contribution claims are resolved pursuant to Section 2 of the UCFA.

### III.   Settlement 3–NASSCO and Port District

#### 1.   Terms of the Settlement Agreement

By the terms of the Settlement Agreement between NASSCO and the Port District, the Port District agrees to pay $1.4 million towards the cleanup of the South Yard, and NASSCO agrees to implement and complete the Remedial Action in the Remedial Footprint of the South Yard, comply with the CAO, and indemnify the Port District for the "Indemnified Matters."  (ECF No. 370-3 at 22, 24, 26, Settlement Agreement ¶¶ 2.1(a), 3.1, 6.1).  NASSCO and the Port District also agree to "mutually release all claims against each other related to the Remedial Footprint for the South Yard–subject to certain enumerated exclusions–and dismiss, with prejudice, their claims against each other in this litigation."  (ECF No. 370-1 at 16).

"Excluded Matters" are defined by the Settlement Agreement as:

> [C]laims and liabilities associated with (a) any contamination in the remainder of the Shipyard Sediment Site or other areas not within the Remedial Footprint; (b) the landside of any of the NASSCO leaseholds; (c) any contamination of the Remedial Footprint occurring after execution of this Agreement; (d) natural resource damage claims brought under CERCLA or any equivalent state law; (e) ongoing or future enforcement actions or proceedings not covered by the CAO, including, without limitation, the Chollas Creek TMDL proceedings, the application of the Phase II Sediment Quality Objectives for Enclosed Bays and Estuaries of California, and any other sediment quality objectives to be developed by the State Water Resources Control Board; (f) third party tort claims; (g) any obligations under Order Directives, Section A, Paragraphs 3 through 5 of the CAO addressing MS4 investigation and mitigation and any other obligations or liabilities associated with the MS4 or discharges from the MS4; and (h) any rights and obligations of these parties under any other agreements including, without limitation, leases, Tidelands Use and Occupancy Permits ("TUOPs"), permits, easements, and conveyances.

(ECF No. 370-3 at 18-19, Settlement Agreement ¶ 1.8).

#### 2.   Good Faith of the Settlement

NASSCO and the Port District contend that the settlement was entered into in

good faith, the settlement is fair, reasonable, and the settlement is consistent with the intent of CERCLA.  (ECF No. 370-1 at 9).  NASSCO and the Port District contend that the settlement promotes the goals of CERCLA "by facilitating the largest sediment cleanup in San Diego Bay history."  *Id*. at 8.  The parties contend that the terms of their agreement "are the result of arm's length negotiations over several years of privately-mediated and judicially-supervised settlement discussions among all parties to this action...."  *Id*. at 9.  The parties contend that the administrative proceedings began in 1991, and after "decades of investigation and deliberation, the Regional Board ordered an extensive cleanup...."  *Id*. at 9, 10.  The parties contend that the litigation began in 2009, and "[s]ince these initial filings, this case has been vigorously contested, and the parties have engaged in substantial investigation and written discovery, including responding to document requests, interrogatories and requests for admissions about their respective Site activities."  *Id*. at 11-12.  The parties contend that "[f]or the past few years, all parties participated in numerous mediation sessions...to resolve liability, allocation, and contribution."  *Id*. at 12.  The parties contend that they are entitled to a presumption of fairness, and that the Settlement Agreement is both procedurally and substantively fair.

The City opposes NASSCO and the Port District's joint motion on grounds that the amount paid to NASSCO by the Port District is not fair or reasonable.  The City also contends that there are contractual issues between NASSCO and the Port District, which do not exist with other parties, and which show that the value of the settlement is "not reflective of the claims of others."  (ECF No. 393 at 8-9).

The Court finds that the settlement agreement between NASSCO and the Port District is the product of lengthy and vigorous settlement discussions between sophisticated parties and counsel which was overseen by both an experienced mediator and the Magistrate Judge.  The parties compiled an extensive administrative record, and engaged in more than five years of mediation sessions devoted to cleanup and allocation issues.  The Court finds that the arm's-length negotiations before the mediator and

Magistrate Judge, as well as the voluminous record, demonstrate that the Settlement Agreement is fundamentally fair, adequate, and reasonable.  The Court finds that the Settlement Agreement furthers the goals of CERCLA to remediate contamination and to ensure that the costs are borne by the potentially responsible parties.  The settlement between NASSCO and the Port District will avoid significant delays and transaction costs associated with protracted litigation, thereby preserving resources for remediation.  The objection of the City to the amount of the settlement does not preclude the determination that the settlement is reasonable.  Under the proportionate share method of Section 6, the liability of the City and other non-settling parties will remain to be adjudicated, and will be proportionate to the fault of the respective parties. *See Comerica Bank-Detroit*, 769 F. Supp. at 1414; *Western Processing Co., Inc.*, 756 F. Supp. at 1427.

> 3.   <u>Bar Order</u>

NASSCO and the Port District request an Order from the Court stating:

> Pursuant to Section 6 of the UCFA and Section 877.6 of the California Code of Civil Procedure, and CERCLA section 113, any and all claims for contribution, cost recovery, or equitable indemnity against NASSCO and the Port District, and each of them, arising out of the facts alleged in the Complaint, counterclaims, cross-claims in this Action (except such claims which are specifically excluded or reserved by the terms of the Settlement Agreement), regardless of when such claims are asserted or by whom, relating to Covered Matters under the Settlement Agreement are hereby BARRED.  Such claims by any non-settling party are barred regardless of whether they are brought pursuant to CERCLA section 107, CERCLA section 113, or any other theory, as any claims against NASSCO and the Port District, and each of them, arising out of the facts alleged in this Action are in the nature of contribution claims arising out of a common liability, whether framed in terms of federal or state statute or common law.

