1
2
3
4
5
6
7
8
9

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY OF SAN DIEGO, | CASE NO. 09cv2275 WQH (BGS) |
| Plaintiff, | |
| vs. | ORDER |
| NATIONAL STEEL & SHIPBUILDING COMPANY; *et al.*, | |
| Defendants. | |
| AND RELATED CROSS-ACTIONS AND COUNTERCLAIMS | |

HAYES, Judge:

The matter before the Court is the Joint Motion of National Steel and Shipbuilding Company and City of San Diego for Determination of Good Faith Settlement filed by Plaintiff City of San Diego (the "City") and Defendant National Steel & Shipbuilding Corporation ("NASSCO"). (ECF No. 487).

## BACKGROUND

The Shipyard Sediment Site ("the Site") is an area of bottom marine sediment located along the eastern shore of the central San Diego Bay. (ECF No. 367-3 at 76-78). The Site consists generally of two leaseholds presently occupied by BAE Systems San Diego Ship Repair ("BAE Systems") and NASSCO. *Id.* The "North Yard" consists of the BAE Systems leasehold and certain surrounding tidelands, and the "South Yard" consists of the NASSCO leasehold and certain surrounding tidelands. *Id.* BAE Systems and its predecessors, including Southwest Marine, Inc. ("Southwest

Marine"), have operated at the North Yard for nearly one hundred years.  (ECF No. 354-2 at 4).  NASSCO has operated at the South Yard since at least the 1960's.  *Id.*

In or about 1991, the California Regional Water Quality Control Board ("Regional Board") commenced an initial investigation of impacts to marine sediment at the Site.  *Id.* at 5.  Initially, the Regional Board's investigation focused on BAE Systems and NASSCO.  *Id.*  The Regional Board directed BAE Systems and NASSCO to address sediment contamination directly adjacent to their facilities.  *Id.*

In February 2001, the Regional Board commenced administrative proceedings in connection with historical discharges at the Site.  (ECF No. 368-3 at 2).  The Regional Board compelled NASSCO, BAE Systems, and other parties to undertake studies and submit information concerning the nature and extent of contamination resulting from the historical discharges.  *Id.*  The result of this fact-gathering process was an extensive Administrative Record compiled from over a decade of submissions and studies related to the historical discharges at the Site.  *Id.*

On April 29, 2005, the Regional Board issued a Tentative Cleanup and Abatement Order ("tentative CAO"), that identified NASSCO, BAE Systems, the City, Campbell Industries ("Campbell"), San Diego Gas & Electric ("SDG&E"), and the U.S. Navy (the "Navy") as the "Dischargers" or "Persons Responsible" for the contamination at the Site, and set forth proposed cleanup requirements for the Site.  (ECF No. 1 at 50-77).  On August 24, 2007, April 4, 2008, December 22, 2009, and September 15, 2010, the Regional Board issued revised versions of the Tentative Cleanup and Abatement Order.  (ECF No. 354-2 at 5-6).

In June 2008, the "Dischargers," each represented by experienced counsel, entered into arm's-length mediation regarding cleanup, liability, and allocation issues before environmental litigation mediator Timothy Gallagher.  (ECF No. 354-2 at 6).  Since that time, the "Dischargers" have been engaged in regular settlement discussions.  (ECF No. 370-2 at 4-5).

On October 14, 2009, the City initiated this action by filing a Complaint for

Environmental Cost Recovery and Contribution, Injunctive Relief, Declaratory Relief and Damages against BAE Systems, NASSCO, SDG&E, Campbell, the Navy, the San Diego Unified Port District (the "Port District"), San Diego Marine Construction Company, San Diego Marine Construction Corporation, Martinolich Shipbuilding Company, National Iron Works, National Steel & Shipbuilding Corporation, Southwest Marine, Inc., Star and Crescent Boat Company ("Star and Crescent"), Star and Crescent Ferry Company, Star and Crescent Investment Company, and Does 1-100, inclusive ("the parties"). (ECF No. 1). The City alleged contribution and cost recovery claims under both state and federal law. *Id*. The City also alleged contractual and express indemnity claims against NASSCO, and intentional tort claims for nuisance and trespass against all Defendants except the Navy. (ECF No. 1 ¶¶ 101, 202-218). The subject matter of the Complaint relates to, and derives from the underlying administrative Regional Board proceedings and the tentative cleanup and abatement orders. All of the parties named in the tentative cleanup and abatement orders as "Dischargers" or "Responsible Parties" are parties to this action.

Defendants filed contribution and cost-recovery counterclaims against the City, and contribution and cost-recovery cross-claims and supplemental cross-claims against each other, under both state and federal law. (ECF Nos. 13, 14, 16-18, 20, 21, 29, 49, 63, 90, 210, 223, 300, 302, 307, 308).

On July 15, 2010, the Magistrate Judge issued an order adopting a phased discovery plan proposed by the parties. (ECF No. 125). Phase I discovery was limited to certain categories of information, and was divided into three segments:

- Phase I(a), a seven-month phase during which each party served limited initial disclosures and was permitted to issue "Interrogatories, Requests for Admission, Requests for Production of Documents and Things."
- Phase I(b), fact depositions limited to the topics addressed in Phase I.
- Phase I(c), court-ordered mediation during which no discovery would take

place.

*Id.* at 3-6.  Phase I(c) mediation with Timothy Gallagher began in May 2011, and continued through June 2013.

In November 2011, the parties participated in a three-day evidentiary hearing as part of the Regional Board's administrative proceedings.  (ECF No. 354-2 at 6).

On March 14, 2012, the Regional Board issued its final Cleanup and Abatement Order (No. R9-2012-0024) ("the Final CAO"), along with a Technical Report, in which it (1) found various parties to be "Dischargers" or "Persons Responsible" for environmental contamination at the Shipyard Sediment Site, (2) concluded that the sediments at the Site posed a risk to aquatic and human receptors, and (3) mandated an extensive cleanup.  (ECF No. 367-3 at 7-44).