(*See* NASSCO & Port District Proposed Order at 2-3).[8]  NASSCO and the Port District request the Court dismiss with prejudice "[a]ll claims, cross-claims and counterclaims in the Action asserted by any other party in this Action against NASSCO and the Port District, or either of them, relating to the Covered Matters in the Settlement

---

[8] Counsel for NASSCO emailed NASSCO and the Port District's Proposed Order to the Court on November 7, 2013.

1   Agreement...." *Id.* at 3.

2          The City contends that NASSCO cannot seek a bar to claims against it, as it is not

3   the "liable party" under Section 6 of the UCFA.  (ECF No. 393 at 8).  The City contends

4   that the settlement between NASSCO and the Port District "should not impact others'

5   claims." *Id.*  The City contends that "there are expressly several matters which are not,

6   or cannot be, covered by the settlement which cannot be made the subject of any bar

7   order...." *Id.*  Specifically, the City contends that it has intentional tort claims for

8   nuisance and trespass against both NASSCO and the Port District, which cannot be

9   subject to any bar. *Id.* at 21.  The City contends that it also has express indemnity and

10  contract claims against NASSCO which are purely contractual, and cannot be subject

11  to a bar. (ECF No. 393 at 21).  The City also contends it has cost recovery claims which

12  cannot be barred. *Id.* at 21-22.  Finally, the City contends that it has claims against

13  NASSCO and the Port District relating to discharges into the City's MS4 system.  The

14  City contends that the MS4 is not a "Covered Matter" under the Settlement Agreement,

15  and "any claims by the City against the Port, or NASSCO, relating to the MS4 releases

16  at the NASSCO Site cannot be subject to any bar order." *Id.* at 24.

17         In their reply, NASSCO and the Port District contend that they are "not seeking

18  any claims bar or dismissal as to the 'North Yard' of the Shipyard Sediment Site, or as

19  to claims relating to the MS4 (except to the extent any discharges from the MS4

20  resulted in the contamination being remediated in the South Yard).  Such claims fall

21  expressly within the scope of 'Excluded Matters,' not 'Covered Matters.'" (ECF No.

22  408 at 11).  NASSCO and the Port District also contend that City's cost recovery,

23  nuisance, and trespass claims "are not truly independent claims, but are in the nature of

24  contribution and indemnity arising out of a common liability for the Site cleanup."

25  (ECF No. 408 at 12).

26         Section 6 of the UCFA provides that "a release, covenant not to sue, or similar

27  agreement entered into by a claimant [NASSCO] and a responsible person [the Port

28  District] discharges that person [the Port District] from all liability for contribution, but

it does not discharge any other persons liable upon the same claim.  UCFA § 6, 12 U.L.A. 44, 56 (Supp. 1992).  The bar requested by NASSCO and the Port District prohibits all claims by non-parties to the Settlement Agreement against both NASSCO and the Port District.  To the extent the bar prohibits claims against NASSCO, it is not consistent with Section 6 of the UCFA.  The UCFA provides that NASSCO's claims against other non-parties are reduced by the amount of the Port District's equitable share of the obligation, which will be determined by the Court when any remaining contribution claims are resolved pursuant to Section 2 of the UCFA.

With respect to the City's argument that its non-contribution claims cannot be barred, the Court notes that the City's claims against NASSCO are not barred pursuant to Section 6.  As for the City's cost recovery claims against the Port District, the parties' proposed order bars claims for "contribution and indemnity" and not cost recovery.  To the extent the City has cost recovery claims against the Port District that are not based on contribution and indemnity, such claims are not barred by Section 6.

With respect to the City's intentional tort claims against the Port District, the Court finds that the City's claims for nuisance, public nuisance, and trespass are disguised state law contribution claims, and may be barred under Section 6.  *See Heritage Bond*, 546 F.3d at 671 (court can enter a bar order under California Code of Civil Procedure section 877.6 that addresses related state law claims for "contribution and indemnity or disguised claims for such relief.").

With respect to the City's argument that its MS4 claims cannot be barred, NASSCO and the Port District have stated that claims related to the MS4 system are "Excluded Matters" and therefore not covered by the Settlement Agreement or the bar order.  (*See* ECF No. 408 at 11).  However, to the extent the City's MS4 claims against the Port District concern discharges that resulted in the contamination being remediated at the South Yard, they are covered by the Settlement Agreement, and thus covered by the bar order.

**CONCLUSION**

IT IS HEREBY ORDERED that the good faith settlement motions (ECF Nos. 354, 366, 367, 368, 370) are GRANTED as follows:

1.   The Court finds the Settlement Agreements were entered into in good faith, and are fair, reasonable, and consistent with the purposes of CERCLA and the UCFA.

2.   The Moving Parties shall prepare proposed orders that are consistent with this Order and file them on the docket within ten (10) days from the date this Order is filed.  Any objections shall be filed within ten (10) days from the date(s) the proposed orders are filed.

DATED:  July 10, 2014

**WILLIAM Q. HAYES**
United States District Judge