Specifically, the Regional Board found that "[e]levated levels of pollutants above San Diego Bay background conditions exist in the San Diego Bay bottom marine sediment" along the Shipyard Sediment Site.  *Id.* at 7.  The Regional Board found NASSCO, BAE Systems, the City, San Diego Marine Construction Company,[1] Campbell, SDG&E, the Navy, and the Port District:

> [H]ave each caused or permitted the discharge of waste to the Shipyard Sediment Site resulting in the accumulation of waste in the marine sediment.  The contaminated marine sediment has caused conditions of pollution, contamination or nuisance in the San Diego Bay that adversely affect aquatic life, aquatic-dependent wildlife, and human health San Diego Bay beneficial uses.

*Id.*

The Final CAO identifies the following "Dischargers" or "Persons Responsible" finding that each caused or permitted wastes to be discharged or deposited into the San Diego Bay and created or threatened to create a condition of pollution or nuisance.

---

[1] San Diego Marine Construction Company is not identified in the CAO as a discharger with responsibility for compliance because "San Diego Marine Construction Company no longer exists and no corporate successor with legal responsibility for San Diego Marine Construction Company's liabilities has been identified."  *Id.* at 7 n.1.

Persons Responsible

1.   NASSCO

NASSCO owns and operates a full service ship construction, modification, repair, and maintenance facility on 126 acres of tidelands property leased from the Port District on the eastern waterfront of central San Diego Bay at 2798 Harbor Drive in San Diego [the "South Yard"]. Shipyard operations have been conducted at this site by NASSCO over San Diego Bay waters or very close to the waterfront since at least 1960. Shipyard facilities operated by NASSCO over the years at the site have included concrete platens used for steel fabrication, a graving dock, shipbuilding ways, and berths on piers or land to accommodate the berthing of ships. An assortment of waste is generated at the facility including spent abrasive, paint, rust, petroleum products, marine growth, sanitary waste, and general refuse.

*Id.* at 7-8.

2.   BAE Systems

From 1979 to the present, Southwest Marine, Inc. and its successor BAE Systems have owned and operated a ship repair, alteration, and overhaul facility on approximately 39.6 acres of tidelands property on the eastern waterfront of central San Diego Bay. The facility, currently referred to as BAE Systems San Diego Ship Repair, is located on land leased from the Port District at 2205 East Belt Street, foot of Sampson Street in San Diego, San Diego County, California [the "North Yard"]. Shipyard facilities operated by BAE Systems over the years have included concrete platens used for steel fabrication, two floating dry docks, five piers, and two marine railways. An assortment of waste has been generated by the facility including spent abrasive, paint, rust, petroleum products, marine growth, sanitary waste, and general refuse.

*Id.* at 8.

3.   City of San Diego

From the early 1900s through February 1963, when the relevant tideland areas were transferred from the City of San Diego to the Port District, the City was the trustee of and leased to various operators, all relevant portions of the Shipyard Sediment Site. The ... City of San Diego caused or permitted [waste] to be discharged, or to be deposited where they were discharged into the San Diego Bay through its ownership of the Shipyard Sediment Site....

The City of San Diego also owns and operates a municipal separate storm sewer system (MS4) through which it discharges waste commonly found in urban runoff to San Diego Bay subject to the terms and conditions of a National Pollutant Discharge Elimination System (NPDES) Storm Water Permit. The [Regional Board] finds that the City of San Diego has discharged urban storm water containing waste directly to San Diego Bay at the Shipyard Sediment Site.

[The Regional Board] finds that the City of San Diego has also discharged urban storm water containing waste through its MS4 to Chollas

Creek resulting in the exceedances of chronic and acute California Toxics Rule copper, lead, and zinc criteria for the protection of aquatic life. Studies indicate that during storm events, storm water plumes toxic to marine life emanate from Chollas Creek up to 1.2 kilometers into San Diego Bay, and contribute to pollutant levels at the Shipyard Sediment Site. The urban storm water containing waste that has discharged from the on-site and off-site MS4 has contributed to the accumulation of pollutants in the marine sediments at the Shipyard Sediment Site to levels, that cause, and threaten to cause, conditions of pollution, contamination, and nuisance by exceeding applicable water quality objectives for toxic pollutants in San Diego Bay.

*Id.* at 8-9.

### 4.   Campbell

From July 1972 through 1979, Campbell's wholly owned subsidiaries MCCSD and later San Diego Marine Construction Corporation operated a ship repair, alteration, and overhaul facility on what is now the BAE Systems leasehold at the foot of Sampson Street in San Diego. Shipyard operations were conducted at this site by Campbell over San Diego Bay waters or very close to the waterfront. An assortment of waste was generated at the facility including spent abrasive blast waste, paint, rust, petroleum products, marine growth, sanitary waste, and general refuse.

*Id.* at 10.

### 5.   SDG&E

SDG&E owned and operated the Silver Gate Power Plant along the north side of the BAE Systems leasehold from approximately 1943 to the 1990s. SDG&E utilized an easement to San Diego Bay along BAE Systems' north property boundary for the intake and discharge of cooling water via concrete tunnels at flows ranging from 120 to 180 million gallons per day. SDG&E operations included discharging waste to holding ponds above the tunnels near the Shipyard Sediment Site.

*Id.* at 11.

### 6.   U.S. Navy

The U.S. Navy owns and operates a municipal separate storm sewer system (MS4) at the Naval Base San Diego (NBSD), formerly Naval Station San Diego or NAVSTA, through which it caused or permitted the discharge of waste commonly found in urban runoff to Chollas Creek and San Diego Bay...Technical reports by the U.S. Navy and others indicate that Chollas Creek outflows during storm events convey elevated sediment and urban runoff chemical pollutant loading and its associated toxicity up to 1.2 kilometers into San Diego Bay over an area included in the Shipyard Sediment Site.

[The Regional Board] finds that the U.S. Navy has caused or permitted marine sediment and associated waste to be resuspended into the water column as a result of shear forces generated by the thrust of propellers during ship movements at NBSD. The resuspended sediment and

pollutants can be transported by tidal currents and deposited in other parts of San Diego Bay, including the Shipyard Sediment Site. The above discharges have contributed to the accumulation of pollutants in marine sediment at the Shipyard Sediment Site to levels that cause, and threaten to cause, conditions of pollution, contamination, and nuisance by exceeding applicable water quality objectives for toxic pollutants in San Diego Bay.

Also, from 1921 to the present, the U.S. Navy has provided shore support and pier-side berthing services to U.S. Pacific fleet vessels at NBSD located at 3445 Surface Navy Boulevard in the City of San Diego. NBSD currently occupies 1,029 acres of land and 326 water acres adjacent to San Diego Bay to the west, and Chollas Creek to the north near Pier 1. Between 1938 and 1956, the NBSD leasehold included a parcel of land within the Shipyard Settlement Site referred to as the 28th Street Shore Boat Landing Station, located at the south end of the present day NASSCO leasehold at the foot of 28th Street and including the 28th Street Pier. [The Regional Board] finds that the U.S. Navy caused or permitted wastes to be deposited where they were discharged into San Diego Bay and created, or threatened to create, a condition of pollution or nuisance at this location when it conducted operations similar in scope to a small boatyard, including solvent cleaning and degreasing vessel parts and surfaces, abrasive blasting and scraping for paint removal and surface preparations, metal plating, and surface finishing and painting. Prevailing industry-wide boatyard operational practices employed during the 1930s through the 1980s were often not sufficient to adequately control or prevent pollutant discharges, and often led to excessive discharges of pollutants in marine sediment in San Diego Bay. The types of pollutants found in elevated concentrations at the Shipyard Sediment Site ... are associated with the characteristics of the waste the U.S. Navy operations generated at the 28th Street Shore Boat Landing Station site.

*Id*. at 11-12.

### 7.   Port District

The Port District is a special government entity, created in 1962 by the San Diego Unified Port District Act, California Harbors and Navigation Code Appendix I, in order to manage San Diego Harbor, and administer certain public lands along San Diego Bay. The Port District holds and manages as trust property on behalf of the People of the State of California the land occupied by NASSCO, BAE Systems, and the cooling water tunnels for SDG&E's former Silver Gate Power Plant. The Port District is also the trustee of the land formerly occupied by the San Diego Marine Construction Company and by Campbell at all times since 1963 during which they conducted shipbuilding and repair activities. The Port District's own ordinances, which date back to 1963, prohibit deposit or discharge of any chemicals or waste to the tidelands or San Diego Bay and make it unlawful to discharge pollutants in non-storm water directly or indirectly into the storm water conveyance system.

*Id*. at 12.

The Regional Board stated that it has discretion to name the Port District in its capacity as the State's trustee as a "Discharger," and does so in the Final CAO. (ECF

No. 367-3 at 12).  The Regional Board did not accord the Port District secondary liability status, finding:

> The Port District also owns and operates a municipal separate storm sewer system (MS4) through which it discharges waste commonly found in urban runoff to San Diego Bay subject to the terms and conditions of an NPDES [National Pollutant Discharge Elimination System] Storm Water Permit.  [The Regional Board] finds that the Port District has discharged urban storm water containing waste directly or indirectly to San Diego Bay at the Shipyard Sediment Site.
> ....
> The urban storm water containing waste that has discharged from the on-site and off-site MS4 has contributed to the accumulation of pollutants in the marine sediments at the Shipyard Sediment Site to levels, that cause, and threaten to cause, conditions of pollution, contamination, and nuisance by exceeding applicable water quality objectives for toxic pollutants in San Diego Bay.

*Id.* at 13.

Waste Discharge/Use Impairments

The Final CAO identified the types of waste discharge, as well as the use impairments caused by the contamination.  The San Diego Bay shoreline occupied by the Shipyard Sediment Site is "listed on the Clean Water Act section 303(d) list of Water Quality Limited Segments for elevated levels of copper, mercury, zinc, PAHs, and PCBs in the marine sediment."  (ECF No. 367-3 at 13).  The Regional Board found that "[t]hese pollutants are impairing the aquatic life, aquatic-dependent wildlife, and the human health beneficial uses designated for San Diego Bay and are causing the Bay's narrative water quality objective for toxicity not to be attained."  *Id.*  The Regional Board based its findings and conclusions in the Final CAO on "data and other technical information contained in the Shipyard Report prepared by NASSCO's and BAE's consultant, Exponent," after a detailed sediment investigation at the Shipyard Sediment Site within and adjacent to the NASSCO and BAE Systems leaseholds.  *Id.*

The Final CAO identified constituents of primary concern ("primary COCs") for the Shipyard Sediment Site to be copper, mercury, HPAHs, PCBs, and TBT, "which are associated with the greatest exceedance of background and highest magnitude of potential risk at the Shipyard Sediment Site."  *Id.* at 19.  Secondary COCs are arsenic,

cadmium, lead, and zinc.  *Id.*  The Regional Board determined that "[a]lthough there are complexities and difficulties that would need to be addressed and overcome ... it is technologically feasible to cleanup to the background sediment quality levels utilizing one or more remedial and disposal techniques." (ECF No. 367-3 at 20).

The Final CAO "evaluated a number of criteria to determine risks, costs, and benefits associated with no action, cleanups to background sediment chemistry levels, and alternative cleanup levels greater than background concentrations."  *Id.*

> The criteria included factors such as total cost, volume of sediment dredged, exposure pathways of receptors to contaminants, short- and long-term effects on beneficial uses (as they fall into the broader categories of aquatic life, aquatic-dependent wildlife, and human health).  The [Regional Board] then compared these cost criteria against the benefits gained by diminishing exposure to the primary COCs to estimate the incremental benefit gained from reducing exposure based on the incremental costs of doing so.

*Id.*

Based on the above considerations, the Regional Board concluded that "cleaning up to background sediment chemistry levels is not economically feasible."  *Id.*  The Regional Board prescribed alternative, less stringent, cleanup levels in compliance with State Water Board Resolution No. 92-49, *Policies and Procedures for Investigation and Cleanup and Abatement of Discharges under Water Code Section 13304.  Id.*  at 21.

> The alternative cleanup levels will result in significant contaminant mass removal and therefore risk reduction from San Diego Bay. Remediated areas will approach reference area sediment concentrations for most contaminants.  Compared to cleaning up to background cleanup levels, cleaning up to the alternative cleanup levels will cause less diesel emission, less greenhouse gas emission, less noise, less truck traffic, have a lower potential for accidents, and less disruption to the local community. Achieving the alternative cleanup levels also requires less barge and crane movement on San Diego Bay, has a lower risk of re-suspension of contaminated sediments, and reduces the amount of landfill capacity required to dispose of sediment wastes.  The alternative cleanup levels properly balance reasonable protections of San Diego Bay beneficial uses with the significant economic and service activities provided by the City of San Diego, the NASSCO and BAE Systems Shipyards and the U.S. Navy.

ECF No. 367-3 at 22.

The Regional Board set out a "Remedial Monitoring Program" which provides for monitoring during remediation activities, as well as post-remediation monitoring.

1  *Id*. at 23.

2      The Dischargers have proposed a remedial action implementation
3  schedule and a description of specific remedial actions they intend to
   undertake to comply with this CAO.  The remedial action implementation
4  schedule will begin with the adoption of this CAO and will end with the
   submission of final reports documenting that the alternative sediment
5  cleanup levels have been met.  From start to finish, remedial action
   implementation is expected to take approximately 5 years to complete.

6  *Id*. at 24.

7  <u>Order Directives</u>

8      The Final CAO ordered all Dischargers to comply with several directives,

9  including the following:

10      1.    <u>Cleanup and Abate</u>

11      Dischargers shall terminate all illicit discharges, if any, to the Shipyard
    Sediment Site in violation of waste discharge requirements or other order
12  or prohibition issued by the [Regional Board]....  The Dischargers shall
    take all corrective actions necessary to remediate the contaminated marine
13  bay sediment at the Shipyard Sediment Site....

14  *Id*. at 27.  The Final CAO set forth a detailed corrective action design ordering

15  Dischargers to dredge remedial areas to attain specific "post remedial surface-area

16  weighted average concentrations ('SWACs')."  (ECF No. 367-3 at 27-28).

17      In addition, with respect to the municipal separate storm sewer system ("MS4"),

18  the Regional Board ordered that after the adoption of the Final CAO:

19      [T]he City of San Diego and the San Diego Unified Port District within the
    tideland area shall take interim remedial actions, as necessary, to abate or
20  correct the actual or potential effects of the releases from the MS4 system
    that drains to outfall SW4....
21
        The City of San Diego and the San Diego Unified Port District within the
22  tideland area shall prepare and submit a municipal separate storm system
    (MS4) Investigation and Mitigation Plan (Plan) within 90 days after
23  adoption of the CAO.  The plan shall be designed to identify, characterize,
    and mitigate pollutants and pollutant sources in the watershed that drains
24  to the MS4 outfall SW-4 at the Shipyard Sediment Site....

25  ECF No. 367-3 at 28-29.  The Final CAO identified required components of the MS4

26  Investigation and Mitigation Plan, as well as an Activity Completion Schedule.  *See id*.

27  at 29-30.

28      2.    <u>Remedial Action Plan and Implementation</u>

  
The Regional Board ordered that "[a]ll Dischargers shall prepare and submit a Remedial Action Plan (RAP) to the [Regional Board] no later than 90 days after adoption of the CAO." *Id*. at 30. The Regional Board required specific components in the RAP including an introduction, a description of the selected remedies, a health and safety plan, a community relations plan, a quality assurance project plan, a sampling and analysis plan, a description of wastes generated, results of pilot testing, a design criteria report, an equipment, services and utilities list, regulatory permits and approvals, a remediation monitoring plan, a site map, contingencies, and a remediation schedule. *Id*. at 30-32.

### 3. Cleanup and Abatement Completion Verification

The Dischargers shall submit a final Cleanup and Abatement Completion Report verifying completion of the RAP activities for the Shipyard Sediment Site within 90 days of completion of remediation. The report shall provide a demonstration, based on sound technical analysis, that sediment quality cleanup levels in Directive A.2 have been achieved.

*Id*. at 32.

### 4. Post Remedial Monitoring

The Regional Board ordered that no later than 90 days after the adoption of the CAO, "[t]he Dischargers shall prepare and submit a Post Remedial Monitoring Plan to the [Regional Board].... The Post Remedial Monitoring Plan shall be designed to verify that the remaining pollutant concentrations in the sediments will not unreasonably affect San Diego Bay beneficial uses." (ECF No. 367-3 at 32). The Final CAO provided several specific elements that are required to be included in the Post Remedial Monitoring Plan, including a quality assurance project plan, a sampling and analysis plan, sediment chemistry, bioaccumulation testing, sediment chemistry for benthic exposure, sediment toxicity, a benthic community assessment, and a schedule detailing the sequence of sampling events and the time frame for each activity. *Id*. at 32-35. The Regional Board further ordered that the Dischargers submit "Post Remedial Monitoring Reports" containing specified information, including an analysis of whether or not remedial goals have been attained at Year 2, Year 5, and Year 10. *Id*. at 35-36.

1        5.     <u>Quarterly Progress Reports</u>

2        The Regional Board ordered that by the 15th day of March, June, September, and

3   December of each year after the Final CAO goes into effect, the Dischargers shall

4   submit "written quarterly progress reports." *Id*. at 37-38.  The Regional Board ordered

5   that these reports continue until the submission of the final Cleanup and Abatement

6   Completion Report verifying completion of the Remedial Action Plan for the Shipyard

7   Sediment Site.

8        6.     <u>No Further Action</u>

9        The Regional Board ordered that upon its approval of the Final Cleanup and

10  Abatement Order and the Post Remedial Monitoring Reports, "remedial actions and

11  monitoring will be complete and compliance with this CAO will be achieved." *Id*. at

12  38.

13  <u>Earlier Settlements</u>

14       On June 24, 25, and 26, 2013, the parties attended a Mandatory Settlement

15  Conference with the Magistrate Judge.  (ECF No. 279).  A settlement was not reached.

16   On July 19, 2013, the Magistrate Judge issued a Case Management Conference Order

17  regulating Phase I(b) and Phase II of discovery.[2]  (ECF No. 290).

18       In or around October and November, 2013, three settlement agreements were

19  reached between various parties.  SDG&E and BAE Systems settled their respective

20  claims for response costs at the North Yard.  The Navy, BAE Systems, and NASSCO

21  settled their respective claims with respect to response costs at both the North and South

22  Yards.  NASSCO and the Port District settled their respective claims with respect to

23  response costs at the South Yard.[3]   The settling parties filed motions seeking

24  _____

25       [2] On November 7, 2013, the Magistrate Judge issued an Amended Case
    Management Conference Order extending the deadlines for fact and expert discovery,

26  and allowing for increased numbers of Interrogatories, Requests for Admission, and
    Requests for Production of Documents and Things.  (ECF No. 376).

27       [3] In December 2012, NASSCO established the San Diego Bay Environmental

28  Restoration Fund - South ("South Trust"), for which it serves as trustee, for the purpose
    of providing for payment of work required under the Final CAO.  (ECF No. 370-3 at
    21, 23-24).

1   determinations that the settlement agreements were reached in good faith, and approval
2   of requested bars to future claims.  (ECF Nos. 354, 366, 367, 368, 370).

3        On July 10, 2014, the Court issued an order granting the motions, concluding that
4   "all three settlement agreements were entered into in good faith," and were "fair,
5   reasonable, and consistent with the purposes of CERCLA and the [Uniform
6   Contributory Fault Act]."  (ECF No. 423 at 48).  Following approval of the settlements,
7   the City was the only remaining "Discharger" or "Person[] Responsible" identified in
8   the Final CAO that had yet to settle with NASSCO.

9   The Pending Settlement

10       On February 11, 2015, NASSCO and the City filed the joint motion for
11  determination of good faith settlement, indicating that a settlement agreement had been
12  entered into regarding response costs of the "South Yard" portion of the Shipyard
13  Sediment Site.  (ECF No. 487-1).  The pending motion requests approval of the
14  Settlement Agreement and an order dismissing and barring all claims against the City
15  and NASSCO in this action "with regard to 'Covered Matters' under the Agreement,
16  as more particularly set forth in the Settling South Parties' moving papers, except as
17  expressly reserved or excluded in the Agreement."  (ECF No. 487 at 2).  The motion is
18  accompanied by the Declaration of Kelly Richardson ("Richardson Decl."), the
19  settlement agreement entered into between NASSCO and the City (the "Settlement
20  Agreement"), a proposed order barring and dismissing claims against NASSCO and the
21  City ("proposed bar order"), and a request for judicial notice of the Final CAO and
22  Technical Report.  (ECF Nos. 487-2 through 487-6).

23       NASSCO and the City assert that their settlement, in addition to the earlier
24  settlements, "resolves all claims in this action relating to the remediation of the South
25  Site."  *Id.* at 8.  NASSCO and the City assert that the terms of their settlement
26  agreement (the "Settlement Agreement") are the "result of arms' length negotiations
27  over several years of privately-mediated and judicially-supervised settlement
28  discussions among all parties to this action, and are without collusion, fraud, or any

tortious conduct aimed to injure the interests of non-settling parties." *Id.* at 9.  Kelly Richardson states that the Regional Board estimates the total cost of cleanup of the South Yard to be $24 million.

Under the terms of the Settlement Agreement, NASSCO agrees to "be solely responsible to perform the work required by the CAO in the South Yard and for the implementation and completion of the Remedial Action in the South Yard" and to pay $580,724.21 for "unpaid Past State Oversight Costs related to the South Yard." (ECF No. 487-2 at 14-15).  The City agrees to pay 24% of "Past South Trust Costs" of which it has paid $4,154,581.36 to date.  *Id.* at 15.  The City agrees to pay $1,070,204.02 to NASSCO for "Past Response Costs."  *Id.*  The City agrees to pay $301,046.18 for "Past Unpaid State Oversight Costs."  *Id.*  The City agrees to pay 24% of "Future Response Costs."  *Id.*

On March 2, 2015, counsel for the City emailed the Court's chambers a "revised" proposed  order dismissing and barring claims against the settling South Yard parties.  Counsel states that "[t]his revised order is a product of negotiations between the moving parties and the Port District."  The docket reflects that the revised proposed order has not been filed.  On March 2, 2015, the Port District filed a "Conditional Non-Opposition" to the pending motion, "expressly conditioned upon the modifications to the proposed 'Order Confirming Good Faith Settlement Between National Steel and Shipbuilding Company and City of San Diego and Barring and Dismissing Claims Against the City,' as reflected in the revised proposed Order submitted to the Court this afternoon...."  (ECF No. 493 at 3).

On March 2, 2015, the Port District filed objections to NASSCO and the City's request for judicial notice.  (ECF No. 494).  On March 9, 2015, NASSCO filed a response to the Port District's objections.  (ECF No. 496).

### APPLICABLE LAW

### I.     CERCLA Liability

CERCLA imposes "strict liability for environmental contamination" upon four

classes of potentially responsible parties. *Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 608 (2009).  Enacted as a part of the Superfund Amendments and Reauthorization Act of 1986, § 113(f) authorizes one potentially responsible party to sue another for contribution in certain circumstances. 42 U.S.C. § 9613(f).  CERCLA liability is joint and several, meaning that a responsible party may be held liable for the entire cost of cleanup even where other parties contributed to the contamination. *Fireman's Fund Ins. Co. v. City of Lodi*, 302 F.3d 928, 945 (9th Cir. 2002).  Parties required to pay cleanup costs may, in turn, sue other potentially responsible parties for contribution. *Id.*

## II.      CERCLA Favors Settlement and Allows Contribution Bars

CERCLA encourages responsible parties to remediate hazardous sites without delay. *Burlington N. & Santa Fe Ry. Co.*, 556 U.S. at 602; *Fireman's Fund Ins. Co.*, 302 F.3d at 947 ("A fundamental purpose and objective of CERCLA is to encourage the timely cleanup of hazardous waste sites.").  The Courts have recognized a strong federal interest in promoting settlement of complex CERCLA actions.  *See e.g.*, *Cal. Dep't of Toxic Substances Control v. Hearthside Residential Corp.*, 613 F.3d 910, 915 (9th Cir. 2010) ("Another important purpose of CERCLA is to encourage early settlement between potentially responsible parties and environmental regulators."); *Fireman's Fund Ins. Co.*, 302 F.3d at 948 (finding "early settlement[s]" under CERCLA allow "energy and resources to be directed at site cleanup rather than protracted litigation."); *Carson Harbor Vill. Ltd. v. Unocal Corp.*, 270 F.3d 863, 880, 884 (9th Cir. 2001) (en banc) (discussing CERCLA's policies of "encouraging early settlement" and promoting the "expeditious and efficient cleanup of hazardous waste sites.").

"To facilitate settlement in multi-party litigation, a court may review settlements and issue bar orders that discharge all claims of contribution by nonsettling defendants against settling defendants." *Adobe Lumber, Inc. v. Hellman*, No. CIV 05-1510 WBS EFB, 2009 WL 256553, at *2 (E.D. Cal. Feb. 3, 2009); *see also AmeriPride Servs., Inc.*

1   *v. Valley Indus. Servs., Inc.*, No. CIV. S-00-113-LKK JFM, 2007 WL 1946635, at *2

2   (E.D. Cal. July 6, 2007) ("Within the Ninth Circuit, a court's authority to review and

3   approve settlements and to enter bar orders has been expressly recognized.").  The

4   Court can bar related state law claims in a federal action.  *See In Re Heritage Bond*

5   *Litig.*, 546 F.3d 667, 670-71 (9th Cir. 2008) (court can enter bar order under California

6   Code of Civil Procedure section 877.6 that addresses related state law claims for

7   "contribution and indemnity or disguised claims for such relief"); *see also Fed. Sav.*

8   *and Loan Ins. Corp. v. Butler*, 904 F.2d 505, 511 (9th Cir. 1990).

9   **III.    Fairness, Adequacy, and Reasonableness of the Settlement**

10          "'The initial decision to approve or reject a settlement proposal is committed to

11   the sound discretion of the trial judge.'"  *S.E.C. v. Randolph*, 736 F.2d 525, 529 (9th

12   Cir. 1984) (quoting *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 625 (9th

13   Cir. 1982)).  "In deciding whether to approve a proposed settlement in a CERCLA case,

14   a district court must weigh the 'fairness, adequacy and reasonableness' of the proposed

15   settlement."  *Stearns & Foster Bedding Co. v. Franklin Holding Corp.*, 947 F. Supp.

16   790, 813 (D.N.J. 1996) (quoting *United States v. Rohm & Haas Co.*, 721 F. Supp. 666,

17   685 (D.N.J. 1989)). The Court of Appeals for the Ninth Circuit has indicated that "[a]

18   settlement should be approved if it is fundamentally fair, adequate, and reasonable."

19   *Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1375 (9th Cir. 1993).  When evaluating

20   a settlement, the Court does not conduct a trial on the merits, nor should the proposed

21   settlement "be judged against a hypothetical or speculative measure of what might have

22   been achieved by the negotiators."  *Officers for Justice,* 688 F.2d at 625.  Instead, a

23   presumption of fairness arises where: (1) counsel is experienced in similar litigation;

24   (2) settlement was reached through arm's-length negotiations; and (3) investigation and

25   discovery are sufficient to allow counsel and the court to act intelligently.  *Linney v.*

26   *Alaska Cellular P'ship*, No. C-96-3008 DLJ, 1997 WL 450064, at *5 (N.D. Cal. Jul. 18,

27   1997), *aff'd* 151 F.3d 1234 (9th Cir. 1998); *Ellis v. Naval Air Rework Facility*, 87

28   F.R.D. 15, 18 (N.D. Cal. 1980), *aff'd*, 661 F.3d 939 (9th Cir. 1981).

However, the "fairness or reasonableness of a ... settlement simply cannot be measured" in "an informational vaccum." *United States v. Montrose Chem. Corp. of Cal.*, 50 F.3d 741, 747 (1995). "'Fair' and 'reasonable' are comparative terms." *Arizona v. City of Tucson*, 761 F.3d 1005, 1012 (9th Cir. 2014) (citing *Montrose*, 50 F.3d at 748). "[I]n order to approve a CERCLA consent decree, a district court must find that the agreement is 'based upon, and roughly correlated with, some acceptable measure of comparative fault, apportioning liability among the settling parties according to rational (if necessarily imprecise) estimates of how much harm each [potentially responsible party] has done.'" *Id.* (quoting *United States v. Charter Int'l Oil Co.*, 83 F.3d 510, 521 (1st Cir.1996)). The district court has an "obligation to independently 'scrutinize' the terms of a settlement." *Montrose*, 50 F.3d at 747. The district court "should determine the proportional relationship between the [settlement amount] and [estimates of] total potential damages. The court should evaluate the fairness of that proportional relationship in light of the degree of liability attributable to the settling defendants." *Id.* The court should also take into account "the *nature* of the liability of the various defendants" and any "reasonable discounts for litigation risks, time savings, and the like that may be justified." *Id.*

## IV. Appropriate Method for Allocation of Response Costs

CERCLA section 113(f)(2) instructs courts to "allocate response costs among liable parties using such equitable factors as the court determines are appropriate." 42 U.S.C. § 9613(f)(1). "[C]ourts have adopted two main alternative methods: proportionate share and pro tanto (dollar-for-dollar)." *Id.*; *see generally McDermott, Inc. v. AmClyde*, 511 U.S. 202, 211 (1994) (defining the proportionate share and pro tanto methods). The pro tanto approach, embodied in the Uniform Contribution Among Tortfeasors Act (UCATA), provides for the reduction of nonsettling defendants' liability by the dollar amount of the settlement. UCATA § 4, 12 U.L.A. 194 (1996). Alternatively, the proportionate share approach contained in the Uniform Comparative Fault Act (UCFA) reduces the liability of the nonsettling defendants by the equitable

share of the settling parties' obligations.  UCFA § 6, 12 U.L.A. 126 (1996).

CERCLA does not specify which method of apportionment courts should apply in evaluating settlements, and the Ninth Circuit Court of Appeals has not issued a guiding decision on the issue.  *See* 42 U.S.C. § 9613(f); *Adobe Lumber*, 2009 WL 256553, at \*3 (noting that the Ninth Circuit "has never addressed the question of proper credit method for settlements").  District courts in the Ninth Circuit, however, have uniformly employed the proportionate share method of the UCFA.  *See, e.g.*, *Tyco Thermal Controls LLC v. Redwood Indus.*, No. C 06-07164 JF (PVT), 2010 WL 3211926, at \*5 (N.D. Cal. Aug. 12, 2010); *Adobe Lumber*, 2009 WL 256553, at \*7; *Acme Fill Corp. v. Althin CD Med.*, *Inc.*, No. C 91-4268-MMC, 1995 WL 822663, at \*1 (N.D. Cal. Nov. 8, 1995); *United States v. W. Processing Co.*, 756 F.Supp. 1424, 1432 (W.D. Wash. 1990).  District courts nationwide have similarly adopted the proportionate share method.  *See, e.g.*, *Tosco Corp. v. Koch Indust.*, 216 F.3d 886, 897 (10th Cir. 2000) ("[T]he majority of courts deciding contribution suits between private parties ... have applied the [UCFA] to reduce a nonsettling party's liability by the amount of the settling parties' liability, not the settlement amount."); *State v. Solvent Chem. Co., Inc.*, 984 F.Supp. 160, 168 (W.D.N.Y. 1997); *United States v. SCA Serv.*, *Inc.*, 827 F. Supp. 526, 535 (N.D. Ind. 1993).

Under the proportionate share method, Section 6 of the UCFA provides:

A release, covenant not to sue, or similar agreement entered into between a claimant and a person liable discharges that person from all liability for contribution, but it does not discharge any other person liable upon the same claim unless it so provides.  However, the claim of the releasing person against other persons is reduced by the amount of the released person's equitable share of the obligation....

UCFA § 6, 12 U.L.A. 44, 56 (Supp. 1992).

Section 2 of the UCFA provides that the court will make findings as to "the percentage of the total fault that is allocated to each claimant, defendant, third-party defendant, and person who has been released from liability under Section 6."  UCFA § 2(a)(2).  The contribution provision of the UCFA "aims to avoid a variety of scenarios by which a comparatively innocent [party] might be on the hook for the entirety of a

large cleanup bill." *Carson*, 270 F.3d at 871.  The proportionate share approach furthers the underlying policy of the contribution provision by "ensuring ... that damages are apportioned equitably among the liable parties." *American Cyanamid Co. v. Capuano*, 381 F.3d 6, 20 (1st Cir. 2004).

In this case, there is no dispute among the parties that the proportionate share approach of the UCFA is the most equitable method of apportioning liability.  The Court finds that the UCFA's proportionate share approach is consistent with the underlying goals of section 113(f)(1) and provides the most equitable method of apportioning fault.

## V.   State Law Claims

Where a settlement agreement involves the resolution of state law claims, federal courts may apply the criteria set forth by the California Supreme Court in *Tech-Bilt, Inc. v. Woodward-Clyde Assoc.*, 38 Cal. 3d 488 (1985) to determine whether a particular settlement was made in good faith, and thus extinguishes any equitable right of contribution or indemnity from nonsettling parties.  *Heritage Bond*, 546 F.3d at 680-681; *see also Shawmut Bank N.V. v. Kress Assoc.*, 33 F.3d 1477, 1504 (9th Cir. 1994).

District courts have the discretion to enter a bar order that applies the UCFA contribution bar to state law claims in a CERCLA action.  *See, e.g., Acme Fill Corp.*, 1995 WL 822664, at *8.  In *Acme Fill*, nonsettling defendants challenged the settling parties' proposed order applying the UCFA contribution bar to all state law claims asserted in the case.  The district court explained:

> The rationale for dismissal of all claims is that unless the related state claims that arise out of the same set of facts and involve identical subject matter are also dismissed, the finality of the settlement gained by applying UCFA becomes meaningless.  As a result, '[federal district] courts have held that the contribution protection accorded to defendants settling their liability under CERCLA discharges related claims made under state law.'  A settling defendant freed from federal contribution claims, but not from state law claims, would gain little from the settlement payment.  The incentive to reach settlement in CERCLA actions would likely disappear under a policy that allowed related state law claims to survive imposition of a contribution bar.  The CERCLA policy that encourages early settlement would be circumvented by lingering state law claims.

*Id*. (quoting *Hillsborough Cnty. v. A&E Road Oiling Svc., Inc.*, 853 F. Supp. 1402, 1408

1 | (M.D. Fla. 1994)).

2 | **DISCUSSION**

3 | **I.  Request for Judicial Notice**

4 |     NASSCO and the City request judicial notice of the Final CAO and Technical

5 | Report.  The Port District objects to judicial notice of these documents "to the extent

6 | they relate to the Port District's alleged liability for contamination of the Shipyard

7 | Sediment Site and for the municipal separate storm sewer system ('MS4') owned and

8 | operated by the City of San Diego."  (ECF No. 494 at 3).  The Port District contends

9 | that NASSCO and the City have failed to identify the particular facts within the Final

10 | CAO and Technical Report  that are the subject of their request for judicial notice.  The

11 | Port District contends that findings contained in the Final CAO and Technical Report

12 | are disputed by the parties.  NASSCO asserts that it does not seek judicial notice of the

13 | Final CAO and Technical Report for the truth of the matters asserted therein, "but to

14 | provide contextual background upon which the Mediator, NASSCO and the City each

15 | evaluated ... the basis for and reasonableness of their settlement."  (ECF No. 496 at 3).

16 |     The Court takes judicial notice of the fact that the Regional Board issued the

17 | Final CAO and Technical Report and that these documents contain certain statements.

18 | **II.  Good Faith, Fairness, Adequacy, and Reasonableness of the Settlement**

19 |     In this case, the parties have been engaged in administrative proceedings before

20 | the Regional Board since 2005.  (ECF No. 487-2 at 3).  The parties began arm's-length

21 | mediation sessions with an experienced environmental mediator in June 2008.  *Id.*  The

22 | parties have also participated in settlement discussions before the Magistrate Judge.  *Id.*

23 | NASSCO and the City have continued to negotiate in good faith as the final two

24 | nonsettling parties identified as "Persons Responsible" for contamination of the South

25 | Yard.  The Court finds that the parties entered into the Settlement Agreement in good

26 | faith.

27 |     The Court further finds that the Settlement Agreement furthers the goals of

28 | CERCLA to remediate contamination and to ensure that the costs are borne by the

potentially responsible parties. The settlement will avoid significant delays and transaction costs associated with protracted litigation and preserve resources for remediation. This settlement concludes negotiations for cleanup costs with respect to the South Yard.

The Court further finds that the terms of the Settlement Agreement are procedurally fair, adequate, and reasonable. All parties identified as "Persons Responsible" for South Yard contamination in the Final CAO are parties to this case, participated in lengthy administrative proceedings, participated in settlement conferences before the Magistrate Judge, participated in nearly seven years of mediation with an experienced mediator, and had the opportunity to oppose this noticed motion.

Finally, the Court finds that the allocations of responsibility in the Settlement Agreement are substantively fair, adequate, and reasonable in light of the total estimated cost of cleanup of the South Yard. Kelly Richardson states that the Regional Board estimates the total cost of cleanup of the South Yard to be $24 million. (ECF No. 487-2 at 3). The Port District agreed to pay a total of $1.4 million, which included past oversight costs, past response costs, and future response costs. (ECF No. 370-3 at 23). The Navy agreed to pay $966,398.84 for combined past response costs and past oversight costs. (ECF No. 366-2 at 11). The Navy agreed to pay $6,765,000 for future response costs, and in the event that future response costs total more than $20,500,000, 33% of future response costs beyond that amount. *Id.*

In the Settlement Agreement, the City agrees to pay $1,070,204.02 in past response costs, $301,046.18 in past oversight costs, 24% share of "Past South Trust Costs," and 24% of future response costs. (ECF No. 487-2 at 15-16). In the Settlement Agreement, NASSCO agrees to pay $580,724 in past oversight costs and "shall be solely responsible to perform the work required by the CAO in the South Yard and for the implementation and completion of the Remedial Action in the South Yard required under the CAO...." *Id.* at 487-2 at 14-15. In the joint motion, NASSCO represents that its fair share of the clean-up costs does not exceed 37%.

The Court finds that these allocations of responsibility are not inconsistent with any findings of the Final CAO and are fair and reasonable.  As the final two "Persons Responsible" for contamination of the South Yard site, NASSCO and the City are in the best position to allocate the remaining responsibility between themselves.  There are no remaining nonsettling parties who may be left with an "inequitable distribution of costs," yet barred from seeking contributions from the settling parties.  *See Atl. Research Corp. v. United States*, 551 U.S. 128, 140 (2007) (noting that CERCLA contribution counterclaims "blunt any inequitable distribution of costs").

**III.  Proposed Order**

The docket reflects that a revised proposed bar order, to which the Port District does not object, has not been filed.  The moving parties shall file the revised proposed bar order on the docket within ten days from the date this Order is filed.  Any objections shall be filed within ten days from the date the proposed order is filed.

**CONCLUSION**

IT IS HEREBY ORDERED that the good faith settlement motion (ECF No. 487) is GRANTED as follows:

1.      The Court finds the Settlement Agreement was entered into in good faith, and is fair, reasonable, and consistent with the purposes of CERCLA and the UCFA.

2.      The Moving Parties shall file the revised proposed bar order within ten (10) days from the date this Order is filed.  Any objections shall be filed within ten (10) days from the date the proposed bar order is filed.

DATED:  April 21, 2015

**WILLIAM Q. HAYES**
United States District Judge